IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WYETH LLC, WYETH PHARMACEUTICALS LLC, PF PRISM C.V., PFIZER PHARMACEUTICALS LLC, and PFIZER PFE IRELAND PHARMACEUTICALS HOLDING 1 B.V., | ) ) ) ) ) ) | Redacted- Public Version |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 16-1305-RGA |
| ALEMBIC PHARMACEUTICALS, LTD., *et al.* | ) ) ) | **CONSOLIDATED** |
| Defendants. | ) ) ) | ▮▮▮▮▮▮▮ |

## BRIEF IN SUPPORT OF SUN'S MOTION TO EXCLUDE
## THE OPINIONS AND TESTIMONY OF BERNHARDT TROUT, PH.D

OF COUNSEL:
Stephen P. Benson
Kimberly A. Beis
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000

Huiya Wu
Daniel P. Margolis
Cindy Chang
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Joshua Weinger
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-8361

Dated: August 30, 2019

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants Sun Pharmaceutical Industries Inc. and Sun Pharmaceutical Industries Limited*

## TABLE OF CONTENTS

I.   Nature and Stage of the Proceedings ........................................................................1

II.  Summary of Argument and Statement of Facts ..................................................1

III. Legal Standards..............................................................................................2

IV.  Dr. Trout's Opinions and Testimony Regarding Anticipation
     of the '625 Patent Should be Excluded.................................................................3

     A.   Dr. Trout is Not Qualified to Opine Regarding
          Anticipation of the '625 Patent ...........................................................3

          1.   Dr. Trout Does Not Qualify as a Person of Ordinary Skill
               in the Art ................................................................................3

          2.   Dr. Trout Fundamentally Does Not Understand
               the Process or Requirements for Animal Studies
               in Drug Development.................................................................5

     B.   Dr. Trout Is Unable to Define "Pharmaceutically
          Acceptable Composition" ...................................................................7

     C.   Dr. Trout Repeatedly Walks Away From or Contradicts
          the Opinions Expressed in His Expert Report .........................................9

     D.   Dr. Trout "Does not Have an Opinion" on Fundamental
          Issues Relating to His Opinion ...........................................................10

V.   Conclusion ..................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bourjaily v. United States*,
    483 U.S. 171 (1987)................................................................................................................2

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
    350 F.3d 316, 322 (3d Cir. 2003) ..........................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993)...........................................................................................................2, 3

*Elcock v. Kmart Corp.*,
    233 F.3d 734 (3d Cir. 2000)...................................................................................................2

*Meadows v. Anchor Longwall and Rebuild, Inc.*,
    306 Fed. App'x. 781 (3d Cir. 2009)........................................................................................2

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)...................................................................................................2

*Pell v. E.I. DuPont De Nemours & Co.*,
    231 F.R.D. 186 (D. Del. 2005)...............................................................................................2

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
    550 F.3d 1356 (Fed. Cir. 2008)..........................................................................................3, 5

**OTHER AUTHORITIES**

Fedearl Rule of Evidence 702................................................................................................2, 3, 5

## I.      Nature and Stage of the Proceedings

This is a patent infringement action relating to the alleged infringement and invalidity of three patents which purportedly cover Plaintiffs' marketed product containing bosutinib.   The parties have completed expert discovery, including expert reports and expert deposition and are preparing for trial in early November.   In the Scheduling Order the Court allowed Daubert briefing at the end of expert discovery, and Sun presents this brief in support of its Motion to Exclude the Testimony and Opinions of Bernhardt Trout, Ph.D.

## II.     Summary of Argument and Statement of Facts

Dr. Trout was engaged by Plaintiffs as one of four (4) individuals to respond to the Opening Invalidity Report of Dr. Craig Lindsley.   Specifically, Dr. Trout was asked to respond to Dr. Lindsley's opinion that U.S. Patent No. 7,919,625 ("the '625 patent") is invalid due to anticipation.[1]   Dr. Trout opines "a POSA reading Boschelli 2001 would not have understood it to disclose a pharmaceutical composition comprising bosutinib.  Thus, my opinion is that Boschelli 2001 does not anticipate the '625 patent."  Ex. A (Trout Rpt). ¶ 81.   Sun seeks to exclude the opinions and testimony of Dr. Trout because he does not have the requisite knowledge, expertise or understanding of the pertinent art to opine on anticipation of the '625 patent and his opinions are not reliable.   More specifically and explained in more detail below:

1.  Dr. Trout does not qualify as a Person of Ordinary Skill in the Art ("POSA")

2. Dr. Trout does not understand the process or requirements for animal studies in drug development

3. Dr. Trout is unable to define "pharmaceutically acceptable composition"

---

[1] Dr. Lindsley offers additional opinions regarding invalidity due to obviousness, lack of written description, enablement and indefiniteness, which are responded to by three other individuals retained by Plaintiffs.

4.  Dr. Trout walks away from and contradicts the opinions expressed in his report

5.  Dr. Trout "does not have an opinion" on fundamental issues relating to his opinion and conclusions.

## III.    Legal Standards

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.,* 509 U.S. 579 (1993).  "Rule 702 has three requirements:  (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring specific, technical or specialized knowledge, *i.e.*, must be reliable; and (3) the expert's testimony must assist the trier of fact, *i.e.*, must be fit."  *Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 Fed. App'x. 781, 788 (3d Cir. 2009).  The relevant factors to be considered when assessing the reliability of an expert's testimony include:  "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."  *Oddi v. Ford Motor Co*., 234 F.3d 136, 145 (3d Cir. 2000) (citing *In re Paoli*, 35 F.3d at 742 n.8).  However, the list is "nonexclusive" and "each factor need not be applied in every case."  *Elcock v. Kmart Corp*., 233 F.3d 734, 741 (3d Cir. 2000).  The party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

2

The qualification requirement examines whether the witness has "specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise." *Pell v. E.I. DuPont De Nemours & Co.*, 231 F.R.D. 186, 192 (D. Del. 2005). In a patent case, an expert testifying on validity or infringement must have at least the expertise of a person of ordinary skill in the art ("POSA"). *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363–64 (Fed. Cir. 2008). Further, an expert's opinions "must be confined to [the expert's] field" of expertise. *Pell*, 231 F.R.D. at 192. "An expert may be generally qualified but may lack qualifications to testify outside his area of expertise." *Calhoun*, 350 F.3d 322 (holding that expert in investigating "aquatic related accident[s]" could testify about "different types of jet skis and their operation," but not whether specific jet ski designs were safe). The more specific the opinions given, the more specific the knowledge required. *Calhoun*, 350 F.3d at 322. Rule 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert,* 509 U.S. at 589.

## IV.  Dr. Trout's Opinions and Testimony Regarding Anticipation of the '625 Patent Should be Excluded

### A.  Dr. Trout is Not Qualified to Opine Regarding Anticipation of the '625 Patent

#### 1.  Dr. Trout Does Not Qualify as a Person of Ordinary Skill in the Art

At the outset, Dr. Trout does not qualify as a POSA under either party's definition and most certainly does not qualify as a POSA under Pfizer's definition. In his report, Dr. Trout notes Pfizer's definition of a POSA is:

> someone having the knowledge of (1) an M.D. with several years of experience as an oncologist treating patients with CML; (2) a Ph.D. with several years of experience conducting research on inhibition of tyrosine kinases; and (3) a person with a Ph.D in medicinal chemistry, pharmacology or a related field with several

3

years of experience in drug development and formulation.  *See* Ex. B (Trout Rpt)
¶25, citing D.I. 91 at 4.

Dr. Trout goes on to note under Pfizer's proposal, a **single** hypothetical individual would have all of the relevant experience.  Ex A. (Trout Rpt.) ¶ 27.  At his deposition, Dr. Trout admitted he is not POSA under Pfizer's full definition and qualifies his "skill is really focused on the third part of that definition."  Ex. B (Trout Tr.) at 21:7-14. Under Sun's definition Dr. Trout similarly fails to meet the standard for a POSA.  Sun's proposed definition is a person with:

> a high level of skill, such as an M.D. and several years of experience as an oncologist treating patients with CML, or a Ph.D. and several years of experience conducting research on inhibition of tyrosine kinases.  A POSA would have access to and could have collated with individual with pertinent experience, such as medicinal chemistry, biology, pharmacology and/or drug metabolism and pharmacokinetics.  A POSA could have a lower degree of formal education is such person had a high degree of expertise. D.I. 91 at 5.

Dr. Trout does not have any experience with the treatment for CML, "outside of just reading the documents in this case."  Ex. B. (Trout Tr.) at 12:21-24.  Prior to his engagement in this matter, Dr. Trout did not have a specific or detailed understanding of CML, other than knowing Gleevec was a pharmaceutical for the treatment of cancer.  *Id*. at 12:25-13:12.  Dr. Trout gained his understanding of CML ("to the extent [he has] an understanding") from the '625 patent, the background in Dr. Lindsley's report and some of the exhibits.  *Id*. at 14:5-15. Dr. Trout admitted he does not have any experience conducting research specifically on inhibition of tyrosine kinases.  *Id*. 15:12-18.  Further, his background knowledge on inhibition of tyrosine kinases is general in terms of his study of drug development and inhibition broadly, his understanding is not specific as it relates to the treatment of CML, and his understanding of the role of inhibition of tyrosine kinases in the treatment for CML is based on his general educational background and the documents he reviewed for this matter.  *Id*. at 15:19-16:19.

Prior to his engagement in this matter, he did not have any specific understanding of how tyrosine kinases and/or their inhibition were implicated in CML therapy. *Id*. at 16:20-16:25.

In a patent case, an expert testifying on validity or infringement must have at least the expertise of a person of ordinary skill in the art ("POSA"). *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363–64 (Fed. Cir. 2008) In this case, the issues call for consideration of evidence from the perspective of a POSA, and it would be "contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art." *Id*.  More specifically, "a witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of the underlying questions, such as the nature of the claimed invention, what a prior art references discloses, or whether the asserted claims read on the prior art reference." *Id* at 1364.  Based on Dr. Trout's background and his testimony, his knowledge and experience do not qualify him as a POSA nor is his expertise appropriately relevant to the pertinent art.  Dr. Trout's testimony should be excluded as he is not qualified to opine in relation to the pertinent art and his testimony will not assist the trier of fact.

### 2.     Dr. Trout Fundamentally Does Not Understand the Process or Requirements for Animal Studies in Drug Development

Dr.  Trout correctly notes an anticipation defense focuses on "whether a POSA would *reasonably understand or infer* that every claim element is disclosed in that reference."  Ex. A (Trout Rpt.) ¶31 (emphasis added).  However, Dr. Trout's testimony and misunderstanding of the pertinent art makes it clear he is unable to testify as to what a POSA would reasonably understand or infer Boschelli 2001 to disclose. Dr. Trout repeatedly makes incorrect and contradictory assumptions and conclusions, and fails to provide knowledge or opinions relating to the pertinent art.

Dr. Trout criticizes the Boschelli 2001 reference and determines it does not anticipate the '625 patent, because it was not clear to him "the researches took care to synthesize [bosutuinb] for use in animal studies such that the active compound being evaluated would be "pharmaceutically acceptable."  Ex. A (Trout Rpt) ¶ 68.  He further criticizes Boschelli for not disclosing "that the research took care to procure and use pharmaceutical grade excipients when preparing the composition administered in the reported animal studies." Ex. A (Trout Rpt) ¶ 74. The basis for his opinion is premised on a misreading of the prior art.

A principal reference Dr. Trout relies on for this opinion is Wolff 2003.  When specifically confronted with the Wolff reference Dr. Trout admitted Wolff states the use of non-pharmaceutical grade excipients should be based on 1) scientific necessity 2) nonavailability of an acceptable veterinary or human pharmaceutical grade compound and 3) specific review and approval by the IACUC.  Ex. B. (Trout Tr.) at 79:14-21.   In line with the disclosure of Wolff, Dr. Trout was asked what im Boschelli would lead him to believe there was a scientific necessity to use non-pharmaceutical grade excipients.  His response was "I would say it the other way around.   There was not a scientific necessity for Boschelli to use pharmaceutical grade compounds." Ex. B. (Trout Tr.) at 79:23-80:7.  This is directly contradictory to Wolff, the very reference Dr. Trout relies upon to justify his opinions. Dr. Trout's misinterpretation of Wolff highlights his lack of understanding of the basics relating to animal research.

Dr. Trout's misunderstanding is understandable given he has never conducted animal research. Further, he admitted he did not consult with any of his colleagues who conduct animal research to determine their standard practice. Ex. B. (Trout Tr.) at 81:18-23.  Dr. Trout could not state whether a POSA in the art reading Boschelli would believe it was more likely than not that the TWEEN 80 used in Boschelli was pharmaceutical grade, only that there was no indication it

was pharmaceutical grade.  Ex. B. (Trout Tr.) at 92:11-93:2.  However, based on Wolff and other references, it is clear a POSA would reasonably understand or infer pharmaceutical grade excipients were used, because that is the standard and there was no indication otherwise.  *See* Ex. C (Wolff).

Dr. Trout concedes a pharmaceutical composition according to the '625 patent includes compositions formulated for use in animal laboratory research. The Boschelli reference is directed to use of a composition in just such a context. However, Dr. Trout has never done research in laboratory animals and has never read the two governing documents setting out the standards for laboratory research in animals. Ex. B. (Trout Tr.) at 36:25-38:21. Not surprisingly, when confronted with questions regarding the requirements relating to animal research, Dr. Trout repeatedly responded with "I don't have an opinion on that."  *See* Ex. B (Trout Tr. 106:18-108:18). Specifically, Dr. Trout was asked whether researchers working with laboratory animals have a duty to ensure the research causes the least possible harm to the animal - Dr. Trout did not have an opinion.  Dr. Trout did also did not have an understanding as to the requirements for providing veterinary care to laboratory animals. and did not have an opinion

A POSA reading the Boschelli reference *would* have an understanding of the requirements for conducting laboratory research and it would have informed their understanding and inference of what the Boschelli reference discloses. Dr. Trout is unable to, and indeed does not, provide any reliable opinions on what a POSA would reasonably understand or infer Boschelli to be disclosing about the composition used in the animal studies. As such, Dr. Trout lacks the necessary knowledge and understanding of the pertinent art to testify in this matter and his testimony should be excluded.

### B.    Dr. Trout Is Unable to Define "Pharmaceutically Acceptable Composition"

The opinion Dr. Trout purports to offer is exceedingly narrow, namely that the Boschelli reference *does not* say the composition it uses to inhibit tumors in mice is a "pharmaceutically acceptable" composition. In fact, Dr. Trout never offers the opinion the composition of Boschelli is *not* pharmaceutically acceptable. *See e.g.* Ex. B (Trout Tr.) at 151:24-152:11. It is not surprising he is unable to reach that conclusion given Dr. Trout was unable to define the criteria one would have to meet to arrive at a "pharmaceutically acceptable" composition.

Dr. Trout offered the opinion Boschelli does not disclose a "pharmaceutically acceptable" composition because (1) the bosutinib was *likely* not pure; and (2) Boschelli does not disclose the excipients used were pharmaceutical grade excipients. Ex. A (Trout Rpt.) ¶¶66-74.[2] However, when asked if the composition of Boschelli would be "pharmaceutically acceptable" if it used pure bosutinib and pharmaceutical grade excipients, Dr. Trout didn't have an opinion. Ex. B (Trout Tr.) at 72:6-75:24. He also didn't form an opinion as to whether the composition could have been reproduced in such a way to make it pharmaceutically acceptable. *Id.* at 157:17-158:3.

Dr. Trout's failure underpins the fact he cannot say what a "pharmaceutically acceptable" composition would be in the context of the '625 patent. Dr. Trout was repeatedly asked what, if anything, would be pharmaceutically acceptable pursuant to the claims. He was unable to do so. *See* Ex. B (Trout Tr.) at 133:4-138:6; 141:11-23; 149:8-150:9. In fact, Dr. Trout does not even know if the *only composition* disclosed in the '625 patent is a pharmaceutically acceptable composition. Ex. B (Trout Tr.) at 165:19-166:7. Dr. Trout's opinions are fundamentally unreliable because he cannot say with any degree of clarity of thought what would constitute a pharmaceutically acceptable composition as that term is used in the '625 patent.

---

[2] Dr. Trout agrees every excipient used in the Boschelli composition are disclosed in the '625 patent and are generally recognized as safe by FDA.

**C.      Dr. Trout Repeatedly Walks Away From or Contradicts the Opinions Expressed in  His Expert Report**

Throughout Dr. Trout's deposition, he contradicted his own expert report by stating he had no opinion on things he explicitly addressed in his report.

In Dr. Trout's report he offers the opinion "the mice [in the Boscelli experiment] did not have CML, and [bosutinib] was not being administered to provide a therapeutic benefit." Ex. A (Trout Rpt) ¶ 67 . Dr. Trout's opinions are further premised on his belief the API used in the experiments were being produced for "screening experiments." *See, e.g., id*  at ¶ 69.  But at his deposition, Dr. Trout was asked what the objective was of administering the composition to the mice and he answered he didn't have an opinion:

> Q: What was the objective of the Boschelli folks in administering the composition containing bosutinib, Tween 80 and dextrose?"
> …
> A: I didn't speak in my report about the specific objective, so I didn't express an opinion about that."

Ex. B (Trout Tr.) at 145:22-146:5; *see also* 146:19-147:15.

It is fundamentally contradictory to on the one hand express an opinion about the reason a composition was being administered to the mice and simultaneously testify he did not consider why the compositions were being administered to the said same mice. Put differently, Dr. Trout cannot simultaneously offer opinions a composition was "not being administered to provide a therapeutic benefit" and the API was being produced to be used in "screening experiments" and testify he has no opinion about the objective of administering the composition to laboratory animals.

Dr. Trout's failure to offer an opinion on why the composition was being administered further undercuts his related testimony that one would have to have an understanding of the

objectives of administering a compound to understand whether it was a "pharmaceutically acceptable composition."

> Q: Do you have an opinion about what a composition administered to a laboratory animal would have to look like in order for it to be considered pharmaceutically acceptable?
>
> A: … And, again, it would depend on the context, what the study was done for, and I would have to analyze those details."

Ex. B. (Trout Tr.) at 141:11-23.

As previously demonstrated, Dr. Trout cannot define what a "pharmaceutically acceptable composition" is, does not know whether the composition of Boschelli is "pharmaceutically acceptable" and is not qualified to ascertain whether a POSA would reasonably understand or infer it was pharmaceutically acceptable. Furthermore, Dr. Trout failed to undertake the very same analysis he testified was necessary to determine whether the composition was pharmaceutically acceptable. In view of this failure alone, he should not be permitted to testify as to the anticipation of the sole asserted claim of the '625 patent.

### D.     Dr. Trout "Does not Have an Opinion" on Fundamental Issues Relating to His Opinion

Dr. Trout was either unable or unwilling to offer multiple opinions central to his ultimate conclusions.  For example, Dr. Trout testified he does not have an opinion/understanding as to whether or not Claim 1 of the '625 patent requires treating CML with a pharmaceutically acceptable composition.  Ex. B (Trout Tr.) at 48:25-49:8.  Further, as noted above, in reviewing the '625 patent, Dr. Trout made clear he did not have an opinion as to whether the composition disclosed in the patent described a pharmaceutically acceptable composition.  Ex. B (Trout Tr.) at 165:19-166:2.

Further, should Dr. Trout be allowed to testify at trial, Dr. Trout should not be allowed to offer any testimony or opinion regarding any alleged interchangeability of the terms "treating"

and "inhibiting" as used in the '625 patent.   Ex. A (Trout Rpt.) ¶37, fn. 1.    At Dr. Trout's deposition he stated he did not use those terms interchangeably in formulating his opinions, but was "observing that I think the '625 patent does so."   Ex. B (Trout Tr.) at 22:17-23:11.   This statement is consistent with his repeated testimony that he does not understand or did not analyze issues central to his opinions and this matter.

## V.    Conclusion

Based on the foregoing, Sun respectfully requests this Court entering an Order excluding Dr. Trout's opinions and testimony from being presented or relied upon in this matter.

|  | */s/ Nathan R. Hoeschen* |
|---|---|
|  | John W. Shaw (No. 3362) |
|  | Karen E. Keller (No. 4489) |
|  | Nathan R. Hoeschen (No. 6232) |
| OF COUNSEL: | SHAW KELLER LLP |
| Huiya Wu | I.M. Pei Building |
| Daniel P. Margolis | 1105 North Market Street, 12th Floor |
| Steven J. Bernstein | Wilmington, DE 19801 |
| Cindy Chang | (302) 298-0700 |
| GOODWIN PROCTER LLP | jshaw@shawkeller.com |
| The New York Times Building | kkeller@shawkeller.com |
| 620 Eighth Avenue | nhoeschen@shawkeller.com |
| New York, NY  10018 | *Attorneys for Defendants Sun* |
| (212) 813-8800 | *Pharmaceutical Industries Inc. and Sun* |
| Joshua Weinger | *Pharmaceutical Industries Limited* |
| GOODWIN PROCTER LLP |  |
| 100 Northern Avenue |  |
| Boston, MA 02210 |  |
| (617) 570-8361 |  |

Kimberly A. Beis
Stephen P. Benson
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60606
(312) 360-6000 (312) 902-5200

Dated: August 30, 2019

## CERTIFICATE OF SERVICE

I, Nathan R. Hoeschen, hereby certify that on August 30, 2019, this document was served

on the persons listed below in the manner indicated:

### BY EMAIL

Jack B. Blumenfeld
Maryellen Noreika
MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com
*Attorneys for Plaintiffs*

Aaron Stiefel
Daniel P. DiNapoli
Stephanie Piper
Victoria L. Reines
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
aaron.stiefel@apks.com
daniel.dinapoli@apks.com
stephanie.piper@apks.com
victoria.reines@apks.com
*Attorneys for Plaintiffs*

Soumitra Deka
ARNOLD & PORTER KAYE
  SCHOLER LLP
Two Palo Alto Square
3000 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 319-4500
soumitra.deka@apks.com
*Attorneys for Plaintiffs*

Ali Haghighi
ARNOLD & PORTER KAYE
  SCHOLER LLP
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017
(213) 243-4000
ali.haghighi@apks.com
*Attorneys for Plaintiffs*

Rachel Shen
ARNOLD & PORTER KAYE
  SCHOLER LLP
Three Embarcadero Center
10th Floor
San Francisco, CA 94111
(415) 471-3100
rachel.shen@apks.com
*Attorneys for Plaintiffs*

Jesse A. Salen
SHEPPARD, MULLIN, RICHTER
  & HAMPTON, LLP
1227 El Camino Real, Suite 200
San Diego, CA 92130
(858) 720-8900
jsalen@sheppardmullin.com

Kelly E. Farnan
Nicole K. Pedi
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
farnan@rlf.com
pedi@rlf.com

April E. Weisbruch
SHEPPARD, MULLIN, RICHTER
  & HAMPTON, LLP
2099 Pennsylvania Avenue NW, Suite 100
Washington, DC 20006
(202) 747-1900
aweisbruch@sheppardmullin.com

Bradley C. Graveline
Manish K. Mehta
SHEPPARD MULLIN RICHTER
  & HAMPTON LLP
70 West Madison Street, 48th Floor
Chicago, IL 60602
bgraveline@sheppardmullin.com
mmehta@sheppardmullin.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendants Sun
Pharmaceutical Industries Inc. and
Sun Pharmaceutical Industries Limited*

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WYETH LLC, WYETH PHARMACEUTICALS LLC, PF PRISM C.V., PFIZER PHARMACEUTICALS LLC, and PFIZER PFE IRELAND PHARMACEUTICALS HOLDING 1 B.V., | ) ) ) ) ) ) | Redacted- Public Version |
| Plaintiffs, | ) ) ) | C.A. No. 1:16-cv-01305-RGA CONSOLIDATED |
| v. | ) ) | |
| ALEMBIC PHARMACEUTICALS, LTD., ALEMBIC PHARMACEUTICALS, INC., SUN PHARMACEUTICAL INDUSTRIES LIMITED, and SUN PHARMACEUTICAL INDUSTRIES, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## RESPONSIVE EXPERT REPORT OF BERNHARDT L. TROUT, PH.D. REGARDING THE VALIDITY OF U.S. PATENT NO. 7,919,625







    d.   background on the '625 patent; and

    e.   my opinion that claim 1 of the '625 patent is not anticipated by Boschelli

    2001.

## III.   PERSON OF ORDINARY SKILL IN THE ART

25.    I understand that Pfizer has taken the position that, in the context of the '625

patent, a POSA is:

> someone having the knowledge of (1) an M.D. with several years of experience as
> an oncologist treating patients with CML; (2) a Ph.D. with several years of
> experience conducting research on inhibition of tyrosine kinases; and (3) a person
> with a Ph.D. in medicinal chemistry, pharmacology, or a related field with several
> years of experience in drug development and formulation.

(Joint Claim Construction Br., D.I. 91, at 4 (Ex. D)).

26.    I understand that Sun has further stated that in the context of the '625 patent:

> a POSA would have a high level of skill, such as an M.D. and several years of
> experience as an oncologist treating patients with CML, or a Ph.D. and several
> years of experience conducting research on inhibition of tyrosine kinases. A
> POSA would have access to and could have collaborated with individuals with
> pertinent experience, such as a medicinal chemistry, biology, pharmacology,
> and/or drug metabolism and pharmacokinetics. A POSA could have a lower
> degree of formal education if such person had a higher degree of experience.

(Ex. D at 5).

27.    It is my understanding that Pfizer and Sun do not dispute the type of experience to

which a POSA would have access.  In Pfizer's proposal, a single hypothetical individual would

have all of the relevant experience.  In Sun's proposal, the narrower experience of one individual

would be supplemented by the knowledge of team members regarding other disciplines.  My

opinions are the same regardless of which definition is applied.

## IV.   LEGAL STANDARDS

28.    I am informed that Sun has challenged the validity of the one claim set forth in the

'625 patent on several grounds including, *inter alia*, anticipation.

### A.    Claim Construction

29.    I understand that the validity of the '625 patent must be evaluated in light of the claim that appears in the '625 patent as properly construed.  I have read Judge Andrews' June 27, 2018 claim construction opinion, (Markman Order, D.I. 98) (Ex. E), which construed a term in the claim of the '625 patent as follows:

| Claim Term | Court's Construction |
|---|---|
| "pharmaceutical composition" ('625 patent claim 1) | "a pharmaceutically acceptable composition containing the specified compound and one or more excipients" |

(Ex. E at 1).

30.    I have applied this construction in performing the analysis in this report.

### B.    Anticipation

31.    I have been advised by Pfizer's lawyers that for a reference to anticipate a patent claim, it must disclose every element of that claim.  The question is not whether a prior art reference suggests each element, but whether a POSA would reasonably understand or infer that every claim element is disclosed in that reference.

32.    I further understand that, in order to anticipate a claimed invention, a prior art reference must enable one of ordinary skill in the art to make the invention without undue experimentation.

## V.    INFORMATION AND MATERIALS CONSIDERED

33.    In preparing this report, I have reviewed and relied upon the materials listed in Exhibit F, including the materials cited and listed in this report.  My opinions are based in part on my review of those documents and materials.

34.    I have also relied on my education, experience, and knowledge of industry practices as well as my understanding of the applicable legal principles described above.























67,377, 67,378-79 (Dec. 24, 1997) (Ex. EE).   The pharmaceutical composition must also be manufactured and maintained with appropriate sterility.   This is particularly important for pharmaceutical compositions that are meant to be injected.   (FDA Q6A Specifications, Ex. CC § 3.3.2.3(c).; *see also Remington* ch. 41, Ex. AA at 783-84).

65.     Finally, in a pharmaceutical composition the excipients used must be compatible with each other and with the API.   (*Remington* ch. 38, Ex. K at 713-14).   Such compatibility is essential in a pharmaceutical composition.   Both dextrose and Tween-80 have incompatibilities with certain pharmaceuticals and other compounds that must be taken into account when developing pharmaceutical compositions that include those ingredients.   (Arthur H. Kibbe, ed, *Dextrose*, *in Handbook of Pharmaceutical Excipients* 175, 176 (3rd ed. 2000) (Ex. FF); Arthur H. Kibbe, ed, *Polyoxyethylene Sorbitan Fatty Acid Esters*, *in Handbook of Pharmaceutical Excipients* 416, 419 (3rd ed. 2000) (Ex. GG)).

## IX.    CLAIM 1 OF THE '625 PATENT IS NOT ANTICIPATED BY BOSCHELLI 2001

66.     Claim 1 of the '625 patent is not anticipated by Boschelli 2001 because Boschelli 2001 does not disclose a pharmaceutical composition comprising bosutinib.

67.     As discussed above in Section VII, Boschelli 2001 discloses a newly lab-synthesized compound that is tested in animal experiments.   In those animal studies reported in Boschelli 2001, human CML tumor cells were introduced into laboratory mice, and the tumors were assessed after administration of compound 31a.   The mice did not have CML, and compound 31a was not being administered to provide a therapeutic benefit.   The animals were to be sacrificed after testing.   There is no suggestion in Boschelli 2001 that the researchers took care to develop a "pharmaceutically acceptable composition" in conducting these initial animal studies.   *See Remington* ch. 10, Ex. L at 87; *Remington* ch. 39, Ex. BB at 721-22.

21

### A.      Boschelli 2001 Does Not Disclose the Synthesis of a Pharmaceutically Acceptable API

68.      There is no disclosure in Boschelli 2001 that the researchers took care to synthesize compound 31a for use in the animal studies such that the active compound being evaluated would be "pharmaceutically acceptable." *See Remington* ch. 10, Ex. L at 87.

69.      As explained in more detail below, the chemical synthesis disclosed in Boschelli 2001 was not designed to lead to, and likely would not have led to, a pharmaceutically acceptable API.  Boschelli 2001 describes an initial laboratory procedure intended to produce a material that could be used in screening experiments.  (Boschelli 2001, Ex. B at 3974).  Boschelli 2001 includes no indication that there was any effort to produce compound 31a under conditions suitable for its inclusion in a pharmaceutical composition or to confirm its suitability for use in a pharmaceutical composition.  *See Remington* ch. 10, Ex. L at 87.

70.      A POSA reading Boschelli 2001 would conclude that compound 31a was synthesized without much attention paid to purification or to any of the specifications required for active compounds that are to be included in a pharmaceutical composition; compound 31a most likely contained impurities such that it would not have been pharmaceutically acceptable.

71.      As discussed above in Section VIII.A, to be pharmaceutically acceptable, an active compound must meet specifications including a maximum of net percentage impurities and maxima of each impurity.  There is no indication that the main separation step disclosed in Boschelli 2001, a basic "column chromatography," reduces impurities to pharmaceutically acceptable levels.  (Boschelli 2001, Ex. B at 3974).  Indeed, this separation method is not used for creating pharmaceutically acceptable actives, but rather is used only for a crude separation. When creating a pharmaceutically acceptable active, appropriate particle size and type, pressure, column length, and flow rate must all be taken into account during the separation step.  Crude

22

column chromatography of the kind used in Boschelli 2001 does not take these factors into account.  *See* A.M. Katti & P. Jagland, *Development and Optimization of Industrial Scale Chromatography for Use in Manufacturing*, 26 Analusis Mag. 38, 45-46 (1998) (Ex. HH) (discussing the conditions which must be optimized for using the chromatography process past the discovery stage).  Additionally, the large range of the melting point of compound 31a reflects a large fraction of impurities in the compound.  *See* Steven A. Hardinger, *A Simple Demonstration of the Effect of Impurities on Melting Point*, 72 J. Chemical Educ. 250, 250 (1995) (Ex. II).

72.     Further, Boschelli 2001 does not reflect any measurement or characterization of the impurities in compound 31a or otherwise suggest that the specifications required for a pharmaceutical composition were met.  *See* FDA Q6A Specifications, Ex. CC at §§ 3.2–3.3; *see also Remington* ch. 36, Ex. M at 669; Leonard C. Baily, *Ch. 33: Chromatography*, *in Remington: The Science and Practice of Pharmacy* 587, 587 (Alfonso R. Gennaro et al. eds., 20th ed. 2000) (Ex. JJ).  The only characterization done of compound 31a, other than of its melting range, was aimed at confirming that compound 31a was in fact the compound the researchers had intended to synthesize.  (Boschelli 2001, Ex. B at 3974).

73.     Boschelli 2001's lack of attention to the impurity levels in compound 31a is also apparent in the filtration step of the synthesis.  Boschelli 2001 describes the use of the solvents methanol and dichloromethane, also known as methylene chloride, in synthesizing compound 31a.  (Boschelli 2001, Ex. B at 3974).  The FDA categorizes both methanol and dichloromethane as Class 2 solvents and requires strict concentration limits of these solvents in pharmaceutical compositions.  *See* FDA Q3C Impurities, Ex. EE at 67,381, Table 2.  There is no indication in Boschelli 2001 that the methanol and dichloromethane left in the compound as residual solvents

23

were removed during the filtration step through drying.  Boschelli 2001 also fails to mention any testing done to determine whether the residual solvent levels in compound 31a fell below acceptable limits.

**B.     Boschelli 2001 Does Not Disclose the Use of Pharmaceutically Acceptable Excipients**

74.     In addition to failing to disclose the creation of a pharmaceutically acceptable active compound, Boschelli 2001 does not disclose that the researchers took care to procure and use pharmaceutical grade excipients when preparing the composition administered in the reported animal studies.  Specifically, nothing in Boschelli 2001 suggests that the inactive components of Tween-80, dextrose, and water included with compound 31a in the formulation administered to the laboratory mice were pharmaceutical grade or would have been pharmaceutically acceptable as used.  *See Remington* ch. 10, Ex. L at 87; *Remington* ch. 39, Ex. BB at 721-22.  As discussed above in Section VIII.B, paragraph 62, the rigorous USP-NF standards required for components of pharmaceutical compositions need not apply to the use of compounds for tests involving laboratory animals.  (Wolff 2003, Ex. T at 34).   Compositions used for tests involving laboratory rodents may be made with laboratory grade materials.

**C.     Boschelli 2001 Does Not Disclose the Use of Procedures Required for Making Pharmaceutically Acceptable Compositions**

75.     There is no indication in Boschelli 2001 that the researchers that conducted the animal testing followed production procedures that would have produced an aqueous-based pharmaceutically acceptable composition.  *See Remington* ch. 41, Ex. AA at 781.

76.     As discussed above in Section VIII.B, paragraph 60, the water used in pharmaceutical compositions, particularly those formulated for injection, must meet rigorous standards to the ensure sterility of the composition.  *See* USP25-NF20 Water, Ex. Z at 1809-10;

24





# Exhibit B

1

2    IN THE UNITED STATES DISTRICT COURT

     FOR THE DISTRICT OF DELAWARE

3    Civil Action No. 16-1305-RGA

     --------------------------------------X

4    WYETH LLC, WYETH PHARMACEUTICALS INC.

5    et al.,

6                Plaintiffs,

7         -against-

8    ALEMBIC PHARMACEUTICALS, LTD., et al.,

9                Defendants.

     --------------------------------------X

10

11                  ** CONFIDENTIAL **

12

13    VIDEOTAPED DEPOSITION OF BERNHARDT TROUT, Ph.D.

14

15                  New York, New York

16              Wednesday, August 7, 2019

17

18

19

20

21

22

23    Reported by:

24    JEFFREY BENZ, CRR, RMR

25    JOB NO. 165308

Page 2

1
2
3
4
5        August 7, 2019
6          9:04 a.m.
7
8
9        Videotaped Deposition of BERNHARDT TROUT,
10  Ph.D., held at the offices of Freeborn & Peters
11  LLP, 230 Park Avenue, New York, New York, before
12  Jeffrey Benz, a Certified Realtime Reporter,
13  Registered Merit Reporter and Notary Public of the
14  State of New York.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2        A P P E A R A N C E S:
3
4        ARNOLD & PORTER
5        Attorneys for Plaintiff Wyeth LLC
6          250 West 55th Street
7          New York, New York   10019
8        BY:  STEPHANIE PIPER, ESQ.
9
10       FREEBORN & PETERS
11       Attorneys for Defendant Sun Pharmaceuticals
12         311 South Wacker Drive
13         Chicago, Illinois  60606
14       BY:  STEPHEN BENSON, ESQ.
15         KIMBERLY BEIS, ESQ.
16
17       SHEPPARD, MULLIN, RICHTER & HAMPTON
18       Attorneys for Defendant Alembic Pharmaceuticals,
19       Ltd., et al.
20         2099 Pennsylvania Avenue, NW
21         Washington, D.C.  20006
22       BY:  APRIL WEISBRUCH, ESQ.
23
24       ALSO PRESENT:
25         PHIL RIZZUTI, Videographer

Page 4

1        Trout - Confidential
2        THE VIDEOGRAPHER:  This is the start
3   of Media labeled Number 1 of the
4   video-recorded deposition of Bernhardt
5   Trout in the matter of Wyeth
6   Pharmaceuticals Inc., et al., versus
7   Alembic Pharmaceuticals Ltd., et al., in
8   the United States District Court for the
9   District of Delaware, Case Number
10  16-1305-RGA.  This deposition is being held
11  at 230 Park Avenue, New York, New York, on
12  August 7, 2019, at approximately 9:04 a.m.
13       My name is Phil Rizzuti.  I am the
14  legal video specialist from TSG Reporting
15  Inc.  The court reporter is Jeff Benz, in
16  association with TSG Reporting.
17       Counsel, please introduce yourselves.
18       MR. BENSON:  Stephen Benson, from the
19  firm of Freeborn & Peters, on behalf of the
20  Sun defendants.
21       MS. BEIS:  Kimberly Beis, also from
22  Freeborn & Peters, on behalf of the Sun
23  defendants.
24       MS. WEISBRUCH:  April Weisbruch, from
25  Sheppard, Mullin, Richter & Hampton here

Page 5

1        Trout - Confidential
2   on behalf today of Alembic.
3        MS. PIPER:  Stephanie Piper, from
4   Arnold & Porter, here on behalf of the
5   plaintiffs.
6        THE VIDEOGRAPHER:  Will the court
7   reporter please swear in the witness.
8   BERNHARDT TROUT, Ph.D.,
9        called as a witness, having been first
10  duly sworn by Jeffrey Benz, a Notary
11  Public within and for the State of New
12  York, was examined and testified as
13  follows:
14  EXAMINATION BY MR. BENSON:
15       Q.  Good morning, Dr. Trout.
16       A.  Good morning.
17       Q.  As you heard during the introductions,
18  my name is Stephen Benson, and I represent the
19  Sun defendants.
20            And I understand from looking at your
21  CV that this is not your first time being
22  deposed, correct?
23       A.  Correct.
24       Q.  Okay.  So I'm not going to go into
25  details about the structure of a deposition,

Page 6

Trout - Confidential

1
2  with the understanding that you're familiar with
3  that.  However, I will just remind you that
4  giving deposition testimony is equivalent to
5  giving testimony in a court of law, the same
6  requirements for truthfulness and the same
7  requirement that you answer completely, to the
8  extent that you're able, any question that is
9  asked.  Do you understand those rules?
10      A.  Yes.
11      Q.  Okay.  And if you don't understand a
12  question, please feel free to let me know.  If
13  you want me to rephrase the question, we can do
14  that as well.  Okay?
15      A.  Okay.
16      Q.  And lastly, if you need to take a
17  break, just let me know.  I'm happy to
18  accommodate that.  Okay?
19      A.  Thank you.
20      Q.  Great.
21          Now, you -- at some time in your
22  engagement in this matter you received an expert
23  report by a Dr. Craig Lindsley; is that correct?
24      A.  Yes, I -- I think I received two
25  reports --

Page 7

Trout - Confidential

1
2      Q.  Okay.
3      A.  -- from Dr. Lindsley.
4      Q.  Okay.  And an opening report that
5  related to the invalidity of the -- let's see,
6  U.S. Patent Number -- let me get the full number
7  on the record.
8          7,919,625, correct?
9      A.  Yes.  I think his report discussed a
10  number of patents but that was the focus of my
11  analysis.
12      Q.  Okay.  And for the purposes of this
13  deposition, I'll refer to that particular patent
14  as "the '625 patent."  Okay?
15      A.  Okay.
16      Q.  Now, did you read the entirety of that
17  opening report of Dr. Lindsley?
18      A.  Yes.
19      Q.  Okay.  And my understanding, based on
20  looking at your own report, is that your
21  opinions are specifically focused on one opinion
22  provided by Dr. Lindsley relating to the
23  anticipation of the '625 patent; is that
24  correct?
25      A.  Broadly, I'm not sure if that's one

Page 8

Trout - Confidential

1
2  opinion or if it's multiple opinions.  But, yes,
3  the focus was the anticipation of the '625.
4      Q.  All right.  Now -- were you asked to
5  opine on any of the other bases of invalidity
6  presented by Dr. Lindsley in his opening report?
7      A.  No.
8      Q.  Okay.  Do you have any understanding
9  as to why you were asked specifically to address
10  just the anticipation argument as it relates to
11  the '625 patent?
12      A.  No broader understanding.  I just know
13  about the '625 and the opinions in my report.
14      Q.  Okay.  Having read Dr. Lindsley's
15  opening report, do you feel you were qualified
16  to address any of the other opinions
17  Dr. Lindsley presented as it relates to
18  invalidity of the '625 patent?
19          MS. PIPER:  Objection.  Outside the
20  scope of Dr. Trout's report and opinion.
21      A.  My focus and my task, as I outlined in
22  my expert report itself, was on the '625, so I
23  didn't really look into the details of the
24  others.
25      Q.  Okay.  I think my question was just a

Page 9

Trout - Confidential

1
2  little bit simpler.  It wasn't asking you to
3  give an opinion.  It's as to whether or not you
4  were able to determine, based on your review,
5  whether you were qualified to opine on the
6  issues presented in the remaining portions of
7  Dr. Lindsley's opening report?
8          MS. PIPER:  Objection.  Outside the
9  scope of what Dr. Trout was asked to
10  consider.
11      A.  I didn't look at it to the extent that
12  I could analyze whether I was qualified or not.
13  I -- I think that I'm qualified to give the
14  opinions that I gave in my report.
15          MR. BENSON:  Okay.  All right.  And
16  in -- why don't we go ahead and -- we have
17  previously marked a binder here as the --
18  Trout Exhibit Number 1, and I will have the
19  court reporter hand that to you.
20          (Dr. Trout's expert report, including
21  exhibits, was marked Trout Exhibit 1 for
22  identification, as of this date.)
23          THE WITNESS:  Thank you.
24      Q.  And I will represent to you that this
25  is a copy of your expert report that you've

Page 10

Trout - Confidential

1
2  provided in this case, along with the exhibits
3  cited therein.  But to -- to convince yourself
4  that I am correct, why don't you go ahead and
5  look at the report here, and let me know if you
6  agree that that appears to be the report you
7  provided in this case.
8      A.  So I flipped through the report in
9  Tab 1, and it looks like -- I mean, just on a
10  high level it looks like my report.
11     Q.  Okay.  Now, you -- after providing
12  your expert report, you are aware that
13  Dr. Lindsley prepared a reply report in response
14  to that, correct?
15     A.  Yes.
16     Q.  And did you have an opportunity to
17  read that report?
18     A.  Yes.
19     Q.  Okay.  And after reading that report,
20  have any of the opinions expressed in your
21  opening report or your response report changed?
22     A.  No.
23     Q.  Okay.  Did you formulate any
24  additional opinions based on your reading of
25  Dr. Lindsley's reply report?

Page 11

Trout - Confidential

1
2      A.  No, not based on what was in my
3  report.  I mean, those are the opinions in my
4  report, and so I stick to those opinions that I
5  gave.
6      Q.  Okay.  Is there anything at all you
7  would want to supplement today with respect to
8  your own opinions that you've not shared with
9  defendants?
10     A.  Not at this point in time.
11     Q.  Okay.  Fair enough.  All right.
12         So if I could direct you to your --
13  your expert report, paragraph 25, please.  And
14  this is the definition of a person of ordinary
15  skill in the art.
16         Now, based on your report, you have an
17  understanding, your own definition of a person
18  of ordinary skill in the art is a little
19  different from that presented by Dr. Lindsley,
20  correct?
21     A.  Yes, there's a little bit of a
22  difference, and I discuss that in paragraph 27.
23     Q.  Right.  But basically -- my
24  understanding from your report is, your opinions
25  wouldn't change were you to adopt Dr. Lindsley's

Page 12

Trout - Confidential

1
2  definition of a person of ordinary skill in the
3  art, correct?
4      A.  Yes.
5      Q.  And now, with respect to your own
6  opinion about a person of ordinary skill in the
7  art, first you believe that such a person would
8  have knowledge that would be possessed of an MD
9  with several years of experience as an
10  oncologist treating patients with CML, correct?
11     A.  That's part of the -- the knowledge of
12  that P-O-S-A.
13     Q.  And for clarity, CML is an
14  abbreviation for chronic myelogenous leukemia;
15  is that correct?
16     A.  That's my understanding.
17     Q.  Okay.  And for the court reporter,
18  myelogenous is spelled M-Y-E-L-O-G-E-N-O-U-S.
19  And I make no representations as to whether or
20  not I'm pronouncing that correctly.
21         Do you have any experience with the
22  treatment for CML?
23     A.  No, not outside of just reading the
24  documents in this case.
25     Q.  Okay.  So what was your understanding

Page 13

Trout - Confidential

1
2  of CML prior to your engagement in this case?
3      A.  I didn't have a -- a specific or
4  detailed understanding.  I knew broadly about
5  Gleevec is one of the pharmaceuticals, but I
6  didn't know much about CML per se.
7      Q.  Okay.  And what, if anything, did you
8  know about Gleevec?  Was it just generally that
9  it was a medicine for treating CML?
10     A.  Yes, that it's an important medicine
11  for treating, you know, leukemia or cancer
12  diseases.
13     Q.  Now, did you review that portion of
14  Dr. Lindsley's opening report wherein he talked
15  about CML?
16         MS. PIPER:  Objection.  Outside the
17  scope of what Dr. Trout was asked to opine
18  on.
19     A.  Yes, I reviewed his entire report.
20     Q.  And I think the question was simply,
21  you did review that portion.  Is there anything
22  about that, in reading about Dr. Lindsley's
23  description of CML, that you disagreed with?
24         MS. PIPER:  Objection.  Outside the
25  scope of what Dr. Trout was opine -- was

1    Trout - Confidential
2    said to opine on.
3        A.  I don't have any opinions about that
4    part of the report.
5        Q.  Okay.  Okay.  How did -- in this case,
6    how did you gain your understanding of CML?
7        A.  I gained my understanding from the
8    '625 patent, I mean, to the extent that I have
9    an understanding, and from just the background
10   that I read in Dr. Lindsley's report and maybe
11   in some of the other documents as exhibits.  But
12   I think that the main focus was the '625, a few
13   of the papers, a few of -- in the exhibit -- my
14   exhibits, and then Dr. Lindsley's report --
15   reports.
16       Q.  With respect to Dr. Lindsley's reply
17   report, did you focus on any section other than
18   that portion of his report that was replying to
19   your own opinions?
20       MS. PIPER:  Objection.  Outside the
21   scope of what Dr. Trout was asked to opine
22   on.
23       A.  I read the whole report, but, no,
24   my -- I think your question was about focus.  My
25   focus was on the paragraphs and other parts

1    Trout - Confidential
2    related to my opinions.
3        Q.  Okay.  Okay.  Returning very briefly
4    to your definition of a person of ordinary skill
5    in the art, it also includes the opinion that a
6    person of skill in the art would have the
7    knowledge of a person having a Ph.D. with
8    several years of experience conducting research
9    on inhibition of tyrosine kinases, correct?
10       A.  Yes, that's one of the parts to the --
11   to the definition, yes.
12       Q.  Okay.  What, if any, experience do you
13   have conducting research on inhibition of
14   tyrosine kinases?
15       A.  None, except -- not doing research, I
16   mean, just broad background reading from my
17   general knowledge, but not specific experience
18   doing research.
19       Q.  Can you kind of describe to me what
20   your background knowledge is of just, you know,
21   inhibition of tyrosine kinases?
22       A.  Yes.  Well, I studied biochemistry as
23   an undergraduate.  I continued learning about
24   cellular biology and protein biochemistry
25   post-undergraduate, certainly as an independent

1    Trout - Confidential
2    researcher when I joined MIT on the faculty in
3    1998, so I continued to gain knowledge in that
4    area.  And I understand and continue to learn
5    about drug development and inhibition broadly so
6    I have this kind of general understanding.
7        Q.  So is it fair to say your
8    understanding of the inhibition of tyrosine
9    kinases is not specifically as it relates to the
10   treatment of CML?
11       A.  Yes, that's correct.
12       Q.  What, if any, understanding do you
13   have about the role of the inhibition of
14   tyrosine kinases in the treatment for CML?
15       MS. PIPER:  Objection.  Outside the
16   scope of Dr. Trout's opinion.
17       A.  I just have broad understanding based
18   on the background that I just described and the
19   documents that I reviewed.
20       Q.  So prior to your engagement in this
21   case, did you have any understanding of how
22   tyrosine kinases and/or their inhibition were
23   implicated in CML therapy?
24       A.  Again, just very broadly.  Nothing
25   specific about that, no.

1    Trout - Confidential
2        Q.  All right.  And lastly, your opinion
3    regarding the knowledge of a person having
4    ordinary skill in the art includes a person with
5    a Ph.D. in medicinal chemistry, pharmacology, or
6    a related field with several years of experience
7    in drug development and formulation, correct?
8        A.  Yes.  Correct.
9        Q.  Okay.  Now, what, if any, experience
10   do you have -- can you -- well, strike that.
11       Can you describe for me your
12   experience in drug development and formulation
13   generally?
14       A.  Yes.  As an undergraduate at MIT in
15   the '80s, I worked on research related to
16   processing of pharmaceuticals and also enzymatic
17   catalysis.  I went on to do a Ph.D. in chemical
18   reactivity.  And then when I joined the MIT
19   faculty in 1998, I began an independent research
20   program focusing on formulation -- well, say,
21   drug development and formulation broadly.  And
22   so I have continued that research up till today.
23   I can go into all levels of detail as you like.
24       Q.  Your researches into drug development
25   and formulation, are they aimed at specific

Trout - Confidential

1  chemical compounds?  For example, you know,
2  active pharmaceutical ingredients, for example?
3      A.  Yes.  To qualify that, the broad focus
4  of my research is to develop new technologies
5  related to drug development, formulation, and
6  manufacturing.  In doing that we work on
7  specific pharmaceuticals, a range of
8  pharmaceuticals.
9      Q.  Just for clarity, how do you define
10  the term "pharmaceutical"?
11      A.  And you're talking about general, not
12  in the specific context, like --
13      Q.  Just generally --
14      A.  -- talking about the patent but just
15  generally?
16      Q.  Yes.  I think you said, you know, you
17  do work on specific pharmaceuticals, a range of
18  pharmaceuticals.  So, you know, when you're
19  using it generally in that sense, what is
20  your understanding of -- what is your definition
21  of a "pharmaceutical" as you use it there?
22      A.  In that particular sense I was
23  addressing your question which I interpreted as
24  a -- a specific API, or active pharmaceutical

Trout - Confidential

1  ingredient, so the active ingredient I guess in
2  a formulation or outside of a formulation.
3      Q.  So a medicinal drug, for example?
4          MS. PIPER:  Objection to form.
5      A.  I guess I would stick with the
6  terminology that I used.
7      Q.  Okay.  Now, you'll agree with me a
8  person of ordinary skill in the art, as you've
9  defined it, would understand a pharmaceutical
10  composition to include an API, or active
11  pharmaceutical ingredient, right?
12      A.  Yes.
13      Q.  And a person of ordinary skill in the
14  art would also understand a pharmaceutical
15  composition could include one or more excipients
16  as well, correct?
17      A.  Yes.  And, again, I want to qualify, I
18  know that's a term that has specific
19  implications in this case.  And I understand
20  we're just speaking broadly.  So outside of the
21  context of, let's say, a specific term in a
22  claim, yes.
23      Q.  Okay.  So generally speaking, just to
24  rehash, and, again, just speaking generally, a

Trout - Confidential

1  person of ordinary skill in the art, in your
2  opinion, hearing the term "pharmaceutical
3  composition" would think of an API and one or
4  more excipients, right?
5      A.  Yes, broadly speaking.  Again, I --
6  that seems to be a term that's a little bit more
7  used in a legal context than, let's say, a
8  technical context.  But if I put it into a
9  technical context, then, yes.
10      Q.  So is it -- I'm -- just so I
11  understand, is it -- are you saying that that
12  term like a "pharmaceutical composition" isn't
13  typically used in the art, like, the
14  pharmaceutical arts or the drug development
15  field?  Or you're just saying that it's used
16  both in a legal context here but also in a --
17  I'm just trying to understand.
18          MS. PIPER:  Objection to form.
19      A.  So it can be used in both contexts.
20      Q.  Okay.
21      A.  In sort of my daily -- daily basis
22  we -- or daily work we typically would talk
23  about a drug product or a drug formulation.
24  Composition or pharmaceutical composition can

Trout - Confidential

1  also be used.  Just I know it tends to be used
2  more in the legal context, and certainly in this
3  case, so I wanted to make that clear.
4      Q.  Okay.  I appreciate that.  Thank you.
5  And I think I'm clear on that now.
6      Okay.  So do you consider yourself to
7  be a person having ordinary skill in the art
8  based on your own definition?
9      A.  And just to clarify, you're asking
10  about the entire definition?
11      Q.  Correct.
12      A.  No.  I think my skill is really
13  focused on the third part of that definition.
14      Q.  Okay.  Let me direct you to paragraph
15  42 of your report, please.  Now, you've
16  reproduced here the single claim of the '625
17  patent, correct?
18      A.  Yes.
19      Q.  And that's as it appears in the patent
20  itself, right?
21      A.  Unless I've made any typos, yes.
22      Q.  And so we agree that the compound that
23  is referenced here in Claim -- Claim 1 of the
24  '625 patent is bosutinib, correct?

1  Trout - Confidential
2  MS. PIPER:  Objection to form.
3  A.  Yes, that's my understanding.
4  Q.  Okay.  And you don't disagree with
5  Dr. Lindsley in that regard, right?
6  MS. PIPER:  Objection to form.
7  A.  No.  As far as I understand it, that's
8  correct.
9  Q.  Okay.  Now, I see here that -- well,
10  so the claim is, you know, giving -- you know,
11  replacing the actual chemical name with
12  bosutinib, the claim states, "A pharmaceutical
13  composition comprising a CML inhibiting amount
14  of the compound bosutinib."
15  Correct?
16  A.  Yes.
17  Q.  Okay.  Now, looking at Footnote 1,
18  which is on the bottom of page 9, you observe
19  here, in your opinion, that the '625 patent uses
20  treating and inhibiting CML interchangeably.
21  You see that?
22  A.  Yes.
23  Q.  Okay.  And in formulating your
24  opinions, did you also view treating CML and
25  inhibiting CML as interchangeable terms?

1  Trout - Confidential
2  MS. PIPER:  Objection.  Outside the
3  scope of Dr. Trout's opinion.
4  A.  That's what I included here in the
5  background as I understand it.  Yes.
6  Q.  Well, the question here is, did you
7  use that -- those terms interchangeably, or are
8  you simply observing that you believe that the
9  '625 patent does so?
10  A.  I'm observing that I think the '625
11  patent does so.
12  Q.  Okay.  So what is your understanding
13  of what a CML inhibiting amount of bosutinib
14  would mean?
15  MS. PIPER:  Objection.  Outside the
16  scope of Dr. Trout's opinion.
17  A.  I don't have an opinion on that.
18  Q.  Okay.  So for clarity, you don't have
19  an opinion as to -- well, let me ask you a
20  different question.
21  In formulating your opinions, what was
22  your understanding of what a CML inhibiting
23  amount of bosutinib meant?
24  MS. PIPER:  Objection.  Outside the
25  scope of what Dr. Trout was asked to opine

1  Trout - Confidential
2  on.
3  A.  I didn't formulate opinions
4  specifically on that.
5  Q.  Okay.  Okay.  Now, you understand that
6  the term "pharmaceutical composition" in -- as
7  it appears in Claim 1 has been construed by the
8  Court, correct?
9  A.  Yes.
10  Q.  And you provided that construction in
11  your opinion at paragraph 29, correct?
12  A.  Yes.
13  Q.  Okay.  And it is your understanding
14  the Court's construction of "pharmaceutical
15  composition" is, "A pharmaceutically acceptable
16  composition containing the specified compound
17  and one or more excipients."
18  Correct?
19  A.  Yes.
20  Q.  Okay.  And in this construction, your
21  understanding of a -- "the specified compound"
22  is bosutinib, correct?
23  A.  Yes.
24  Q.  Okay.  And --
25  A.  Meaning -- sorry, just to qualify.

1  Trout - Confidential
2  That's the other part of the -- that's another
3  element of the claim, right --
4  Q.  That's correct.
5  A.  -- yes.
6  Q.  And so your understanding is when --
7  when the Court is -- in the Court's construction
8  when it says, "A pharmaceutically acceptable
9  composition containing the specified compound,"
10  it's your understanding based on the claim that
11  that specified compound in this context is
12  bosutinib, correct?
13  A.  Yes, in the context of Claim 1 of the
14  '625 patent, correct.
15  Q.  And one or more excipients, right?  Is
16  the last portion of this construction.
17  So what is your understanding of what
18  an excipient would be in the context of this
19  construction?
20  A.  So I talk about that, for example, on
21  page 15 of my report, paragraph 53.  I say,
22  "There are ingredients other than the active
23  ingredient," and then there's some, you know,
24  more qualification of that in the subsequent
25  paragraphs in terms of specific types of

Page 26

1   Trout - Confidential
2   specifications that they must meet.
3       Q.  Now, you don't disagree generally that
4   TWEEN 80 is -- can be an excipient in a
5   pharmaceutical composition as -- as you've
6   defined excipients here, right?
7       MS. PIPER:  Objection to form.
8       A.  It can be an excipient.  It has to
9   meet the kind of specifications that I discuss
10  here, a particular version of TWEEN 80, but it
11  can be.
12      Q.  Okay.  And, in fact, it's described in
13  the '625 patent as a possible excipient for
14  bosutinib compositions, correct?
15      A.  And just to be clear, could you point
16  me to where you're referring?
17      Q.  Yes, I can.  Let me direct you to
18  Exhibit A.
19      Sorry, my computer is asking me if I'm
20  enjoying the iAnnotate app that I'm using right
21  now, so I had to take care of that and let it
22  know I was indeed enjoying it, so.  It wouldn't
23  leave me alone about it.
24      So, I'm sorry, we were going to
25  Exhibit A, which -- in responding to their

Page 27

1   Trout - Confidential
2   inquiry.
3       Closed it for me.
4       Okay.  So this is the '625 patent.  Do
5   you recognize that?
6       A.  I mean, looking at the first page it
7   looks like the '625 patent that I'm familiar
8   with, yes.
9       Q.  Okay.  So let's go to Column 4,
10  beginning at line 5, and let me know when you're
11  there.
12      A.  I'm there.
13      Q.  Okay.  Now, this begins with, "The
14  compounds of the invention may be formulated
15  with conventional excipients such as a filler, a
16  disintegrating agent, a binder, a lubricant, a
17  flavoring agent, color additive, or a carrier."
18      Right?
19      A.  Yes.
20      Q.  And then here in this section various
21  types of excipients are described.  Would you
22  agree with me on that?
23      A.  Yes, in the subsequent part of that
24  paragraph.
25      Q.  And if we go to that paragraph that

Page 28

1   Trout - Confidential
2   begins around line 27 in Column 4, do you see
3   that?
4       A.  Yes.
5       Q.  And here within this -- in this it
6   states that, "Detergents such as TWEEN 20 and
7   TWEEN 80 can be used in certain formulations of
8   the invention."
9       Correct?
10      A.  Yes.  I think you're referring to
11  lines 34 to 35 in that Column 4.
12      Q.  Yes.  Correct.  Okay.  So you will
13  agree with me that the patent itself identifies
14  TWEEN 80 as a pharmaceutical excipient that
15  could be used in bosutinib compositions,
16  correct?
17      A.  Yes.  And I emphasize that this is
18  within the context of the '625 patent --
19      Q.  Okay.
20      A.  -- which we're talking about
21  pharmaceutical compositions.
22      Q.  Okay.  Perfect.
23      Now, some other -- some other
24  excipients that are mentioned here generally,
25  so -- for example, if we go back up a little bit

Page 29

1   Trout - Confidential
2   further to line 17, wherein it states, "When
3   provided orally or topically."
4       Do you see that paragraph?
5       A.  Yes.  Yes.
6       Q.  Okay.  You know, it says:  When
7   provided orally or topically some -- such
8   compounds would be provided to a subject by
9   deliver -- by delivery in different carriers.
10  And then it says, "Typically such carriers
11  contain excipients such as starch, milk, sugar,"
12  and then it goes on and identifies some others,
13  correct?
14      A.  Yes.
15      Q.  And you'll agree with me that dextrose
16  is a sugar, correct?
17      A.  Yes.
18      Q.  And dextrose is a well-known excipient
19  for use in pharmaceutical compositions, wouldn't
20  you agree?
21      MS. PIPER:  Objection to form.
22      A.  Well, I would say that dextrose is in,
23  for example, the Handbook of Pharmaceutical
24  Excipients.  So I assume you're talking about
25  the timeframe of the '625 patent.

Page 30

Trout - Confidential

Q. Correct.

A. So it was known as an excipient, for example, in the Handbook of Pharmaceutical Excipients in that timeframe.

Q. Okay. And you reference the Handbook of Pharmaceutical Excipients, correct?

A. Yes.

Q. Okay. And the Handbook of Pharmaceutical Excipients is -- you'll agree with me is a handbook that identifies various pharmaceutical excipients that can be used in pharmaceutical compositions, correct?

A. Well, I would say it's a handbook, so it has entries on a set of pharmaceutical excipients, including selective but important properties that the formulation scientist or someone interested would need to know for its use as an excipient, including reference to various specifications beyond what's in that handbook.

Q. Okay. Do you have any understanding as to whether or not excipients are identified in the Handbook of Pharmaceutical Excipients that have never been used in pharmaceutical

Page 31

Trout - Confidential

compositions approved by FDA?

A. I haven't checked all the excipients.

Q. Okay.

A. I presume they have been used, but I haven't checked them one by one.

Q. And do you have any understanding as to whether or not dextrose itself has been used in formulations of drugs that have been approved by FDA?

A. By the date of the '625 patent I presume you're talking about.

Q. Yes.

A. I can't think of an example sitting here. I have no reason to think that it wasn't used in other formulations, but I can't think of an example.

Q. Are you aware of a database that FDA maintains that identifies excipients that have been used and approved in drug products previously?

MS. PIPER: Objection to form.

A. Yes, I know there's a list.

Q. And do you know what the name of that list is?

Page 32

Trout - Confidential

A. Yes. It's called the GRAS list, I think is what you're talking about. At least that's what I'm thinking of.

Q. GRAS list?

A. Yes. It's a -- abbreviation for Generally Recognized As Safe.

Q. Do you have any understanding as to whether or not dextrose is identified as a -- an excipient in the GRAS list?

A. I didn't specifically look it up in the GRAS list.

Q. Would you expect it would be identified there, based on your experience and knowledge?

A. I would think it would be identified there, but one would have to check to confirm.

Q. Okay. How about TWEEN 80? Would you expect TWEEN 80 would be identified in the GRAS list as well, based on your experience and knowledge?

A. Yes, again, I would expect it. I didn't specifically check it as of this date, as of the date of the '625 patent.

Q. And I appreciate your clarifications

Page 33

Trout - Confidential

but I will confirm for you, just to simplify things, that if I'm asking you a question about this -- something in -- being known in the art, I am referring to known as of the priority date of the invention. Okay?

A. Okay.

Q. So if I'm going to deviate from that, I'll let you know. Okay.

A. Okay.

Q. But, again, I do appreciate your -- your being clear about that when I ask a question. It's helpful.

Now, other carriers that are identified in Column 4 of the '625 patent, for example, at line 14 are carriers such as water, correct?

A. Yes, water is identified there.

Q. Okay. And there's really no dispute that water is a common carrier for pharmaceutical compositions, right?

MS. PIPER: Objection to form.

A. Yes. I mean, certain water that has to meet specifications for it to be used in a pharmaceutical composition. But it's possible,

Trout - Confidential

1  yes.
2      Q.  All right.  Let's talk a little bit
3  about various modes of administration the '625
4  patent identifies for the pharmaceutical
5  compositions of the invention.  And I will
6  direct you now, again staying in Exhibit A,
7  Column 3 and line 52.
8      Now, do you see here where it states
9  that the compounds may be provided orally, by
10 intralesional, intraperitoneal, and there are
11 various modes of administration identified,
12 correct?
13     A.  Yes.
14     Q.  Okay.  And, again, one of those
15 identified here at -- looks like line 53 is
16 intraperitoneal, right?
17     A.  Yes.
18     Q.  And what is intraperitoneal?
19     A.  It means delivery into the body
20 cavity, so not into the blood system,
21 circulatory system directly, for example.
22     Q.  Okay.  Is that often abbreviated as
23 ip, little i, little p?
24     A.  I've seen it abbreviated as such.

Trout - Confidential

1      Q.  Okay.  Now, what is your
2  understanding, if you have any, of what form of
3  compositions are typically administered ip, or
4  intraperitoneal?
5      A.  What do you mean by "form"?
6      Q.  Sure.  So, for example, powders,
7  tablets, solutions, suspensions, you know, what
8  form of composition are typically administered
9  intraperitoneal?
10     A.  And speaking just generally, I would
11 think typically it would be injected, and so it
12 would have to be some kind of liquid or
13 suspension.
14     Q.  Okay.  You said "liquid" or
15 "suspension."  Are those, in your mind,
16 different things?
17     A.  Yes.  A liquid in that context, it is
18 more broad.  Suspension is specifically a liquid
19 with solid material in it.
20     Q.  Okay.  So is it fair to say then,
21 based on that testimony, that liquid, in your
22 mind, is more something that -- where all of the
23 various excipients are in solution versus a
24 suspension where some of those excipients are

Trout - Confidential

1  suspended in the liquid matrix?
2      A.  Yes, that's what I was thinking of in
3  general context.  It might differ depending on
4  the specific context in which it's used.
5      Q.  Are there any other forms of
6  compositions or -- or that you're aware of that
7  are delivered intraperitoneal?
8      A.  There's none that I'm aware of.  Those
9  are the broad categories.  This is a big field.
10 Lots of people do research.  Someone may have --
11 pretty confident that people -- someone must
12 have tried other different types of forms, but
13 the ones I gave you I think would be generally
14 the ones used.
15     Q.  Okay.  Great.
16     Now, in your own research, do -- do
17 you have an opportunity to use laboratory
18 animals in your research?
19     A.  I do not use laboratory animals in my
20 laboratory.  I certainly work with other people
21 who use them and review literature and the
22 results of those as I need them, but I do not in
23 my lab do animal research.
24     Q.  Have you ever in your career or

Trout - Confidential

1  education had an opportunity to work with
2  laboratory animals?
3      A.  So personally I have not done
4  experiments on laboratory animals.  I have
5  helped to design studies that were done on
6  laboratory animals and interpret the results.
7  But that was -- since '98 when I started my
8  independent career, so I generally have students
9  and technicians and other people do that kind of
10 research.
11     Q.  Okay.  Have you ever had experience
12 with other researchers who have been doing
13 cancer studies in mice?
14     A.  I may have.  Nothing specific comes to
15 mind.  Wasn't -- wasn't a big project that I was
16 working on.
17     Q.  Okay.  So I do appreciate that working
18 with laboratory animals is not something that
19 you yourself have done in your career, but do
20 you have an understanding at all as to whether
21 or not -- or as to how common it is to
22 administer the compositions to mice
23 intraperitoneally?
24     A.  I don't know how common it is, no.

Page 38

Trout - Confidential

1
2    Q.  Okay.  All right.  Now, are you
3  familiar with the Animal Welfare Regulations
4  promulgated by the USDA?
5    A.  What do you mean by "familiar"?  Just
6  do I know about -- that they exist?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Have you ever had an opportunity to
10  review those regulations?
11    A.  No.
12    Q.  Okay.  How about the Policy on Humane
13  Care and Use of Laboratory Animals?  Are you
14  familiar with that policy?
15    A.  Using your definition of "familiar,"
16  yes.
17    Q.  So you're aware of it?
18    A.  I'm aware of it, correct.
19    Q.  Have you ever had an opportunity to
20  review that particular document?
21    A.  No.
22    Q.  Okay.  So let's return for a moment to
23  your report, and I want to return to the claim
24  for one moment, and that's at 42.
25    A.  I'm there.

Page 39

Trout - Confidential

1
2    Q.  Okay.  Thank you.
3      When I refer to "the claim," I'm
4  thinking about the claim with the construction
5  the Court has provided.  Okay?  So in other
6  words, in -- you would substitute pharmaceutical
7  composition with the construction the Court has
8  provided.  Okay?
9    A.  Okay.
10    Q.  For clarity.  All right.
11      Now, based on that claim, what, if
12  any, understanding do you have as to whether the
13  pharmaceutical compositions described therein
14  are required to be acceptable for human use?
15    A.  Described therein you mean
16  specifically in the claim?
17    Q.  In the claim, right.
18    A.  Not generally in the patent but in the
19  claim?
20    Q.  Right.
21    A.  My understanding that it's not -- is
22  that it's not limited to human use.
23    Q.  Okay.  So it does contemplate
24  pharmaceutically acceptable compositions that
25  could be administered to laboratory animals, for

Page 40

Trout - Confidential

1
2  example, correct?
3    MS. PIPER:  Objection to form.
4    A.  Well, I wouldn't say it that way.  I
5  think it's -- can -- it's more inclusive than
6  humans, so it could be used for veterinary
7  purposes.
8    Q.  Okay.  All right.  So your
9  understanding is, it could be used for humans
10  and veterinary purposes.  And what's the basis
11  of that understanding?
12    A.  The basis is the claim.  And I
13  understand that there was some discussion with
14  the Court about whether it's limited to humans,
15  and I understand that it's not.
16    Q.  Okay.  So based on looking at the
17  claim and that discussion with the Court, it is
18  your understanding at least that the claims do
19  contemplate pharmaceutical compositions for
20  veterinary purposes, right?
21    A.  Yes.
22    Q.  Okay.  And that would include animals
23  such as mice, correct?
24    MS. PIPER:  Objection to form.
25    A.  It could if you're trying to treat

Page 41

Trout - Confidential

1
2  mice.  I guess if you have a pet mouse, for
3  example.
4    Q.  Okay.  So let me -- tell me a little
5  bit about what your understanding -- what you
6  mean when you say "pharmaceutical compositions
7  can be used for veterinary purposes."
8    A.  What I mean is that as a
9  pharmaceutical composition, it's used to treat
10  or to attempt to treat a kind of disease, and so
11  that can be done for humans or for nonhuman
12  animals, the latter being veterinary purposes.
13    Q.  Based on your experience, is it --
14  strike that.
15      Now, you'll agree with me that in the
16  context of laboratory research using animals,
17  animals are often being treated for diseases,
18  correct?
19    MS. PIPER:  Objection to form.
20    A.  Well, it depends on the experiment,
21  the laboratory experiment, and the purpose of
22  the experiment.
23    Q.  So there are -- there are specific
24  contexts, you will agree, wherein laboratory
25  animals have disease or some sort of condition

1     Trout - Confidential
2  which is being treated in the lab using
3  pharmaceutical compositions, right?
4      A.  As a hypothetical, that's certainly a
5  possibility.
6      Q.  Well, that's an important part of drug
7  research, isn't it --
8      MS. PIPER:  Objection --
9      Q.  -- using laboratory animals to see how
10  a target API is able to treat laboratory
11  animals, correct?
12      A.  That's one part of laboratory research
13  involving animals.
14      Q.  But it's almost unheard of, isn't it,
15  to have -- in the drug application process to
16  actually have a research plan that doesn't
17  involve treating laboratory animals with the API
18  at some level, correct?
19      MS. PIPER:  Objection to form.
20      A.  I'm not quite sure I understand your
21  question.  You're talking about filings to
22  regulatory authorities?  Or --
23      Q.  So just the -- you know, in the
24  context of pharmaceutical drug development,
25  isn't laboratory research using animals -- it

1  almost always involves the use of laboratory
2  animals, right?
3      A.  There's quite extensive use of
4      MS. PIPER:  Objection to form.
5      A.  There's quite extensive use of
6  laboratory animals in different stages of, let's
7  say, drug creation, if that's what you mean.
8      Q.  Yes.  Okay.  And oftentimes that use
9  includes having animals that are used as models
10  of a specific disease, correct?  So -- let me
11  strike that.
12      Are you familiar with the use of
13  xenografts in mice as a model for studying
14  potential candidates for treating cancer?
15      A.  Yes.
16      Q.  And what is a xenograft?
17      A.  A xenograft is when you put in foreign
18  tissue or foreign cells into an animal such as a
19  mouse, laboratory mouse.
20      Q.  So, for example, tumor cells that
21  might have been harvested from a human, correct?
22      A.  That's an example, correct.
23      Q.  Okay.  And then -- and so often in
24  xenograft studies, the tumor cells are injected
25  into the mouse and then the tumor is allowed to

1     Trout - Confidential
2  grow, correct?
3      A.  That's an example, correct.
4      Q.  Right.  And in many contexts if the
5  tumor is left untreated, it will result in the
6  death of the animal; is that correct?
7      A.  Well, I wouldn't quite say it that
8  way.  In the type of experiments that you're
9  talking about the objective is not to treat the
10  animal but to perform experiments to -- whatever
11  the -- broadly speaking, the experiment is meant
12  to accomplish.  It's not to treat the animal.
13      Q.  That wasn't my question.  My question
14  was, when the xenograft tissue is introduced
15  into the animal and the tumor is allowed to
16  grow, if the tumor isn't addressed, it will --
17  the tumor will grow and result in death of the
18  animal, correct?
19      A.  Well, you are just talking broadly.  I
20  mean, I guess it depends on the type of tumor
21  and the type of research that's being done and
22  the hypothesis that's being tested.
23      Q.  Okay.  Well, based on your review of
24  the prior art in this case, isn't it true that
25  the xenograft studies that were performed in the

1     Trout - Confidential
2  prior art resulted in tumors that left untreated
3  were fatal to the mice?
4      A.  And just to be specific, you're
5  talking about the -- what I call the Boschelli
6  2001 reference?
7      Q.  That is an example of the prior art,
8  yes, that's correct.
9      A.  Yeah, so in that reference so that is
10  a study performed on laboratory mice in which,
11  as you say correctly, there were xenografts
12  performed on mice that were meant to be
13  sacrificed.
14      Q.  Is it important that they were meant
15  to be sacrificed?
16      A.  Yes.
17      Q.  Why is that important?
18      A.  Because -- and, again, if there's a
19  specific place in that reference, we can talk
20  about the specific place.  But in general terms,
21  the objective of Boschelli and coworkers was not
22  to treat laboratory mice per se, but to test a
23  variety of hypotheses and -- and to determine
24  outcomes.  And what's important about sacrifice
25  is that either way, if the tumors went away or

Trout - Confidential

1  if they didn't go away, the mice were not to
2  continue living.
3      Q.   So, in your opinion, is the fact that
4  they weren't intended to continue living
5  relevant to whether or not the experiment was a
6  treatment of the animal?
7      A.   Yes.  Living -- just to be clear, I
8  think living -- I don't know how it came out.
9  But -- so, yes, because, again, the objective
10  wasn't to treat animals, to cure them from a
11  disease, or to manage a disease.  The objective
12  was to do experiments, and they were going to
13  die either way regardless of the outcome.
14     Q.   In your opinion, the fact that they
15  were going to die either way, is that relevant
16  to the types of pharmaceutical excipients one
17  would select for a composition?
18     A.   Yes.  Could be, yes.
19     Q.   Why?
20     A.   Well, I've opined in my report, we can
21  go to the specific places, but there are
22  different requirements depending on what you're
23  intending to do with the animals.  I have
24  references, for example, of -- Wolff reference,

Trout - Confidential

1  which we can talk about if you're interested.
2  But I discuss this in many paragraphs in my
3  report.
4      Q.   Okay.  So when you say "there are
5  different requirements depending on what you're
6  intending to do with the animals," can you
7  elaborate on that for me a little bit?  And,
8  yeah, feel free --
9      A.   Yes.
10     Q.   -- to go to your report and direct me
11  to that specific paragraph.
12     A.   So, for example, on page 21, and
13  subsequent places in my report, starting
14  paragraph 67, that's when I talk about the fact
15  that there's the xenograft done, the mice did
16  not have CML, Compound 31a, which is also
17  bosutinib, was not being administered to provide
18  a therapeutic benefit, and the animals were to
19  be sacrificed after testing.
20         And I talk -- I mean, essentially, the
21  bulk of the substance of my report is why what
22  was used or not pharmaceutically acceptable
23  compositions or a pharmaceutically acceptable
24  composition.

Trout - Confidential

1      Q.   And that's the heart of your opinion,
2  right?  That the composition of Boschelli wasn't
3  a pharmaceutically acceptable composition,
4  correct?
5      A.   That's a major part of, I guess, the
6  conclusion, and -- and I discuss in multiple
7  pages and paragraphs why that's the case.
8      Q.   Now, I understand that you've been
9  engaged as an expert witness in patent
10  litigation cases previously, correct?
11     A.   Yes.
12     Q.   And have you ever been asked to give
13  an opinion about a claim that patent lawyers
14  taught -- defined as a method claim?
15     A.   I'm pretty sure the answer to that is
16  yes.  I'm not thinking of one specific claim as
17  we speak, but I'm sure I have.
18     Q.   Based on your experience, is the claim
19  of the '625 patent a method claim?
20     A.   That's a legal question.  I really
21  leave that to the lawyers.  I mean, my opinion
22  certainly focused on the science and the meaning
23  within the context of the claim construction.
24     Q.   Okay.  Does -- do you have any

Trout - Confidential

1  understanding as to whether or not Claim 1 of
2  the '625 patent requires treating CML with a
3  pharmaceutically acceptable composition?
4      MS. PIPER:  Objection.  Outside the
5  scope of what Dr. Trout was asked to opine
6  on.
7      A.   I don't have an opinion on that.
8      Q.   Okay.  All right.  You did direct us
9  to paragraph 67, so why don't we take a look at
10  that, paragraph 67 of your report.  And this is
11  that section of your report wherein you are
12  stating your opinions that the Claim 1 of the
13  '625 patent is not anticipated by Boschelli
14  2001.
15         And Boschelli is spelled
16  B-O-S-C-H-E-L-L-I, correct?
17     A.   Well, this is really a -- a summary.
18  I would say my whole report addresses that
19  issue.
20     Q.   Okay.  Fair enough.
21         So at 67 here, you say, "Boschelli
22  2001 discloses a newly lab-synthesized compound
23  that is tested in animal experiments."
24         Correct?

Page 50

Trout - Confidential

1
2      A.   Yes.
3      Q.   That lab synthesized compound is
4   bosutinib, correct?
5      A.   Yes, the Compound 31a.
6      Q.   Okay.  All right.  Compound 31a in
7   Boschelli 2001 is bosutinib, right?
8      A.   That's the molecule, yes.
9      Q.   Okay.  Next you say, "In those animal
10  studies reported in Boschelli 2001, human CML
11  tumor cells were introduced into laboratory
12  mice, and the tumors were assessed after
13  administration of Compound 31a."
14      Correct?
15      A.   Yes, that's what I wrote.
16      Q.   Okay.  And then you go on to say, "The
17  mice did not have CML."
18      And so first -- let's just focus on
19  that for a moment.  What do you mean when you
20  say, "Mice did not have CML"?
21      A.   What I mean is that the mice were not
22  being treated for CML.  They didn't -- they
23  weren't taken to the lab with CML.  They were
24  specifically given humor CML tumor cells to be
25  experimented on.

Page 51

Trout - Confidential

1
2      Q.   So isn't CML characterized by a tumor,
3   CML that -- the myelogenous tumor cells?
4      MS. PIPER:  Objection to form.
5      Q.   I mean -- I mean, that is what
6   characterized the CML, right, having tumors that
7   are cancerous?
8      MS. PIPER:  Objection.  Outside the
9   scope of Dr. Trout's opinion.
10      A.   I'll leave it to the medical doctors
11  to answer that question.
12      Q.   So you don't disagree that human CML
13  tumor cells were introduced into the laboratory
14  mice, correct?
15      A.   Correct.
16      Q.   Okay.  And that those CML tumor cells
17  were allowed to proliferate in the mice,
18  correct?
19      A.   Well, there were different types of
20  experiments but broadly speaking, I would say
21  the cells were introduced, and the effects of
22  various compounds on those cells were tested, in
23  particular bosutinib.
24      Q.   And -- right.  And so bosutinib was
25  administered to these mice after they had -- the

Page 52

Trout - Confidential

1
2   CML tumor cells had been introduced, correct?
3      Let me direct you to -- perhaps I can
4   direct you to page 46 of your report.
5      A.   So I think that there were two
6   different types of experiments which they call
7   staged and unstaged and --
8      MS. PIPER:  Clarification.  Paragraph
9   46 or page 46?
10      MR. BENSON:  Paragraph 46.
11      Q.   Are you at paragraph 46?
12      A.   Yes.
13      Q.   Okay.  All right.
14      A.   So in the experiments discussed at the
15  top of 46, the -- tumor cells were
16  inoculated first.
17      Q.   And then they were allowed to reach
18  15 percent of the body weight of the mouse,
19  correct?
20      A.   Well, I mean, that's when -- I guess,
21  as I have written here, that's when the
22  experiment was ended.
23      Q.   Right.  Okay.
24      Well, let me -- and then there was an
25  unstaged model, correct?

Page 53

Trout - Confidential

1
2      A.   Yes.
3      Q.   Okay.  And then you write here that,
4   "Boschelli 2001 concluded Compound 31a
5   effectively inhibited tumor growth."
6      Correct?
7      A.   Yes, I'm just quoting from Boschelli.
8      Q.   And you don't disagree with that
9   conclusion, correct?
10      MS. PIPER:  Objection.  Outside the
11  scope of Dr. Trout's opinion.
12      A.   I don't have an opinion.  I'm just
13  quoting -- this is background on Boschelli, and
14  I'm just quoting Boschelli here.
15      Q.   Okay.  So you didn't independently
16  assess whether Compound 31 did or did not
17  inhibit tumor growth in this model, correct?
18      MS. PIPER:  Objection.  Outside the
19  scope of Dr. Trout's opinion.
20      A.   That's correct.
21      Q.   Do you have any reason to disagree
22  with the conclusions of Boschelli?
23      MS. PIPER:  Objection.  Outside the
24  scope of Dr. Trout's opinion.
25      A.   I don't have any reason to agree or

Trout - Confidential

1 
2 disagree. I'm just providing quotes of
3 background from Boschelli. I didn't analyze
4 that separately.
5      MR. BENSON: Okay. Okay. Do you want
6 to take a -- is this a good time for a
7 short break?
8      THE WITNESS: Sure. If you want to
9 keep going, we can keep going. If you want
10 to take a break --
11      MR. BENSON: Yeah, I could use a
12 break.
13      THE VIDEOGRAPHER: The time is
14 10:14 a.m., and we are going off the
15 record.
16      (Recess from 10:14 to 10:28.)
17      THE VIDEOGRAPHER: The time is
18 10:28 a.m., and we are back on the record.
19 Q. Okay. All right. Let's return to
20 paragraph 46. And this is, again, just your --
21 you know, kind of just articulation of what you
22 see in Boschelli, correct?
23 A. Well, it's part of the background in
24 Boschelli.
25 Q. Yeah. Okay. All right. Now, so

Trout - Confidential

1 
2 setting aside for the moment -- so the vehicle
3 we see here that you describe at paragraph 46, I
4 think it's the second -- no, third full
5 sentence, you're quoting, and it says, "The
6 vehicle used was 2 percent TWEEN 80 and
7 5 percent dextrose/water."
8      You see that?
9 A. Yes, that's part of the quote.
10 Q. Okay. Now, setting aside the
11 pharmaceutical grade of excipients used, you
12 don't disagree that that describes a
13 pharmaceutical vehicle that could be used with
14 an API in the context of -- as that would be
15 described in the invention?
16      MS. PIPER: Objection to form.
17 A. I'm sorry, just to be clear, you're
18 asking a hypothetical outside of the Boschelli?
19 Q. Let me ask a different question.
20 Okay. Now, do you recall in Dr. Lindsley's
21 report he gives the opinion that 3 milligrams of
22 bosutinib, 10 milligrams TWEEN 80, and 25
23 milligrams of a dextrose/water mixture was
24 placed in a .5 milliliter aqueous vehicle? Do
25 you remember that testimony?

Trout - Confidential

1 
2 A. Maybe we could go to his report. I
3 remember something like that, but I haven't
4 memorized his report.
5      MR. BENSON: Do we have a copy of his
6 report?
7      Here you are.
8      MS. PIPER: Thank you.
9      MR. BENSON: I don't know if there
10 are -- Alembic, if there are portions of it
11 that are -- there might be portions of it
12 that address the infringement position with
13 respect to Sun, so you might want to --
14      MS. WEISBRUCH: And if I need to step
15 outside the room, that's fine, too.
16      MR. BENSON: No, that's fine. It's
17 just that it might be in the binder so --
18      MS. BEIS: The report itself was
19 submitted on behalf of both Sun and Alembic
20 so --
21      MR. BENSON: Yeah, but there might
22 be -- I think there's a section --
23      MS. BEIS: We will let you know if
24 something comes up.
25      MR. BENSON: I'm not going to be

Trout - Confidential

1 
2 directing you to any of those portions.
3      MS. WEISBRUCH: If I need to step out,
4 just let me know.
5      MR. BENSON: Sorry, just protective
6 order issues.
7      Can I have this marked as the Trout
8 Deposition Exhibit Number 2, please.
9      (Opening expert report of Craig W.
10 Lindsley, Ph.D. and reply expert report of
11 Craig W. Lindsley, Ph.D. were marked Trout
12 Exhibit 2 for identification, as of this
13 date.)
14      THE WITNESS: Thank you.
15      MR. BENSON: Okay. Did I hand you a
16 copy, Counsel? I did. Okay. Thank you.
17 Sorry.
18      MS. PIPER: Thank you.
19 Q. I've handed you -- the court reporter
20 has handed you what we've marked as Trout
21 Deposition Exhibit Number 2, and this is a
22 binder that contains two documents tabbed 1 and
23 2. The first is the opening expert report of
24 Dr. Craig Lindsley and the second is the reply
25 expert report of Dr. Lindsley.

1        Trout - Confidential
2            Could you please just briefly take a
3    look at those two documents and confirm these
4    are the expert reports of Dr. Lindsley that you
5    have reviewed in connection with your work in
6    this case.
7            (Witness reviewing document.)
8        A.  Okay.  I've flipped through these,
9    they're over a hundred pages, and they look like
10   the two reports that I reviewed.
11       Q.  Okay.  Thank you very much.
12           I will direct you to the first tab,
13   which is the opening report of Dr. Lindsley.
14   And in particular, I would like you to go to --
15   paragraph 161 and 162 is where we will be.
16           MS. PIPER:  One clarification.  This
17   entire binder is Trout Exhibit 2, both
18   reports?
19           MR. BENSON:  Yes.
20           MS. PIPER:  Thank you.
21           MR. BENSON:  You're welcome.
22       A.  Without the exhibits?
23       Q.  That's correct.
24       A.  Okay.  I'm at paragraph 161 and 162.
25       Q.  Okay.  Now, this is that part of

1        Trout - Confidential
2    Dr. Lindsley's report wherein he opines the
3    Claim 1 of the '625 patent is invalidated as
4    anticipated by Boschelli 2001, right?
5        A.  Yes.  And that's the heading in the --
6    the previous page 57, section Roman numeral IX.
7        Q.  And these are the specific opinions
8    you're responding to in your own expert report,
9    correct?
10           MS. PIPER:  Objection to form.
11       A.  I mean, I -- I think -- I'm responding
12   generally -- in general terms to the opinions in
13   his report, or maybe other location, I wouldn't
14   say it's limited.  But this is certainly the
15   section in which he opines that the patent is
16   invalid or Claim 1 of the patent is invalid.
17       Q.  Just so -- the avoidance of any
18   ambiguity moving forward, the only opinion of
19   Dr. -- well, Dr. Lindsley has provided a number
20   of opinions about the invalidity of the '625
21   patent, correct?
22       A.  Yes.
23       Q.  And one of those opinions, speaking in
24   the broadest sense, is that Claim 1 of the '625
25   patent is anticipated and therefore invalid,

1        Trout - Confidential
2    correct?
3        A.  Correct.  That's one of Dr. Lindsley's
4    opinions.
5        Q.  And that is the sole opinion to which
6    you are responding to in this case, correct?
7        A.  Yes, that's correct.  Specifically
8    anticipation due to the Boschelli 2001 document.
9        Q.  Correct.
10       A.  Correct.
11       Q.  Okay.  I just wanted to be sure, any
12   of his other opinions about the '625 patent
13   being invalid for written description, for
14   example, you're not opining on that particular
15   aspect of his report, correct?
16       A.  Correct.
17       Q.  And his opinions about enablement or
18   any section -- well, any of the section 112
19   arguments he is making in his report, you're not
20   responding to those particular arguments,
21   correct?
22       A.  Counsel, that sounds like a legal
23   term.  I'm solely responding to anticipation due
24   to Boschelli 2001.
25       Q.  Okay.  All right.  Yeah.  I think

1        Trout - Confidential
2    that's clear.  Thank you.
3            All right.  So let's return to
4    paragraph 161, and in this particular paragraph,
5    second sentence, Dr. Lindsley is -- is stating
6    his understanding of Boschelli 2001 as
7    disclosing, "Xenograft studies wherein bosutinib
8    was dosed ip in amounts up to 100 milligrams per
9    kilogram as a 0.5 milliliter solution prepared
10   in 2 percent TWEEN 80, 5 percent
11   dextrose/water."
12           Do you see that?
13       A.  Yes, I see that written here.
14       Q.  Do you disagree with Dr. Lindsley in
15   that regard?
16       A.  Well, I don't disagree that -- that
17   Boschelli states that.  I mean, Boschelli is
18   doing a lot more than just that, and other
19   amounts, too.  But there's nothing wrong with
20   that sentence if one understands that it's part
21   of a broader context.
22       Q.  Right.  Okay.  And then the next --
23   the next paragraph 162, Dr. Lindsley concludes,
24   "Thus, Boschelli 2001 discloses a composition
25   comprising approximately 3 milligrams bosutinib,

Trout - Confidential

1
2  10 milligrams TWEEN 80, and 25 milligrams
3  dextrose/water in a .5 milliliter aqueous
4  vehicle."
5      Do you see that?
6      A.  Yes.  And just to be clear, you --
7  actually I think the way you said it is probably
8  better because you didn't read the "and enables"
9  so --
10      Q.  Yeah, I didn't want to get -- yeah, I
11  just wanted you to focus on the composition that
12  he describes.  Okay?
13      A.  Yes.  Okay.
14      Q.  And we'll get back to the enabled
15  part.
16      But do you disagree with Dr. Lindsley
17  that the composition disclosed in Boschelli is
18  as stated here in paragraph 162?
19      A.  Well, Dr. Lindsley seems to be basing
20  that on certain assumptions and calculations.
21  I -- I didn't try to reproduce those
22  calculations or determine whether his
23  assumptions are valid or not.  But I can take
24  what he's written here and discuss it.
25      Q.  Okay.  Well, you haven't disagreed

Trout - Confidential

1
2  with it in your own responsive report, correct?
3      MS. PIPER:  Objection to form.
4      A.  I -- I don't think that I -- well, I
5  don't remember specifically.  I would have to
6  look through my report.  But I know I did not
7  reproduce his calculations or attempt to
8  validate his assumptions in my report, or in my
9  activity in this case.
10      Q.  Okay.  Do you have any reason, as you
11  sit here today, to disagree with Dr. Lindsley
12  with respect to his conclusions here at
13  paragraph 162 as to the composition components?
14      A.  I don't have a reason to disagree or
15  to agree with his 3 milligrams of bosutinib
16  calculation, except that he seems to take only
17  one of the concentrate -- one of the amounts of
18  dosing used by Boschelli 2001.
19      Q.  Okay.
20      A.  There are others there, too.
21      Q.  Okay.  Well, it's fair to say you
22  don't independently come up with your own
23  calculations with respect to the compositions
24  disclosed in Boschelli, correct?
25      A.  That's correct.  I did not do my own

Trout - Confidential

1
2  calculations.
3      Q.  Okay.  And we can agree just for --
4  just broadly speaking, setting aside whether or
5  not any of the excipients used in Boschelli were
6  pharmaceutical grade excipients, we can agree
7  that Boschelli discloses compositions containing
8  bosutinib, correct?
9      A.  Compositions as such, Boschelli does
10  not call them pharmaceutical compositions.  But
11  if you mean compositions broadly, then, yes.
12      Q.  Yes.  And those compositions disclosed
13  in Boschelli are compositions containing
14  bosutinib as the API, correct?
15      A.  Well, again, API means active
16  pharmaceutical ingredient.  The bosutinib is
17  designated as Compound 31a in Boschelli.  And
18  again -- and I elaborate my opinions in my
19  report, but it's not being used as a
20  pharmaceutical here.  So I wouldn't use it as
21  an -- I wouldn't characterize it as an API, and
22  I don't think Boschelli does either.
23      Q.  What would you characterize bosutinib
24  in this composition?  What is it?
25      A.  It's a -- a chemical that was

Trout - Confidential

1
2  synthesized and tested to -- in a series of
3  experiments to determine its effects on various
4  cells and other assays.
5      Q.  Okay.  You don't disagree bosutinib
6  is, in fact, an active pharmaceutical
7  ingredient, right?
8      MS. PIPER:  Objection to form.
9      A.  I don't disagree that it is today.
10      Q.  So do you disagree that at the time of
11  Boschelli that bosutinib was an active
12  pharmaceutical ingredient?
13      A.  I -- I don't know if I've specifically
14  opined upon that.  I mean, I know that it's not
15  used as a pharmaceutical.  Let's put it that
16  way.  And -- and to me sitting here and trying
17  to answer your question, an active
18  pharmaceutical ingredient has to have a
19  pharmaceutical effect.
20      Q.  When --
21      A.  I don't think -- and I don't think
22  that's -- the objective was not to have a
23  pharmaceutical effect per se in Boschelli.  It
24  was to study the effect of a variety of
25  different synthesized chemicals including 31a,

Trout - Confidential

1  
2  which we can call bosutinib.
3      Q.   What -- when you say "pharmaceutical
4  effect," what does that mean to you?
5      A.   It means -- or we could use the term
6  "pharmaceutical activity."  It means to me that
7  it's used to treat, let's say, patients of
8  whatever sort.  I don't mean that it has to be
9  commercialized.  It could be earlier than that.
10     Q.   So is it -- is your definition
11  intentional?  In other words, when it's being
12  administered, one has to intend it to have a
13  specific effect?  Is that what you're
14  suggesting?
15     A.   I don't think I'm suggesting that it's
16  intentional, that it's -- intentionality.  I
17  think -- I mean, it depends what you mean.  It
18  has to be administered in a certain context, so
19  in that way maybe there's an intentionality in
20  choosing the context.
21     Q.   So the compound described in Boschelli
22  is bosutinib, correct, the Compound 31a?  I
23  mean, we've already established that, right?
24     A.   Yes.
25     Q.   All right.  And chemically it's the

Trout - Confidential

1  
2  same bosutinib as is currently marketed in
3  the -- in the drug Bosulif I believe is the --
4  yeah, Bosulif, correct?
5      A.   Yes, that's my understanding.
6      Q.   Okay.  So the identity of the actual
7  chemical entity is -- is no different in
8  Boschelli than it is in the marketed drug
9  Bosulif, right?
10         MS. PIPER:  Objection to form.  And
11     also objection.  Outside the scope of
12     Dr. Trout's opinion.
13     A.   I mean, it -- again, I'm not sure
14  maybe what you mean by "chemical entity."  I
15  think maybe I -- if I understand your question
16  correctly, what I have opined upon is that the
17  31a as it synthesized and with the impurity
18  levels, and whatnot, is not an API as such,
19  something that would go into a -- a -- a
20  pharmaceutically acceptable composition.
21     Q.   The -- an active pharmaceutical
22  ingredient, so to the -- let me strike that.
23         To the extent we're talking about
24  bosutinib as an active pharmaceutical
25  ingredient, we're talking about the chemical

Trout - Confidential

1  
2  compound bosutinib, correct?
3      A.   No, I think we're talking about the
4  compound -- well, there were two different
5  contexts, and maybe we're talking at cross
6  purposes.  But active pharmaceutical ingredient,
7  API, uses pharmaceutical, so it seems to me that
8  it's more than just a chemical.  There's
9  something more behind it than just that.  If you
10  want to define it as such, you know, we can talk
11  about it in those terms.
12     Q.   Did the inventors do -- in this --
13  in -- did the inventors of the '625 patent do
14  anything to the chemical compound bosutinib that
15  was different than -- or that rendered it to be
16  a pharmaceutical wherein in Boschelli it was
17  not?
18         MS. PIPER:  Objection.  Outside the
19     scope of Dr. Trout's opinion.
20     A.   I didn't opine on that question.
21     Q.   So I'm trying to understand, I guess,
22  how bosutinib is a pharmaceutical now but it was
23  not a pharmaceutical in Boschelli.  And can you
24  help me understand your opinions in that regard?
25     A.   Yes.  For example, we can look at my

Trout - Confidential

1  
2  report pages 14 and 15, paragraphs 51 and 52, in
3  which a defined active pharmaceutical
4  ingredient, component of a pharmaceutical
5  composition, and -- and it goes on.  And I -- I
6  think as a summary, an important part is that
7  the API has to meet certain specifications.
8         And I should say, there are other
9  parts of my report in which I discuss this.
10  This is one part, right?  You can go to the
11  other parts if you want.
12     Q.   All right.  So I understand your
13  opinion that -- I understand your opinion that
14  the bosutinib in Boschelli was not
15  pharmaceutically acceptable as you use that
16  term, correct?  That's your opinion?
17     A.   My opinion is that it's likely not.
18  It was not characterized as such, and so it's
19  likely not.
20     Q.   Okay.  That's fair.  Thank you.
21         But you're -- you're not saying that
22  bosutinib itself doesn't have the very same
23  activity in inhibiting, for example, Src kinase,
24  tyrosine kinase, as it does in the marketed
25  product Bosulif, right?

1    Trout - Confidential
2        MS. PIPER:  Objection.  Outside the
3    scope of Dr. Trout's opinion.
4        A.  I haven't opined on the activity of
5    this drug per se, or the activity of a compound,
6    or -- or whatnot.
7        Q.  You don't disagree that Boschelli
8    concluded by administering the composition that
9    contained bosutinib, they were able to inhibit
10   tumor growth in the mice they studied, right?
11       MS. PIPER:  Objection.  Outside the
12   scope of Dr. Trout's opinion.
13       A.  I think, as we discussed, I quoted
14   Boschelli in background, for example, paragraph
15   46.  I didn't independently analyze that.
16       Q.  But you are testifying today that the
17   bosutinib in Boschelli is not a pharmaceutical;
18   is that right?
19       MS. PIPER:  Objection to form.
20       A.  It's -- it's -- well, it's not a
21   pharmaceutical composition.
22       Q.  Okay.  So the -- the composition which
23   included bosutinib, TWEEN 80, dextrose, and
24   water, your opinion is, that is not a
25   pharmaceutical composition; is that right?

1    Trout - Confidential
2        (Witness reviewing document.)
3        A.  I -- I think a better way of saying is
4    what -- what I opined is, for example, on
5    page 25, paragraph 77, "There is no indication
6    in Boschelli 2001 of pH control in the disclosed
7    TWEEN 80, dextrose/water solution," that's one
8    aspect.  And I talk about various, let's say,
9    lacks of indication.  So there's no indication
10   that what we are discussing is a pharmaceutical
11   composition and for a variety of reasons.
12       Q.  Okay.  The question I have then is, as
13   you sit here today, is it your opinion that the
14   Boschelli composition is not a pharmaceutical
15   composition?
16       A.  My opinion -- and, again, there's a
17   lot in my report that gets here -- is that
18   there's no indication that it discloses a
19   pharmaceutical composition for -- for a variety
20   of reasons that I mention here.
21       Q.  Does the fact that the composition was
22   administered ip to mice for the purposes of
23   inhibiting tumor cell growth any indication to
24   you as to whether or not it was a pharmaceutical
25   composition?

1    Trout - Confidential
2        MS. PIPER:  Objection.  Outside the
3    scope of Dr. Trout's opinion.
4        A.  I don't think I have in my report an
5    opinion about that.
6        Q.  Okay.  So if -- if the -- if the --
7    can we just agree that whether it's a
8    pharmaceutical composition or not, that
9    Boschelli, in fact, discloses a composition,
10   correct?
11       A.  Yes, we can call it a composition.
12       Q.  Okay.  So the composition of
13   Boschelli, had they included purity information
14   as to the bosutinib, would that change your
15   opinion as to whether or not the composition of
16   Boschelli was a pharmaceutical composition?
17       A.  So it depends on the details of this
18   hypothetical.  I mean, I would have to go
19   through what their disclosure would be.  I mean,
20   there's -- that's not the sole reason.  I have a
21   whole variety of reasons which led me to this
22   opinion.
23       Q.  Okay.  So one of the other reasons, in
24   your opinion, was that there was no indication
25   in Boschelli that the excipients used were

1    Trout - Confidential
2    pharmaceutical grade, correct?
3        A.  That's correct.
4        Q.  So --
5        A.  If -- just to be clear, that's
6    another -- there's a variety.
7        Q.  Yeah.  So let's say a hypothetical
8    that Boschelli disclosed that the bosutinib was
9    pure and that the excipients used were
10   pharmaceutical grade excipients.  Would that
11   then change your opinion as to whether or not
12   Boschelli disclosed a pharmaceutical
13   composition?
14       A.  Well, I would need to -- certainly
15   that would affect -- if the excipients were
16   disclosed as pharmaceutically acceptable, that
17   would certainly affect my analysis.  I'm not
18   sure what "purity" means in -- in the context of
19   your question.  I mean --
20       Q.  Well, one of the issues you took with
21   the bosutinib was that it hadn't been purified
22   to the degree one would expect of a -- an API
23   that is going to be incorporated in a drug for
24   use in treating patients, right?
25       A.  Yes.  Purity is a -- was a significant

1    Trout - Confidential
2  issue, for example, on my paragraph 70.
3    Q.  Okay.  So let's say that the bosutinib
4  was pure, and the excipients used in the
5  Boschelli composition were pharmaceutical grade
6  excipients.  Now, with that information, would
7  your opinion change as to whether or not the
8  composition of Boschelli is a pharmaceutical
9  composition?
10    A.  And, Counsel, I'm not trying to split
11  hairs but it's -- I think saying that a compound
12  is pure is a little more complicated.  So it has
13  to be characterized and the -- the impurity
14  profile needs to be characterized.  If you're
15  telling me that it was characterized and there
16  was no detectable impurities, then that would --
17  I would have -- have to redo my analysis --
18    Q.  Okay.
19    A.  -- based on that.
20    Q.  Okay.
21    A.  It would be very unusual if that were
22  the case.
23    Q.  Well, let's say that is the case.
24  Let's say it is pure bosutinib, and the
25  excipients in the formulation were

1    Trout - Confidential
2  pharmaceutical grade excipients.  With that
3  hypothetical, how would that change your opinion
4  as to whether or not the composition in
5  Boschelli was a pharmaceutical composition?
6    MS. PIPER:  Objection to form.
7    A.  I would have to go through -- I mean,
8  I list a whole variety of other issues.  But
9  that would change my set of opinions in the
10  sense that those two opinions, again, with
11  purity being -- it was characterized in an
12  adequate way for a pharmaceutical, I would have
13  to take that into account in a reanalysis.
14    Q.  Okay.  But you haven't -- you haven't
15  considered that in -- as you sit here today, you
16  haven't considered that -- how those factors
17  would change your opinion.  Is that fair?
18    A.  Well, I've considered them broadly in
19  the sense that I considered what was necessary
20  for something to be a pharmaceutical composition
21  and what the disclosure in Boschelli 2001 was.
22  So I considered them in that broad sense.  I
23  didn't do an -- before today do an exercise in
24  the specific hypothetical.
25    Q.  So you'll agree with me Boschelli

1    Trout - Confidential
2  doesn't disclose -- well, strike that.
3    You'll agree with me the excipients
4  used in the Boschelli experiments weren't
5  identified as non-pharmaceutical grade
6  excipients, right?
7    MS. PIPER:  Objection to form.
8    A.  That's right.  They -- their source
9  was not identified at all.  And so they weren't
10  explicitly identified as non-pharmaceutical
11  versions.  But I think the skilled person would
12  expect that if they were pharmaceutical
13  compositions, that would be disclosed.
14    Q.  Why is that?
15    A.  Because it means that there was a -- a
16  specific grade that was used, and there was --
17  there would be specific attention paid to that.
18  The researchers in Boschelli did not pay
19  specific attention to the type of -- call them
20  excipients used.
21    Q.  Are you saying they didn't pay
22  attention to it, or they simply didn't disclose
23  it in their paper?
24    A.  Well, I mean, pay attention to it in
25  the sense of bringing attention to it, let's

1    Trout - Confidential
2  say, disclosing it to the reader of this paper,
3  if you want to say it that way.
4    Q.  But wouldn't a person of ordinary
5  skill in the art who is familiar with animal
6  studies expect that the excipients were
7  pharmaceutical grade excipients?
8    MS. PIPER:  Objection to form.
9    A.  I think I've given a variety of
10  opinions in which person, let's say, would not
11  necessarily expect from the disclosure in
12  Boschelli, and specifically, there's a reference
13  from an author named Wolff which talks about the
14  fact that they could very well be
15  non-pharmaceutical grade.
16    Q.  But doesn't Wolff disclose that the
17  default is that it -- that excipients should be
18  pharmaceutical grade excipients, absent some
19  extenuating circumstances?
20    MS. PIPER:  Objection to form.
21    Q.  And if you would like to go to Wolff,
22  we can do that.
23    A.  Yes, that would be great.
24    Q.  Let's go to -- this is going to be
25  Exhibit T, as in Tom, in your report.

Trout - Confidential

1 
2       And -- you have that?
3       A.  Yes, I'm there.
4       Q.  Okay.  Is this the Wolff reference
5   you're referring to?
6       A.  Yes.
7       Q.  Okay.  All right.  And I believe the
8   specific section you were addressing is on -- if
9   you look at the bottom left-hand corner of the
10  Wolff reference, there is a page number.  And
11  I'm looking at page 34.  Are you there?
12      A.  Yes.
13      Q.  And your opinion focuses on the
14  question in the middle column of Wolff.  It's
15  the third question, and it states, "Are the
16  scientists at our institution allowed to use
17  non-pharmaceutical grade chemical compounds in
18  physiological preparations involving laboratory
19  animals?"
20      Right?  That's the question?
21      A.  Yes.  And then there's another
22  sentence after that but that's --
23      Q.  Okay.  And then it -- right.  So let's
24  focus on that part of it first.  And so it's
25  your opinion that Wolff -- and I think the part

Trout - Confidential

1 
2   that you focused on is that Wolff recognized
3   that under certain circumstances the use of
4   non-pharmaceutical grade excipients is allowed,
5   right?
6       A.  Well, I mean, the second sentence in
7   the query is probably important because it also
8   differentiates survival versus non-survival
9   experiments.  But the way Wolff answers it in
10  his first sentence that you're referring to,
11  alluding to that it's allowed but specifically
12  saying, "It's a necessary and acceptable
13  component of biomedical research."
14      Q.  Okay.  So -- but doesn't -- but Wolff
15  goes on to say that, "The use of
16  non-pharmaceutical grade excipients should be
17  based on, 1, scientific necessity, 2,
18  nonavailability of an acceptable veterinary or
19  human pharmaceutical grade compound, and, 3,
20  specific review and approval by the IACUC."
21      Correct?
22      A.  Yes.
23      Q.  All right.  Now, do you see anything
24  in Boschelli that would lead you to believe that
25  there was a scientific necessity to use

Trout - Confidential

1 
2   non-pharmaceutical grade TWEEN 80 and dextrose?
3       A.  Well, I would say it the other way
4   around.  There was not a scientific necessity
5   for Boschelli to use pharmaceutical grade
6   compounds.  So I think that's the way I would
7   address Number 1 here.
8       Q.  Isn't -- I mean, when scientists are
9   doing research involving laboratory animals,
10  isn't the fact that these are living creatures
11  reason enough in a scientific justification for
12  using pharmaceutical grade excipients in things
13  being administered to those animals?
14      A.  No.  I think that's exactly the point
15  of the Wolff reference.  Again, these animals
16  were specifically induced with cancer with the
17  intention of studying the effect of chemical --
18  chemicals on cancer, with the intention that no
19  matter what they were to be sacrificed.
20      Q.  So under those circumstances it didn't
21  matter whether it was pharmaceutical grade
22  excipients.  Is that your testimony?
23      A.  My testimony is that there's no
24  indication that pharmaceutical excipients were
25  used, and there was not a necessity that

Trout - Confidential

1 
2   pharmaceutically acceptable excipients were
3   used.  And, again, that's just part of my
4   opinion.  The composition and the chemical
5   itself are other parts of it.  But if we're just
6   focused on the excipients...
7       Q.  But here the use of non-pharmaceutical
8   excipients has to be based on scientific
9   necessity, not the use of pharmaceutical
10  excipients, correct?
11      MS. PIPER:  Objection to form.
12      A.  Well, I mean, my reading of it is, is
13  it necessary to use non-pharmaceutical?  Is it
14  necessary to use pharmaceutical?  One would -- I
15  think you have to look at this in a broader --
16  in the broad way in which the authors Wolff, et
17  al., are trying to address this.
18      Q.  Did you talk to any of your colleagues
19  who do scient -- who do animal research to
20  determine what their standard practice would be
21  with respect to the use of pharmaceutical versus
22  non-pharmaceutical grade excipients?
23      A.  No.
24      Q.  Okay.  Well --
25      A.  And I mean, just to be clear,

Trout - Confidential

1   specifically in this case and specifically in
2   that way.
3       Q.  Right.
4       A.  I've certainly talked to colleagues
5   outside of this case and before about animal
6   studies and what they use.
7       Q.  You've had discussions about that
8   specific issue, about whether they use
9   pharmaceutical grade or non-pharmaceutical grade
10  excipients in compositions they're administering
11  to animals?
12      A.  I have not specifically posed that
13  question.  I just had general discussions.
14      Q.  Okay.  So what is the basis of your
15  understanding that a person of ordinary skill in
16  the art reading Boschelli would not understand
17  the excipients to be pharmaceutical grade
18  excipients?
19      A.  Again, my opinion is that there's not
20  an indication that they're pharmaceutical grade
21  excipients, and that's based on -- I mean,
22  there's a variety of reasons in my report.  But
23  if you want me just to summarize, I mean, I
24  would take my opinions as a whole in the report.

Trout - Confidential

1       But a couple of those opinions are
2   that there's no specific disclosure that they're
3   pharmaceutical grade.  Also, there's no
4   scientific necessity because these are
5   experiments that are done early on in the
6   discovery phase in which the animals are induced
7   with the cancer and meant to be sacrificed.
8       Q.  Okay.  So this idea that the animals
9   are meant to be sacrificed, can you just
10  explain -- and I know that you've -- you've
11  talked generally about that, but how is that
12  important for your opinion that the Boschelli
13  composition was not a pharmaceutical
14  composition?
15      A.  Because the animals are not being
16  treated per se to cure a disease.  They're being
17  studied for the effects of various compounds
18  and -- in various assays including the xenograft
19  study.  And so the idea is not to treat them.
20  The idea is to study and then sacrifice them
21  regardless of the outcome.  So -- yeah, stop
22  there.
23      Q.  Okay.  So one -- one -- so the fact
24  that they're going to be sacrificed leads you to

Trout - Confidential

1   believe that they're not being treated, correct?
2   I mean, that's one opinion you have?
3       A.  I think that's an important component.
4       Q.  Okay.  And then anything else?  Any
5   other relevance to the fact that these are --
6   animals are going to be sacrificed?  How does
7   that affect any of your other opinions about the
8   composition in Boschelli?
9       A.  Well, again, my conclusions are based
10  on my analysis as a whole, and that's really the
11  entirety of the substance of my report.  So it's
12  all -- it's all part of analysis of the full
13  disclosure in Boschelli.
14      Q.  Okay.
15      A.  So that full disclosure including the
16  fact that they were not going to survive, they
17  were going to be sacrificed, leads me to the
18  conclusion that I had.
19      Q.  Would that lead a person of ordinary
20  skill in the art, the fact that they were going
21  to be sacrificed, to believe the excipients used
22  were not pharmaceutical grade excipients?
23      A.  Again, I'm -- I'm saying that that is
24  another indication.  There's no disclosure that

Trout - Confidential

1   they are.  And if you look at the totality of
2   the context of the experiments, including the
3   fact that they were to be sacrificed, and that's
4   an important element, but that's -- that is one
5   element of a set of disclosures which leads to
6   my opinion that there's -- and conclusion that
7   there's no indication that these are
8   pharmaceutically acceptable excipients.
9       Q.  Okay.  Now, you don't disagree with me
10  that pharmaceutical grade TWEEN 80 is readily
11  available and would have been at the time of the
12  invention, correct?
13      A.  Well, available, it depends what you
14  mean by "ready."  One --
15      Q.  It can be purchased?
16      A.  -- it could have been -- could have
17  obtained it.  I'm not sure if there would have
18  been delays or what the supply chain would be,
19  but it was obtainable.
20      Q.  Yeah.  You could have bought it from
21  Sigma, right, pharmaceutical grade TWEEN 80?
22      A.  Yes, I think that's one possibility.
23      Q.  Okay.
24      A.  Assuming it was in stock.

Trout - Confidential

1
2      Q.   And one could have also purchased
3   pharmaceutical grade dextrose from Sigma at the
4   time as well, correct?
5      A.   Yes, I think that's correct.
6      Q.   And one could have easily obtained
7   purified water, correct?
8      A.   Well, again, water, as I've talked,
9   it's not just a matter of purified.  It has to
10  be purified and meet certain criteria to be
11  acceptable in a pharmaceutical composition.
12     Q.   But don't laboratories typically --
13  laboratories that are dealing with
14  pharmaceutical compositions, don't they
15  typically have water purification devices in the
16  laboratories that essentially filter water to
17  create sterile, pure water?
18     A.   Well, I think that's the intention
19  behind, you know, a typical water, let's say,
20  filtration device.  I have one in my lab.  But I
21  have not specifically analyzed or even used it,
22  tested it to see if it meets some set of
23  standards that would make it pharmaceutically
24  acceptable.
25     Q.   Do laboratories buy pharmaceutically

Trout - Confidential

1
2   acceptable water from Sigma, for example?
3      A.   I'm not sure if Sigma is a supplier,
4   but there are suppliers that one could buy it
5   from.
6      Q.   In your experience do labs buy
7   pharmaceutical grade water, or do they create it
8   in their lab using their own filtration devices?
9      A.   I'm not sure how they -- there are
10  various routes of obtaining it.  I'm not sure
11  what's most prevalent.
12     Q.   Okay.  And the filtration device you
13  have in your lab, explain to me what -- what is
14  the purpose of that specific device?
15     A.   The purpose is to filter and treat
16  water.  My lab is in Cambridge, Massachusetts.
17  They have a certain degree, certain criteria for
18  water.  We filter it to try to remove impurities
19  that we don't want in the water that, you know,
20  the City of Cambridge, whoever produces their
21  water, leaves in it.
22     Q.   Would a person of ordinary skill in
23  the art have expected the composition in
24  Boschelli was comprised of water that had been
25  filtered in the same way that you filter water

Trout - Confidential

1
2   in your lab?
3      A.   I'm not sure.  There's no indication
4   that it was -- how it was obtained.
5      Q.   But the question is, would a person of
6   ordinary skill in the art reading Boschelli have
7   that expectation, that that's the type of water
8   filtration -- that's the type of water that
9   would have been used in the composition?
10     A.   I think it's possible, maybe likely,
11  but not certain.  I mean, I think it would have
12  to be disclosed for someone to be certain about
13  that.
14     Q.   Okay.  So there's no absolute
15  certainty that that is what was used in the
16  composition of Boschelli, right?
17     A.   Well, I didn't say absolute certainty.
18  I mean, what is absolutely certain?  I -- I said
19  certainty.
20     Q.   Okay.
21     A.   I said it's possible, but it's also
22  possible not.
23     Q.   How about the -- from the perspective
24  of a person of ordinary skill in the art reading
25  Boschelli, would their expectation have been

Trout - Confidential

1
2   that the TWEEN 80 was pharmaceutical grade?
3   TWEEN 80?
4      A.   I think I address this, for example,
5   in my paragraph 74 in which I say, specifically
6   referring to the previous sentence, "Nothing in
7   Boschelli 2001 suggests that the inactive
8   components," including TWEEN 80 in your
9   question, dot dot dot, "in the formulation
10  administered to the laboratory mice were
11  pharmaceutical grade or would have been
12  pharmaceutically acceptable as used."  And
13  there's some references.
14     Q.   Okay.  I appreciate that.  My question
15  was different.  Which is, namely, a person of
16  ordinary skill in the art reading -- well,
17  before we get to there, let's agree on one
18  thing.
19     We can both agree Boschelli is silent
20  as to whether the TWEEN 80 or -- well, let's
21  start with TWEEN 80, is silent as to whether the
22  TWEEN 80 used in the composition of Boschelli
23  was pharmaceutical grade or non-pharmaceutical
24  grade, correct?
25     MS. PIPER:  Objection to form.

Trout - Confidential

1
2   A.  Correct in the sense there's no
3   specific disclosure of the source or the grade
4   of TWEEN 80.
5   Q.  Okay.  And Boschelli is similarly
6   silent as to whether the dextrose used in the
7   compositions of Boschelli was pharmaceutical
8   grade versus non-pharmaceutical grade, correct?
9   A.  That's correct in the sense that
10  there's no specific disclosure as to the source
11  or the -- or the type of dextrose.
12  Q.  Okay.  So with that understanding, my
13  question is a little bit different then.  It is,
14  a person of ordinary skill in the art reading
15  Boschelli, what would their expectation have
16  been based on their own knowledge and experience
17  as to whether or not the TWEEN 80 was
18  pharmaceutical grade?
19  A.  Yes and -- maybe I don't understand,
20  if -- to the extent I understand your question,
21  and I emphasize maybe this helps, all the
22  opinions in my report are based on the point of
23  view of a person of ordinary skill in the art as
24  I've defined it, or -- you know, there's two
25  different definitions.  Either one the opinions

Trout - Confidential

1
2   don't change.
3   And that's why I wanted to stick to
4   specifically what I wrote here in the text
5   suggests that the inactive components, including
6   TWEEN 80 -- there's nothing that suggests that
7   they were pharmaceutical grade or would have
8   been pharmaceutically acceptable as used;
9   definitely from the point of view of the person
10  of ordinary skill in the art.
11  Q.  Well, is there anything about a person
12  of ordinary skill in the art's just experience
13  that would have led them to believe that the
14  pharmaceutical excipients used in Boschelli
15  were, in fact, pharmaceutical grade excipients?
16  MS. PIPER:  Objection to form.
17  A.  I -- I think -- if you mean some
18  degree of certainty, I think -- I mean, I would
19  stick to the words the way I used it in my
20  report, because I know this is a key question in
21  the case, but there's no indication that these
22  are pharmaceutically acceptable or
23  pharmaceutical grade, and so I don't think the
24  skilled person would have had certainty that
25  they are pharmaceutical grade if -- if there's

Trout - Confidential

1
2   no indication.
3   And, again, it's also based on the
4   type of study and the context, and sort of the
5   overall disclosure in the document, too.
6   Q.  Including the fact that the animals
7   were to be sacrificed, right?
8   A.  Yes, that's part of it, including
9   the -- but also the general context of the study
10  which is really in the phases of drug discovery.
11  Q.  The -- well, would a person of
12  ordinary skill in the art reading Boschelli
13  believe it was more likely than not that the
14  TWEEN 80 used was pharmaceutical grade?
15  MS. PIPER:  Objection to form.
16  A.  And just to be clear, this sounds to
17  me like a legal term.  Are you asking more
18  likely than not as --
19  Q.  No, it's not.
20  A.  Not.  Okay.  So not a legal term.
21  I think my opinion is that the skilled
22  person would understand that there's no
23  indication.  I'm not sure what the likelihood
24  would be in a percentage or even qualitative
25  way.  I would stick to the terms that I used in

Trout - Confidential

1
2   my report.
3   Q.  So if a person of ordinary skill in
4   the art was experienced in doing animal studies
5   and based on that experience understood that
6   pharmaceutical grade excipients should be used,
7   how would that -- wouldn't that influence their
8   expectation about whether the TWEEN 80, for
9   example, used in the composition of Boschelli
10  was pharmaceutical grade?
11  MS. PIPER:  Objection to form.
12  A.  Well, I -- I think I put that -- I
13  took into account that possibility in -- in my
14  analysis, and included a lot of, you know,
15  references and a lot of analyses to achieve
16  my -- or to, you know, come up with my opinions,
17  obtain my opinions.
18  MR. BENSON:  Let me mark something
19  here.  Could we mark this as Trout
20  Deposition Exhibit Number 3.
21  (Guide for the Care and Use of
22  Laboratory Animals was marked Trout Exhibit
23  3 for identification, as of this date.)
24  THE WITNESS:  Thank you.
25  Q.  Now, so I've handed you a document we

Trout - Confidential

have marked as Trout Exhibit Number 3, and it is
the Guide for the Care and Use of Laboratory
Animals.  Are you familiar with this document?

    A.  No.  I'm familiar with the concept but
not this particular document.

    Q.  And when you say you're "familiar with
the concept," what do you mean by that?

    A.  Well, that such guides exist, we
talked about that earlier this morning, and the
various criteria.

    Q.  Okay.  All right.  So I would like to
direct you to page -- looks like my page numbers
are behind the clip here.  Let me see.  I
believe it is page 32 of the document.  Do you
see the page numbers are at the corner?

    A.  I see the pages.

    Q.  Okay.  It's actually page 31 of the
document.

        Okay.  So are you at page 31?

    A.  Yes.

    Q.  Okay.  So let's go to that section,
it's italicized, and it is -- it is titled Use
of Non-pharmaceutical Grade Chemicals and Other
Substances.  Okay.  Now, take a moment to just

Trout - Confidential

read that paragraph there on page 31, and let me
know when you're done.

        (Witness reviewing document.)

    A.  Okay.  I've read this.

    Q.  Okay.  Now, according to this document
it states that, "The use of pharmaceutical grade
chemicals and other substances ensures that
toxic or unwanted side effects are not
introduced into studies conducted with
experimental animals."

        Do you agree with that statement?

    A.  Counsel, that's what's written there
and you read that, I think, accurately.  I
haven't seen this document before.  It's over a
hundred pages.  It's got -- I don't know how
many references, maybe a hundred references or
so.  So I would have to analyze this whole
document to opine on a -- a specific statement
as such.

        I don't even know the -- the chapter,
heading, or other statements in the document.
So I -- I can't sitting here, just now having
read that one paragraph --

    Q.  Sure.  We can --

Trout - Confidential

    A.  -- come up with a conclusion on that
sentence.

    Q.  I'm sorry.  I didn't mean to talk over
you.

        We can agree that the use of
non-pharmaceutical grade chemicals and other
substances -- that's exactly what we've been
talking about for the last 35, 40 minutes,
right?

    A.  Well, I think what we've been talking
about is whether the disclosure in Boschelli
2001 is such that the skilled person would
understand are pharmaceutical grade, and so I
have opined it's not indicated and so it's
uncertain.  And so I think that's what we have
been talking about.

    Q.  I get that it's uncertain, and I
understand that.  What I've been trying to get
to is what would -- notwithstanding that it is
not disclosed in Boschelli, what would a person
of ordinary skill in the art have expected.  And
wouldn't you agree based on -- that this
particular document on page 31, that -- the
paragraph you just read, that the recommendation

Trout - Confidential

here is that pharmaceutical grade excipients
should be used when available for all
animal-related procedures, right?

        MS. PIPER:  Objection to form.  And
plaintiffs object to the use of the
document not considered by Dr. Trout in his
report.

    A.  I see that's what's written in the
second sentence in that paragraph.

    Q.  Yeah.  It's written that
pharmaceutical grade excipients when available
should be used, right?

    A.  Well, I think it's important to -- you
read the whole sentence accurately before.  I
think it's important to take the whole sentence
into account, including the unwanted side
effects, and -- and other aspects.  And so the
foc -- and then that's what the "they" refers
to, correct, the pharmaceutical grade chemicals
and other substances.

    Q.  Right.  And then there's a citation
here to USDA 1997b.  Do you have any
understanding as to what that reference is to?

        (Witness reviewing document.)

Trout - Confidential

1
2     MS. PIPER:  Again, objection.
3     Dr. Trout has not considered this document
4     in forming his opinion and is not familiar
5     with the document.
6     A.  I'm trying to look up the reference,
7     but it looks like in the back there are all
8     kinds of different sections, and it's not
9     readily evident where that reference is.  But I
10    don't --
11    Q.  Okay.
12    A.  -- I don't think it's part of my
13    materials considered.
14    Q.  Okay.  Fair enough.
15    A.  Unless I -- unless I'm missing it.  We
16    could check the list.
17    Q.  Okay.
18    A.  I don't --
19    Q.  All right.  So the next sentence here
20    says, "The use of non-pharmaceutical grade
21    chemicals or substances should be described and
22    justified in the animal use protocol and be
23    approved by the IACUC."
24        And the citation here is to Wolff,
25    which is the same article you rely upon in your

Trout - Confidential

1
2     expert report, correct?
3     A.  And just to clarify -- I'll answer
4     that and to clarify the previous answer, I did
5     find now that -- it's actually -- the references
6     I think are at the end of the chapter, and maybe
7     located in a different place in the end of the
8     whole document, but -- so I see now the Wolff
9     reference there.
10        (Witness reviewing document.)
11    A.  And, yes, this looks to be the same
12    reference that is my Exhibit T.
13    Q.  And then the USDA 1997b reference is
14    also indicated there, correct?
15    A.  Yes.  I see that now in the -- in the
16    list of references at the end of the chapter,
17    whatever, or section, whatever it is.
18    Q.  And that reference is to the APHIS
19    Policy Number 3, quote, Veterinary Care, July
20    17.  Do you see that?
21    A.  Yes, I see that.
22    Q.  Do you know what APHIS stands for?
23    A.  No.  But it's probably written in this
24    document somewhere.
25    Q.  Okay.  All right.  And based on the

Trout - Confidential

1
2     date of this, do you understand that this would
3     have been the -- the recommendation that they're
4     referring to here that pharmaceutical grade
5     chemicals or substances should be used when
6     available is a policy that had been promulgated
7     at least as early as 1997?
8         MS. PIPER:  Objection to form.
9     A.  I have not reviewed that -- the
10    reference, the USDA 1997b reference, so I'm not
11    sure if this is an accurate characterization.
12    And I haven't reviewed this document either,
13    except for that one paragraph, so I don't know.
14    Q.  Okay.  All right.  So this document,
15    though, does -- it does cite the Wolff reference
16    that you've relied upon in your -- in your
17    expert report, correct?
18    A.  Yes.
19    Q.  And what it says about Wolff is that
20    the use of non-pharmaceutical grade chemicals or
21    substances should be described and justified in
22    the animal use protocol and be approved by
23    AUCUC, right?
24    A.  IACUC, yes.
25    Q.  I apologize.

Trout - Confidential

1
2     A.  IACUC.  Yes.  That's what's written
3     here.
4     Q.  So wouldn't a person of ordinary skill
5     in the art expect that if -- that if
6     non-pharmaceutical grade chemicals were used,
7     that that would be disclosed in the study
8     protocol?
9         MS. PIPER:  Objection to form.
10    A.  Again, I'm looking at one sentence and
11    one paragraph, and that's all I've read in this
12    hundred-page document with lots and lots of
13    references.  But I'm -- I'm not -- I don't think
14    that Boschelli is disclosing a protocol per se.
15    Part of a protocol or maybe that is the
16    disclosure of the protocol.  But I'm not,
17    frankly, sure exactly what this sentence refers
18    to, so I would really have to study this whole
19    document in detail.
20    Q.  But wouldn't you agree with me that
21    based on the information in this document, a
22    person of ordinary skill in the art would first
23    expect that pharmaceutical grade excipients
24    would be used in animal studies when those
25    excipients are available?

Page 102

Trout - Confidential

1
2     MS. PIPER:  Objection.  Dr. Trout has
3  not had a chance no review this document
4  and has not considered it in forming his
5  opinion.
6     A.  I'm not sure if that's what the
7  document concludes or even indicates,
8  particularly in the context of the Boschelli
9  2001 article.
10    Q.  Okay.  Well, wouldn't a person of
11 ordinary skill in the art have understood that
12 if non-pharmaceutical grade chemicals or
13 substances were used, that that should be
14 disclosed in the study protocol?
15    MS. PIPER:  Objection.  Dr. Trout has
16 not had a chance to review this document
17 and has not considered it in forming his
18 opinion.
19    A.  I mean, again, I read the sentence as
20 such.  I'm not sure of the broader context.  And
21 I think one would have to understand the -- the
22 document as a whole to interpret what a given
23 sentence and given paragraph and given chapter
24 means.
25    Q.  Well, the context as a whole is Wolff,

Page 103

Trout - Confidential

1
2  right?  Because that's what Wolff says, right?
3     A.  No --
4     Q.  If we go back to Wolff, it says:
5  Specific review and approval by IACUC has to
6  be -- has to be achieved for the use of
7  non-pharmaceutical grade excipients.
8     Right?
9     MS. PIPER:  Objection to form.  And
10 Dr. Trout has not had a chance to review
11 this document.
12    MR. BENSON:  I just read from Wolff,
13 and he reviewed it and discussed it at
14 length.
15    Q.  Isn't it true that Wolff explicitly
16 states that, when using non-pharmaceutical grade
17 excipients, specific review and approval by the
18 IACUC must be obtained?
19    A.  Well, going back to Wolff, I mean,
20 that's one of three possibilities in -- in this
21 list from Query 3 in the middle column on
22 page 34.  He discussed that there are other
23 possibilities.  And, again, these -- these are
24 under a broader statement in Wolff.
25    Q.  Now, the very last -- one of the

Page 104

Trout - Confidential

1
2  sentences in Wolff that, you know -- in that
3  first question, the second part of that that you
4  noted was, it states:  Please clarify whether
5  this -- and "this" is the use of
6  non-pharmaceutical grade excipients -- is an
7  allowable practice and whether it makes a
8  difference if the compounds are used in survival
9  versus non-survival experiments.
10    Right?
11    A.  Yes, that's what's written there.
12    Q.  What does Wolff say about that?
13    Well, let me ask a different question.
14 Isn't it true that Wolff says that
15 notwithstanding the use of non-pharmaceutical --
16 of pharmaceutical grade excipients -- let me
17 rephrase that.
18    Isn't it true that Wolff states that
19 it doesn't matter whether the studies are
20 non-survival studies, the scientific principles
21 requiring the use of pharmaceutical grade
22 excipients is -- still remain the same?
23    A.  You know, I think you're referring to
24 the next to the last sentence in the bottom.  It
25 doesn't quite say it the way you stated.  It

Page 105

Trout - Confidential

1
2  really says, "Although the potential animal
3  welfare consequences of complications are less
4  evident in non-survival studies, the scientific
5  issues remain the same."
6     That's what he says.
7     Q.  Right.  And the scientific issue is
8  that, all things being equal, if the
9  pharmaceutical grade excipients is available,
10 that's what should be used.  Isn't that what
11 Wolff is saying?
12    MS. PIPER:  Objection to form.
13    A.  I don't think Wolff says that.
14    Q.  Well, it says, Under certain
15 circumstances one could use non-pharmaceutical
16 grade excipients.  Isn't it true that a person
17 of ordinary skill in the art reading that would
18 say, generally you have to use pharmaceutical
19 grade excipients, under these circumstances
20 outlined here it may be justifiable to use
21 non-pharmaceutical grade excipients?
22    A.  Well, that's correct.  But the -- the
23 circumstances of Boschelli, because -- Boschelli
24 2001 are different, let's say, than other
25 circumstances.

Trout - Confidential

1
2     Q.   In what way?
3     A.   So -- okay.  Just to clarify, and then
4  I'll segue to your question.  So Wolff is
5  talking about a variety of different
6  circumstances.  And -- and so -- and getting to
7  your question, the circumstances around
8  Boschelli are that the animal experiments are
9  done on mice, and they're done early on in the
10  discovery, as opposed to animal experiments that
11  are done later, like, under preclinical context.
12  And so -- so I think one has to take into
13  account those circumstances in understanding the
14  answer here in Query 3 in Wolff.
15     Q.   What's the justification for using
16  non-pharmaceutical grade excipients when you're
17  administering something to a living animal?
18     Let me ask a different question.
19  Don't researchers working with laboratory
20  animals have a duty to ensure that the research
21  they're doing causes the least possible harm to
22  the animal?
23     MS. PIPER:  Objection.  Outside the
24     scope of Dr. Trout's opinion.
25     A.   I'm not sure if they have that duty or

Trout - Confidential

1
2  not.  I don't have an opinion on that.
3     Q.   I mean, isn't that what the, you know,
4  Guideline for the Use and Care of Animals is all
5  about is protecting animals used in laboratory
6  research?
7     MS. PIPER:  Objection.  Again,
8     Dr. Trout has not had a chance to review
9     the entire Guideline for the Care and Use
10     of Laboratory Animals.
11     Q.   You can answer the question.
12     A.   I -- I don't know.  I'm not sure -- I
13  haven't read the whole -- and studied this whole
14  document.
15     Q.   Research laboratories are required to
16  have a veterinarian on staff, right?
17     MS. PIPER:  Objection.  Outside the
18     scope of the Dr. Trout's opinion.
19     A.   I mean, I'm not sure what you mean.
20  Not all research laboratories.  Maybe some.
21     Q.   Do you have any understanding as to
22  what are the requirements for providing
23  veterinary care to laboratory animals?
24     MS. PIPER:  Objection.  Outside the
25     scope of Dr. Trout's opinion.

Trout - Confidential

1
2     A.   I don't have an opinion on that.
3     Q.   Would it change your -- you testified
4  earlier today that the pharmaceutical
5  compositions of the '625 patent are compositions
6  that are appropriate for human or veterinary
7  use, right?
8     A.   In Claim 1 of the '625, yes, it's my
9  understanding.
10     Q.   And if -- if laboratory animals are
11  under the care of veterinarians who are
12  overseeing the medicines being administered to
13  animals, isn't that veterinary care?
14     MS. PIPER:  Objection to form.  And
15     objection.  Outside the scope of
16     Dr. Trout's opinion.
17     A.   I don't have an opinion on that
18  matter.
19     Q.   Okay.  Would it change your opinion if
20  the animals in this particular study were --
21  were under the care of a veterinarian and the
22  procedures were being overseen by a
23  veterinarian?
24     A.   I mean, I would have to -- I would
25  take that into account.  There's no disclosure

Trout - Confidential

1
2  in Boschelli as such.  So I'm not sure, sitting
3  here, how that hypothetical would change my
4  opinions or not.
5     Q.   Okay.  You don't disagree the intent
6  of administering the composition of Boschelli
7  was to inhibit tumor growth in the laboratory
8  mice, right?
9     MS. PIPER:  Objection.  Outside the
10     form -- scratch that.  Objection.  Outside
11     the scope of Dr. Trout's opinion.
12     A.   I don't think I opined upon the
13  intention as such.
14     Q.   You said that the animals weren't
15  being treated; is that right?
16     A.   I believe that's what I said.  I may
17  have said more and qualified that.  But I think
18  what I said is they're not -- stick maybe to
19  what -- my original answer, but they're not
20  intended to be treated to cure disease.  They're
21  intended to test different hypotheses, and --
22  and in the end to be sacrificed.
23     Q.   How does that matter to an
24  anticipation argument on a claim that doesn't
25  require or include a limitation that is a method

Trout - Confidential

1  Trout - Confidential
2  of treating --
3      MS. PIPER:  Objection to form.  And --
4      Q.  -- an animal?
5      I mean, the claim doesn't say -- let
6  me -- you know, let me ask it in a different
7  way, and namely first by directing you to the
8  claim at issue.  You can go back to -- I believe
9  it was at paragraph 40 --
10     A.  42.
11     Q.  42.  Thank you.
12         The claim itself is just, "A
13  pharmaceutical composition comprising a CML
14  inhibiting amount of bosutinib."
15         Right?
16     MS. PIPER:  Objection to form.
17     A.  I think that's what it says, yes,
18  pharmaceutical composition --
19     Q.  So the only issue is, is the
20  composition in Boschelli a pharmaceutical
21  composition, right?
22     MS. PIPER:  Objection to form.
23     Q.  That's one issue, correct?
24     A.  Yes, that's the -- the major issue
25  that I opined upon.

1  Trout - Confidential
2      Q.  And the second issue, is the amount of
3  bosutinib a CML inhibiting amount?
4      MS. PIPER:  Objection.  Outside the
5  scope of Dr. Trout's opinion.
6      Q.  Right?
7      A.  That's part of the claim, and I didn't
8  opine upon the CML inhibiting amount.
9      Q.  Okay.  So your entire opinion is based
10  solely on whether it's a pharmaceutical
11  composition, correct?
12     A.  It being the -- what's disclosed in
13  the Boschelli 2001.  That was the focus of my
14  opinions.
15     Q.  Okay.  So I'll ask that again in a
16  better way, and you're right.  So your opinion
17  is focused solely on whether or not the
18  composition of Boschelli is a pharmaceutical
19  composition as that term has been construed by
20  the Court in this case, correct?
21     A.  Well, that's correct in specifically
22  responding to Dr. -- some of Dr. Lindsley's
23  opinions in that regard, but that's the focus of
24  my report, though.
25     Q.  And just for clarity, you do not give

1  Trout - Confidential
2  an opinion as to whether or not the bosutinib in
3  the Boschelli composition is a CML inhibiting
4  amount of bosutinib, correct?
5      A.  That's correct.  I do not have -- did
6  not express opinions about CML inhibiting
7  amounts.
8      Q.  Okay.  All right.  Now, so given your
9  opinion as focused solely on the pharmaceutical
10  composition, I do want to return to paragraph
11  29, which includes the Court's construction.
12  And I just want to recapitulate where we are in
13  agreement on pharmaceutical composition,
14  specifically looking with reference to the
15  Court's construction.  Okay?
16     MS. PIPER:  Objection to form.
17     MR. BENSON:  That wasn't a question.
18     Q.  Okay.  So the Court's construction --
19     MR. BENSON:  I'll give you a minute.
20     MS. PIPER:  Sorry.
21     MR. BENSON:  That's quite all right.
22  Those are unwieldy binders.
23     MS. PIPER:  Okay.  Thanks.
24     MR. BENSON:  You're welcome.
25     Q.  Okay.  So, again, the Court's

1  Trout - Confidential
2  construction is, "A pharmaceutically acceptable
3  composition containing the specified compound,"
4  in this case bosutinib, "and one or more
5  excipients."
6      Right?
7      A.  Yes.
8      Q.  Okay.  We agree the composition of
9  Boschelli includes -- contains bosutinib, which
10  is under the Court's construction the specified
11  compound, right?
12     MS. PIPER:  Objection to form.
13     A.  Well, I think -- if you're talking
14  about a -- a chemical structure per se, which is
15  somewhat abstract, that's there.  But, again,
16  that's a -- whether it's an API and the -- the
17  way it was made in Boschelli 2001 and the way it
18  was characterized, those are central aspects to
19  my opinions in this case.
20     Q.  Okay.  I'll ask it again.  I think my
21  question was a little bit cleaner.  Namely, the
22  composition of Boschelli contained bosutinib,
23  right?
24     A.  Again, I -- it would just stick to my
25  answer.  I think it's the same question, which

1    Trout - Confidential
2    is that if you're just talking abstractly about
3    the molecule, the chemical formula, that's what
4    is characterized as 31a in Boschelli 2001.
5         But if you're talking about impurity
6    profiles, acceptability as an API, and those
7    aspects, which I think are important aspects
8    of -- of what goes into a composition, then I
9    express a large number of opinions about that.
10        Q.   I understand, but that's not my
11   question.  My question is very simple.  It's a
12   yes or no.  Does the composition of Boschelli
13   contain bosutinib?
14        A.   And in your -- just to clarify in your
15   yes-or-no question, by "bosutinib," you mean
16   abstractly this chemical formula, which is an
17   abstraction of what a -- a chemical is, or do
18   you mean bosutinib as would go into a
19   pharmaceutical composition, or something else?
20        Q.   I don't think -- I don't think the
21   chemical formula of bosutinib is an abstract in
22   any way, shape, or form, is it?
23        MS. PIPER:  Objection to form.
24        Q.   I mean, that confuses me.
25        A.   In my view as a chemist, a chemical

1    Trout - Confidential
2    formula is an abstraction of what's there.  It's
3    maybe a model or an indication.
4         Q.   It's a precise definition of what the
5    chemical entity is, right?
6         I mean, that's how you know what it
7    is.  A chemist can read a chemical formula and
8    know exactly what it is, right?
9         MS. PIPER:  Objection.
10        Q.   It knows how many carbons, how many
11   nitrogens, how many hydrogens, how many oxygens,
12   right?
13        A.   Yes, it allows you to count those.
14        Q.   Yeah, and the way that the -- the way
15   that the chemical formula is constructed, it
16   also gives the chemist information as to how
17   those various atoms are connected to one
18   another, right?
19        A.   That's what a two-dimensional chemical
20   representation does, yes.
21        Q.   Okay.  So the question is -- and we've
22   already agreed that that chemical formula in
23   Claim 1 is bosutinib, right?
24        A.   Bosutinib the molecule, yes.
25        Q.   That's right.  That's what's stated

1    Trout - Confidential
2    there.  And that's what the claim is all about,
3    does it have that molecule?  That's the
4    compound, right?
5         MS. PIPER:  Objection to form.
6         Q.   That's what the claim is about, it's
7    about the compound bosutinib?
8         A.   It's not all about that, Counselor,
9    no.  It's about other -- there are other
10   elements, too.
11        Q.   Well, let's go back to the claim.  The
12   claim says, "A pharmaceutical composition
13   comprising a CML inhibiting amount of the
14   compound," and then it names the chemical
15   formula which is bosutinib, right?
16        A.   Right, as the chemical.
17        Q.   That's the chemical, right.  That's
18   what I'm asking.  That's bosutinib.  That's what
19   the claim is all about.  It's not about an
20   abstraction.  It's not about whether or not it
21   was pure or how it -- whether the column
22   chromatography was done, you know, properly
23   or -- it doesn't matter.  The question I have
24   is, does the composition of Boschelli contain
25   bosutinib?

1    Trout - Confidential
2         MS. PIPER:  Objection to form.
3         A.   Well, in -- qualify in my opinion in
4    reading this as a chemist, there -- there are
5    other parts like pharmaceutical composition.
6    But --
7         Q.   I'm not asking about those.  I just
8    want a yes or no.  Does the composition of
9    Boschelli contain bosutinib?  Yes or no?
10        A.   It contains that molecule --
11        Q.   Thank you.
12        A.   -- 31a, as I've testified to.  31a.
13        Q.   Which is bosutinib, correct?
14        MS. PIPER:  Objection to form.
15        A.   It's the bosutinib chemical, if we
16   talk about it, that -- if that's the focus of
17   it, it's -- but --
18        Q.   Let me do it a different way.
19        A.   Just to finish my answer, Counselor,
20   please.
21        Q.   You know what?  I -- I withdraw the
22   question.  Let me ask a different question.
23        Does the formulation, or -- strike
24   that.
25        Does the composition of Boschelli

Page 118

Trout - Confidential

1  
2  contain 4-[(2,4-dichloro-5-methoxyphenyl) amino]
3  -6-methoxy-7-[-3-(4-methyl-1-pyperazinyl)propoxy
4  ]-3-quinolinecarbonitrile?  Yes or no?
5      A.   Again, I'm not sure if you got all the
6  brackets right, but we know it's written there.
7  So what I'm trying to say is that the -- this
8  particular compound as such is -- is part of
9  what's in Boschelli Reference Number 31a.
10      Q.   So, yes, the composition of Boschelli
11  includes bosutinib, right?
12      A.   If that's what we're defining
13  bosutinib is, is that chemical formula.
14      Q.   Okay.  Can you assume in the question
15  I asked that when I say "bosutinib," I mean the
16  chemical formula?  I'm sorry.  I thought that
17  was clear.  When I say "bosutinib," I mean that
18  chemical formula.  Okay?  That's what I mean.
19      MS. PIPER:  Objection to form.
20      Q.   Do you understand?
21      A.   Yes.
22      Q.   Okay.  Does the composition of
23  Boschelli contain bosutinib?
24      A.   Again, under your definition, this
25  chemical formula, yes.

Page 119

Trout - Confidential

1  
2      Q.   Okay.  And does the composition of
3  Boschelli contain one or more excipients?  Yes
4  or no?
5      A.   So, for example -- on page 15 of my
6  report, 53, I talk about excipients as
7  ingredients of a pharmaceutical composition
8  other than the active ingredient.  From that
9  standpoint since Boschelli does not contain
10  or -- is likely not to contain pharmaceutical
11  compositions, and all the -- I mean, this is
12  really the whole focus of my report, I would not
13  call those excipients.
14      Q.   Okay.  So it is your opinion that the
15  composition of Boschelli does not include any
16  excipients, right?
17      A.   Well, again, there's no indication
18  that what's included are pharmaceutically
19  acceptable.  Certainly TWEEN, dextrose, and
20  water can be excipients, and they're in the
21  Handbook of Pharmaceutical Excipients.  And
22  they're likely on the GRAS list, as we discussed
23  earlier.
24      But if we're defining as I do here
25  that they have to be in a pharmaceutical

Page 120

Trout - Confidential

1  
2  composition for -- and this is just a summary
3  statement for all the reasons which I discuss
4  here, then they're not excipients as such
5  because it's not likely to be a pharmaceutical
6  composition.
7      Maybe if someone were to go back and
8  characterize it, and -- maybe they actually do
9  meet specs but there's no indication that they
10  do, and so there's no indication that they're a
11  pharmaceutical composition, or that they're
12  excipients that are ingredients of a
13  pharmaceutical composition.
14      Q.   Okay.  One second.
15      THE COURT REPORTER:  Counsel, when you
16  get to a good moment, I could use a break.
17      MR. BENSON:  Yeah.  That's what I was
18  getting at.  Let's take a break.
19      THE VIDEOGRAPHER:  The time is
20  11:59 a.m., and we are going off the
21  record.
22      (Luncheon recess at 11:59.)
23  
24  
25  

Page 121

Trout - Confidential

1  
2  A F T E R N O O N  S E S S I O N
3      (1:00)
4  BERNHARDT TROUT, Ph.D.
5      resumed, having been previously duly
6      sworn by a Notary Public, was
7      examined and testified further
8      as follows:
9      THE VIDEOGRAPHER:  The time is 1:00,
10  and we are back on the record.
11  CONTINUED EXAMINATION BY MR. BENSON:
12      Q.   Welcome back, Dr. Trout.
13      A.   Thank you.
14      Q.   So returning to the claim language,
15  what -- and I know we talked about this earlier
16  in the context of what the term means generally
17  to a person of ordinary skill in the art.  But
18  what does a -- what does the term
19  "pharmaceutical" mean to you in the context of
20  the claim at issue here; namely, Claim 1 of the
21  '625 patent?
22      A.   So -- and I think it's important,
23  Counselor, it's -- pharmaceutical composition go
24  together here, and I use the construction
25  that -- as I elaborate in paragraph 29 of my

1    Trout - Confidential
2  report that the Court construed.  And so
3  pharmaceutical composition is what the Court
4  construed and what's written there, "A
5  pharmaceutically acceptable composition
6  containing the specified compound and one or
7  more excipients.
8    Q.   Well, pharmaceutical is an -- it's an
9  adjective, right?  And it's modifying
10  composition?
11    MS. PIPER:  Objection to form.
12    A.   Yes.  And I guess it's an adverb as
13  used by the Court's construction.
14    Q.   Okay.  So in the context of its use in
15  the claim, just pharmaceutical, I mean, what is
16  your understanding of that -- the adjective?
17  What does it mean?
18    I mean, adjectives in their own right
19  have meaning, right?
20    MS. PIPER:  Objection to form.
21    A.   Well, I think pharmaceutical
22  composition go together, and my understanding is
23  that that's, you know, a part of a -- a claim.
24  And so if you're asking me about the specific
25  use in this claim, I think it has to go

1    Trout - Confidential
2  together.
3    And I can opine on -- or I can tell
4  you, you know, broadly outside of the context of
5  this claim pharmaceutical by itself.  But
6  with -- within the claim, I think it has to go
7  with composition.
8    Q.   Well, but each word has its own
9  meaning, right?  I mean, the -- an adjective
10  pharmaceutical has a meaning separate and apart
11  from the noun composition; isn't that correct?
12    MS. PIPER:  Object to form.  Objection
13  to form.
14    A.   I mean, obviously to the extent that
15  you're asking me a legal conclusion, I leave
16  that to the lawyers to decide.  My understanding
17  is that the way the Court looks at it, they go
18  together.  If you mean just broadly
19  grammatically, that's correct, they're two
20  separate words.
21    Q.   And so what does pharmaceutical, the
22  adjective, mean to you?  Again, just in your --
23  in the context of understanding this particular
24  patent, what does that term mean to you
25  "pharmaceutical"?

1    Trout - Confidential
2    A.   Again, you mean -- by "the context"
3  you mean not what's the word in the claim term
4  but just broadly within the context of the
5  patent?  Or --
6    Q.   Right.  Based on your reading of the
7  patent, what is your understanding of what
8  pharmaceutical means?
9    A.   Okay.  So if -- in the context of the
10  patent, I think it's an adjective that modifies
11  composition.  So composition is, you know,
12  some -- let's say, as the Court construes, some
13  mixture of different compounds, and the
14  specifics are there.
15    And then the pharmaceutical modifying
16  composition means that it's not just any
17  composition.  It has to be a pharmaceutical
18  composition.  And I discuss -- I mean, really,
19  my whole report is about that one term, and so
20  it's all -- all my opinions relate to, really,
21  that term.
22    Q.   So we can agree that from the Court's
23  construction, composition is just generally
24  the -- a composition that contains the necessary
25  components articulated in the construction

1    Trout - Confidential
2  itself, namely bosutinib and one or more
3  excipients, right?
4    MS. PIPER:  Objection to form.
5    A.   Right.  I guess the specified compound
6  and one or more excipients in the specified
7  compound is -- is, you know, a chemical term,
8  which we've been discussing, which -- you know,
9  depends on how you want to define it.  It's a --
10  a molecular formula which is related to the, you
11  know, active bosutinib, but abstracted from the
12  actual situation in which it's in, in which
13  there were impurities and there are other
14  aspects to it.
15    Q.   Right.  So -- but the -- what I'm
16  getting at is that we -- we have an
17  understanding, or I have an understanding as to
18  what you're -- what you understand composition
19  to mean in the context of the Court's
20  construction; namely, it's a composition
21  containing bosutinib and one or more excipients,
22  right?
23    So -- correct?
24    A.   Well, again, we have been -- we were
25  discussing this morning what bosutinib means,

Trout - Confidential

1    and we have to be clear from the context.  I
2    mean, there's --
3        Q.   With all due respect, if I have not
4    been clear that when I say "bosutinib," I mean
5    the chemical structure, the compound bosutinib,
6    I apologize, but that's what I mean.  I don't
7    mean anything else.  If I'm talking about
8    anything other than that, I will let you know.
9    But there is -- here it's a compound.  I mean,
10   in the chemical arts, what does a compound mean?
11       A.   In the chemical arts, and I know it
12   can be used differently in -- maybe legal or
13   otherwise, but specifically in chemistry, a
14   compound is a -- let's say a defined set of
15   atoms which are connected through chemical
16   bonds.
17       Q.   Okay.  And that is exactly the way I'm
18   using bosutinib here because the composition --
19   the elements of the composition pursuant to the
20   Court's construction is, it contains a specified
21   compound, which is bosutinib, the compound, as
22   that is used in -- in chemistry and one or more
23   excipients, right?
24       A.   Okay.

Trout - Confidential

1        Q.   Okay.  So we're in agreement on that,
2    right?  A composition is a -- according to the
3    claim is a composition -- now, again, I
4    understand your opinion about pharmaceutically
5    acceptable, and we'll get to that.  But just for
6    clarity, a composition is a composition that
7    contains bosutinib and one or more excipients,
8    right?
9        A.   Again, right, if you're defining
10   bosutinib as this chemical formula.  It's --
11       Q.   But what --
12       A.   Sorry.  Can I just finish my sentence?
13   Thank you.
14       Q.   Yes.
15       A.   Because -- I mean, that -- but that's
16   a key point of my opinions is that if you're
17   talking about it as an API, or as a potential
18   ingredient that could be pharmaceutically
19   acceptable or not, then it's not just the
20   specific compound with a -- a specific molecular
21   formula.  It's abstracted from the real
22   situation of impurity profile and the way it's
23   manufactured and whatnot.
24       Q.   Dr. Trout, I appreciate that you have

Trout - Confidential

1    opinions and that those -- the opinions relate
2    to that particular topic, but --
3        MS. PIPER:  Objection.
4        Q.   -- what I'm looking to is the Court's
5    construction that said a composition contains
6    the specified compound, right?
7        And we just went through what is the
8    compound.  The compound here is bosutinib.  And
9    it's a compound.  It's not an API.  It's not an
10   aggregate of compounds and a bunch of other
11   garbage that may or may not be present.  It's
12   the compound.  And that's what I'm talking
13   about, the Court's construction.
14       The Court's construction of the claim
15   is a composition containing the specified
16   compound, which is bosutinib, right?  The
17   chemical entity, the compound, bosutinib, and
18   one or more excipients, right?
19       MS. PIPER:  Objection to form.
20       Q.   I mean, do you need to look at the
21   construction?  Because it says "specified
22   compound," and we agree that the specified
23   compound -- I thought that was one of the very
24   first things we did today is we talked about the

Trout - Confidential

1    specified compound being that chemical structure
2    that is articulated in the claim, and we agreed
3    that that structure was bosutinib, right?
4        A.   Right, in the sense I'm happy to
5    consider this chemical structure that's in
6    Claim 1 to be bosutinib just with a -- you know,
7    make sure that we agree that if we call that
8    bosutinib, that's that chemical structure per
9    se, not another manifestation of that in a
10   particular environment.
11       Q.   Right.  But it -- correct me if I'm
12   wrong, but there is the question -- the question
13   you're getting to is whether or not there is an
14   inhibiting amount of CML -- a CML inhibiting
15   amount of the compound, right?
16       MS. PIPER:  Objection.
17       Q.   It's, like, how much bosutinib is in
18   there, and what does it look like, right?
19       MS. PIPER:  Objection.  Outside the
20   scope of what Dr. Trout opined on.
21       Q.   That's exactly right.  You didn't
22   consider that at all, right?  You didn't
23   consider how much bosutinib or -- is -- the
24   claim requires, right?

Trout - Confidential

1
2      MS. PIPER: Objection. Outside the
3  scope of what Dr. Trout opined on.
4      A.   And I'm confused because there's
5  multiple questions --
6      Q.   You didn't opine on how much bosutinib
7  has to be in the composition of the claim,
8  right?
9      MS. PIPER: Objection to form.
10     A.   That's correct. I did not opine on a
11  specific amount in this claim.
12     Q.   So then I just want you to focus on
13  the compound itself, just bosutinib. Because
14  the part of the claim that you did consider and
15  opine upon is pharmaceutical composition, and
16  that part of the claim, that part which is all
17  you've testified -- all your opinion relates to,
18  is that -- a pharmaceutically acceptable
19  composition containing the specified compound,
20  bosutinib, and one or more excipients, right?
21     A.   Yes, again, that's fine for a --
22  defining bosutinib as the -- the chemical
23  formula --
24     Q.   And we are.
25     A.   -- which is in the claim.

Trout - Confidential

1
2      Q.   And we are. So a composition,
3  according to the claim -- and then I want to get
4  to your opinion which really relates to
5  pharmaceutically acceptable, correct?
6      MS. PIPER: Objection to form.
7      A.   My opinion relates to -- I mean,
8  everything that I discuss in my report. And
9  pharmaceutically acceptable is a major part of
10  it, and the specifics of the Boschelli reference
11  is also a major part of it.
12     Q.   Right. We agree that there is a
13  composition in Boschelli, right? I mean, we
14  agreed about that this morning?
15     A.   Yes. We can call them a composition.
16  There are a variety of compositions.
17     Q.   Right. And the compositions contain
18  bosutinib and one or more excipients, right?
19     A.   Again, if you are defining -- I mean,
20  they contain other things potentially in them.
21  Those are the key aspects that we have been
22  focusing on, but my report -- I talk about the
23  impurity profiles and I talk about all kinds of
24  other aspects to -- to what's in there, even
25  though they may not be explicitly stated.

Trout - Confidential

1
2      And I talk about all the reasons why
3  there are other things in these -- these
4  non-pharmaceutical compositions, potentially
5  non-pharmaceutical compositions.
6      Q.   Right. It is your opinion that
7  pharmaceutically acceptable excludes any kind of
8  impurities in the composition, right?
9      A.   No, that's not what -- my opinion.
10     Q.   Okay. How much -- how many -- what
11  level of impurities can one have in a
12  pharmaceutical composition?
13     A.   So my understanding as a technical
14  expert is that there's a procedure that one
15  would have to go through to determine and make
16  the case for what's acceptable in a particular
17  situation for a particular, you know, proposed
18  active.
19     Q.   And your opinion relates on the things
20  that a person of ordinary skill in the art has
21  to do to obtain FDA approval to sell a drug,
22  right?
23     MS. PIPER: Objection to form.
24     A.   No, that's -- that's -- I mean, that's
25  part of it, but I talk a lot about a lot of

Trout - Confidential

1
2  aspects. It's not -- it's not so crystalized as
3  such.
4      Q.   Okay. So a pharmaceutical composition
5  does not have to be an FDA approvable
6  composition, correct?
7      MS. PIPER: Objection to form.
8      A.   Not necessarily. I think it -- I
9  think that -- that certainly if it's FDA
10  approvable -- I'm not sure what that means. If
11  it -- but if it's FDA approved, let's say,
12  then -- then that -- that's certainly one
13  example, but that's not the only example.
14     Q.   Okay. So a pharmaceutical composition
15  pursuant to the claims, in your opinion, does
16  not have to be a composition that would meet the
17  standards of FDA approval for a human drug,
18  right?
19     MS. PIPER: Objection to form.
20     A.   Yes, that's correct.
21     Q.   Okay.
22     A.   Not necessarily. That's an example of
23  what it could be.
24     Q.   Okay. So does it have to be a
25  pharmaceutical composition that would meet the

1    Trout - Confidential
2  standards for administering the composition to
3  an animal, for example?
4    MS. PIPER:  Objection to form.
5    A.   Again, I think that's another example
6  of what could be -- again, given my
7  understanding of the construction of this claim,
8  that would fall under a pharmaceutically
9  acceptable composition.
10    Q.   Right.  But the question is, does it
11  have to be a composition that would meet the
12  standards of approval for a composition that
13  could be administered to an animal?
14    A.   I don't -- well, maybe potentially
15  approvable by -- by someone, but that's not --
16  it's not like a threshold, or a, you know,
17  rock-solid criterion.
18    Q.   Okay.  What if it's a -- what if it's
19  a composition that the IACUC approves for the
20  administration to animals in a laboratory
21  context?  Would that meet the standard?
22    A.   I'm -- I'm not sure if it would meet
23  the standard.  I would have to -- I would have
24  to understand the context and -- and what it was
25  approved to do.  And, again, there are different

1    Trout - Confidential
2  kinds of animal studies.  And -- and we talked
3  about what Boschelli 2001 is.  And so it depends
4  what it's approved for.
5    Q.   What is IACUC?  Do you know what that
6  stands for?
7    A.   Yeah, it's -- I don't know off the top
8  of my head but it's in Wolff -- it's the
9  Institutional Animal Care and Use Committees --
10  or Committee, I guess, without the S.
11    Q.   So Institutional Animal Care --
12    A.   And Use Committee.
13    Q.   -- and Use Committees.
14    A.   Committees with plural.
15    Q.   And what is your understanding of what
16  the role of the IACUC is in the context of a
17  research laboratory?
18    MS. PIPER:  Objection.  Outside the
19  scope of what Dr. Trout was asked to opine
20  on.
21    A.   I don't have an opinion on that.
22    Q.   Do they have to approve protocols for
23  the administration of compositions to animals?
24    MS. PIPER:  Objection.  Outside the
25  scope of what Dr. Trout was asked to opine

1    Trout - Confidential
2  on.
3    A.   I don't have an opinion on that.
4    Q.   Do pharmaceutical companies have
5  IACUC -- let me ask that a different way.
6  That's kind of a weird construction.
7    Do pharmaceutical companies have
8  Institutional Animal Care and Use Committees
9  within their organizations?
10    MS. PIPER:  Objection.  Outside the
11  scope of Dr. Trout's opinion.
12    A.   I don't have an opinion on that.
13    Q.   Do pharmaceutical companies employ
14  veterinarians to oversee the care of the animals
15  they may or may not be using in research?
16    MS. PIPER:  Objection.  Outside the
17  scope of Dr. Trout's opinion.
18    A.   It's not an opinion that I have.
19    Q.   Okay.  All right.  So if the
20  composition of -- well, if a composition
21  intended to be administered to laboratory
22  animals for the purpose of gauging its
23  therapeutic potential is approved by the IACUC,
24  would that composition be a pharmaceutically
25  acceptable composition pursuant to the claims of

1    Trout - Confidential
2  the '625 patent?
3    A.   In this hypothetical, I think it
4  depends on the details and what it was approved
5  for and the reason behind the approval.  I --
6  it -- the details are important.
7    Q.   So you would have to know more
8  details.
9    What if -- what if the composition of
10  Boschelli was approved by an Institutional
11  Animal Care and Use Committee?  Would that
12  change your opinion about whether or not that
13  composition was a pharmaceutical composition?
14    MS. PIPER:  Objection to form.
15    A.   If there's additional information
16  regarding the Boschelli 2001 reference, I would
17  certainly take that into account.  I would have
18  to analyze that information to determine how
19  that affects my opinions.
20    Q.   Okay.  So the -- so if, in fact, there
21  were evidence that the IACUC had approved of the
22  composition being administered to the animals in
23  Boschelli, that could impact your opinion as to
24  whether or not that formulation in Boschelli was
25  a pharmaceutical composition, correct?

Trout - Confidential

1   Trout - Confidential
2       MS. PIPER:  Objection to form.
3       A.  It may or may not.  If there's
4   additional information about Boschelli outside
5   of the reference and the other references which
6   I considered, I would take that into account.
7       Q.  All right.  So a pharmaceutical
8   composition as the Court has constructed it, as
9   far as whether it's pharmaceutically acceptable,
10  it doesn't rise to the standard of something
11  that would be approvable by the FDA for human
12  use, right?  That's your testimony?
13      MS. PIPER:  Objection to form.
14      A.  I think my testimony as I gave it
15  before is that that could be one example, but
16  there are other potential examples.
17      Q.  Right.  But the question is a little
18  bit different.  I just want to make sure I'm
19  absolutely clear that it is not your opinion
20  that pharmaceutically acceptable means the
21  composition has to be a composition that would
22  be approvable by FDA for human use, right?
23      MS. PIPER:  Objection to form.
24      A.  I'm not sure what it means that
25  something is approvable.  I think what you're

1   Trout - Confidential
2   asking is if it hypothetically had gone through
3   the FDA approval, that's the only thing that I
4   understand.  Because -- and in --
5       Q.  Right.  A composition could be a -- a
6   composition according to the claims could be a
7   composition that is being used for research
8   purposes, right?
9       MS. PIPER:  Objection to form.
10      A.  Well, it depends on what kind of
11  research.  Broadly speaking, in its -- it's
12  possible.
13      Q.  So if it's being administered to
14  humans for the purposes of researching its
15  therapeutic potential, is it a pharmaceutical
16  composition?
17      A.  Again, one would have to go through
18  the same kind of analysis that I went through
19  in, whatever, 25 or so pages on the Boschelli,
20  you know, given the details of this hypothetical
21  you're posing, to make an opinion upon that.
22      Q.  Okay.  So based on that response then
23  is it your opinion that it is possible that a
24  composition being administered to patients in a
25  Phase III clinical trial may not be

1   Trout - Confidential
2   pharmaceutically acceptable pursuant to these
3   claims?
4       MS. PIPER:  Objection to form.
5       A.  I mean, look, there's always some
6   possibility.  I would generally think that a
7   composition that's been approved to go through
8   Phase III trials would be pharmaceutically
9   acceptable.  There may be exceptions to that.
10  Again, you're asking a broad hypothetical.  But
11  generally, I would expect that that would be
12  pharmaceutically acceptable.
13      Q.  Okay.  Pushing that a little bit
14  further, would you assume a composition that has
15  been approved to administer to a human in any
16  clinical context would be pharmaceutically
17  acceptable?
18      MS. PIPER:  Objection.  Outside the
19  scope of Dr. Trout's opinion and...
20      A.  Yeah, I didn't give an opinion about
21  clinical broadly, and I'm trying to give
22  examples of what could be pharmaceutically
23  acceptable.  Again, the -- the focus on my
24  report was on the Boschelli 2001, and, you know,
25  the analysis that I've done of that reference.

1   Trout - Confidential
2       Q.  Can you think of any example where
3   there's a composition administered to humans and
4   it would not be pharmaceutically acceptable?
5       MS. PIPER:  Objection.  Outside the
6   scope of Dr. Trout's opinion and report.
7       A.  I don't have an opinion about that per
8   se.
9       Q.  Do you have any opinion about --
10  strike that.
11      Do you have any opinion about what a
12  composition administered to a laboratory animal
13  would have to look like in order for it to be
14  considered pharmaceutically acceptable?
15      A.  Yes.  I think it would have to meet
16  some of the criteria, or the -- the bulk of the
17  criteria that I've gone through here in this
18  report, which Boschelli doesn't meet any of
19  those criteria I've talked about.  I think it
20  would have to meet some of them.  And, again, it
21  would depend on the context, what the study was
22  done for, and I would have to analyze those
23  details.
24      Q.  Why does it matter what the study is
25  being done for, in your opinion?

Trout - Confidential

1
2      A.   Because it matters whether the study
3  is attempting to treat animals or is basically
4  doing a study with hypotheses, for example,
5  about how chemicals work, leading to the
6  destruction of those animals one way or another.
7      Q.   What in the Court's construction leads
8  you to believe that pharmaceutically acceptable
9  composition has to be one that is being
10  administered for the purposes of treating?
11      A.   I did not say that it has to be.
12      Q.   Okay.
13      A.   I said that's a potential, you know,
14  example.  But that's not really the threshold.
15  I think the threshold is what I've gone through
16  in this report, and it has to, you know, meet
17  some of the criteria.  And I've discussed in
18  particular why Boschelli 2001 doesn't meet any
19  of those criteria.
20      Q.   So a pharmaceutically acceptable
21  composition could be a composition that's being
22  administered to an animal even though it's not
23  being administered solely for the purposes of
24  treating, right?
25          MS. PIPER:  Objection to form.  And

Trout - Confidential

1
2  outside the scope of Dr. Trout's opinion.
3      A.   I mean, again, pharmaceutically
4  acceptable composition, as I've discussed in my
5  report, would have to meet the criteria that
6  I've discussed.
7      Q.   Okay.  Well, let's see here.  On
8  page -- on paragraph 63 of your report, you say,
9  "Beyond meeting the specifications for the API
10  and excipients discussed above, a pharmaceutical
11  composition as a whole must meet a variety of
12  specifications," and then you are referencing
13  U.S. Food and Drug Administration Q6A
14  specifications, test procedures, and acceptance
15  criteria for new drug substances and new drug
16  products.
17          So do -- does a pharmaceutical
18  composition have to meet the specifications
19  for -- that FDA sets forth for a new drug
20  product?
21      A.   First of all, just to -- it continues,
22  what you read, to, colon, "Chemical Substances,"
23  the Q6A specifications for those.  But, no, I'm
24  not saying that it has to meet Q6A.
25      Q.   Okay.

Trout - Confidential

1
2      A.   I'm saying that's an example.
3      Q.   Okay.  So the specifications for the
4  pharmaceutical composition, as you state it
5  here, is going to be defined by the company
6  producing the pharmaceutical composition and is
7  going to take into account safety and efficacy,
8  right?
9      A.   Yes, that's what I've written.
10      Q.   Okay.  So if -- if the Boschelli group
11  decided that the specifications for the
12  composition in Boschelli met what they define to
13  be acceptable for a pharmaceutical composition
14  to administer to the animals, isn't it a
15  pharmaceutical composition, according to your
16  own opinion?
17          MS. PIPER:  Objection to form.
18      A.   No.
19      Q.   You don't deny the compositions of
20  Boschelli were given to the mice, right?
21          MS. PIPER:  Objection to form.
22      A.   They were administered to the mice.
23      Q.   They were in administered --
24      A.   They were administered to the mice.
25      Q.   Administered -- right.

Trout - Confidential

1
2  Intraperitoneally, right?
3      A.   Well, also orally.
4      Q.   And they were in multiple times for
5  the single mouse, right?
6      A.   Yes.  For -- I mean, the -- there's
7  some details in the different experiments but,
8  yes.
9      Q.   Did they kill the mice by
10  administering the drug?
11          MS. PIPER:  Objection.  Outside the
12  scope of Dr. Trout's opinion.
13      A.   The mice were meant to be sacrificed,
14  so they were eventually killed in these --
15      Q.   Was the purpose of the drug -- to
16  administer the drug for the purpose of killing
17  the animal?
18          MS. PIPER:  Objection.  Outside the
19  scope of Dr. Trout's opinion.
20      A.   I think that the objective of the
21  Boschelli study was not to kill the mice.
22      Q.   What was the objective of the
23  Boschelli folks in administering the composition
24  containing bosutinib, TWEEN 80, and dextrose?
25          MS. PIPER:  Objection.  Outside the

## Page 146

Trout - Confidential
scope of Dr. Trout's opinion and report.
A. I didn't speak in my report about the specific objective, so I didn't express an opinion about that.
Q. Okay. Right. So you don't know whether they -- you don't have an opinion as to whether or not they were administering the composition for the purposes of assessing the composition's potential to inhibit CML tumor growth, right?
MS. PIPER: Objection. Outside the scope of Dr. Trout's opinion and report.
A. Are you quoting from somewhere? Because I --
Q. No. I was just asking a question.
A. Okay. Could you repeat the question, please?
Q. You don't have an opinion as to whether the Boschelli scientists were administering the composition described in that reference for the purposes of assessing the composition's potential to inhibit tumor growth, right?
MS. PIPER: Objection. Outside the

## Page 147

Trout - Confidential
scope of Dr. Trout's opinion and report.
A. That's correct. I've not expressed an opinion about that. I do not have an opinion on that.
Q. Okay. Do you have an opinion as to whether -- strike that.
And you also don't have an opinion as to whether or not the composition was, in fact, capable of inhibiting tumor growth in the mice, right?
MS. PIPER: Objection. Outside the scope of Dr. Trout's opinion and report.
A. That's right. I did not express an opinion about that.
Q. Okay. Okay. If you could -- you have your report in front of you there?
A. Yes.
Q. Okay. I'm just going to -- I have some questions about some of the language in your report.
Well, before I do that, could I take you to Exhibit D in your binder, please.
A. Okay.
Q. I'm sorry. Exhibit DD.

## Page 148

Trout - Confidential
A. Ah.
Q. Two Ds.
A. Okay. I'm there.
Q. Do you recognize this document?
A. Yes.
Q. And what is this document?
A. This is a -- FDA Guidance for Industry INDs for Phase II and Phase III Studies: Chemistry, Manufacturing, and Controls Information.
Q. Okay. What are Phase II studies?
MS. PIPER: Objection. Outside the scope of Dr. Trout's opinion and report.
A. And you mean just in general, or in the context of --
Q. In the --
A. -- my report in the case?
Q. Sure. In the context of this particular document, what is your understanding of what a Phase II study would be?
A. So a Phase II study is part of the clinical studies that -- that can be performed.
Q. In -- in humans, correct?
A. Yes. In -- with this -- with respect

## Page 149

Trout - Confidential
to this document, it's for humans.
Q. Okay. And Phase III studies, what is your understanding of what a Phase III study would be, as that term is used in this document?
A. A Phase III study is another phase of clinical studies used for pharmaceuticals.
Q. Okay. All right. And just for clarity then, it is not your opinion that a pharmaceutically acceptable composition has to be a composition that satisfies the requirements of FDA for use in Phase II studies, right?
MS. PIPER: Objection. Outside the scope of Dr. Trout's opinion and report.
A. I didn't speak, I think, specifically about that, but this is an example, on the other hand, of -- of a composition that could meet the criterion of pharmaceutically acceptable composition.
Q. Okay. But it is possible that a pharmaceutically acceptable composition could be one that does not meet the requirements for use in a Phase II study with humans, right?
MS. PIPER: Objection. Outside the scope of Dr. Trout's opinion and report.

Page 150

Trout - Confidential

1
2     A.  I think my opinion was only about an
3  example of what could -- in this context what
4  could fall under pharmaceutical --
5  pharmaceutically acceptable excipient.
6     Q.  Pharmaceutically acceptable
7  excipient --
8     A.  Pharmaceutically acceptable
9  composition.  Thank you.
10     Q.  So your opinion was, it was limited --
11  so if I understand you correctly, your opinion
12  was essentially to establish a pharmaceutical
13  composition that you have confidence would meet
14  the standard of pharmaceutically acceptable as
15  that term is used in the patent?
16     MS. PIPER:  Objection to form.
17     A.  No, I wouldn't say it exactly that
18  way.  No.
19     Q.  Okay.  How did I get that wrong?
20     A.  So my opinions in this report discuss
21  the kind of issues that the person of ordinary
22  skill in the art would -- would think about and
23  engage in in analyzing whether a particular
24  reference, Boschelli 2001 specifically,
25  discloses pharmaceutically acceptable

Page 151

Trout - Confidential

1
2  compositions or not.  So that was really what my
3  report was about.
4     Q.  And your opinion about that is that,
5  A, you don't know whether the -- the API used in
6  that composition was sufficiently pure to meet
7  the standard of pharmaceutically acceptable,
8  right?
9     MS. PIPER:  Objection to form.
10     A.  I don't know if I would summarize it
11  so cursorily.  I have many pages on this.  I
12  mean, for example, in paragraph 69 it says, "As
13  explained in more detail below," but it's kind
14  of a summary statement on one aspect, "the
15  chemical synthesis disclosed in Boschelli 2001
16  was not designed to lead to and likely not would
17  have led to a pharmaceutically acceptable API."
18     So I don't know if I would summarize
19  it just in a sentence as you did.
20     Q.  Okay.  So -- well, that was one of the
21  things that I wanted to ask you about.
22     So you say it would not -- would --
23  likely would not have led to a pharmaceutically
24  acceptable API.  So you don't -- you don't
25  foreclose the possibility that it was, in fact,

Page 152

Trout - Confidential

1
2  a pharmaceutically acceptable API that was used
3  in the composition of Boschelli, correct?
4     MS. PIPER:  Objection to form.
5     A.  It's -- you know, it's possible.  What
6  I say -- that's why I wrote here, it -- it was
7  not designed to and likely would not have led to
8  a pharmaceutically acceptable API.  In other
9  words, I didn't say it's absolutely certainly
10  did not -- likely would not have led to and was
11  not designed to lead to.
12     Q.  So what gave you the opinion that it
13  was not designed to lead to a pharmaceutically
14  acceptable API?
15     A.  Well, I expressed that in multiple
16  pages, from my experience in pharmaceutical
17  manufacturing research and with pharmaceutical
18  manufacturing, and from the references that --
19  that I've included here in multiple paragraphs
20  in this report, what's disclosed in Boschelli
21  2001 do not -- were not designed and -- to lead
22  to and likely would have not led to a
23  pharmaceutically acceptable API.  So those are
24  the categories of bases for that opinion.
25     Q.  Yeah, it's interesting, I mean, you

Page 153

Trout - Confidential

1
2  don't -- well, I guess you don't have an opinion
3  as to what their intention was with respect to
4  this composition.  But certainly they say in the
5  Boschelli reference that their purpose was to
6  administer the composition to animals to gauge
7  the potential of the API to inhibit tumor
8  growth, right?  That's what they say?
9     MS. PIPER:  Objection to form.
10     Objection that this is outside the scope of
11  Dr. Trout's opinion and report.
12     A.  As you said, I don't have an opinion
13  on that particular subject.
14     Q.  Okay.  So one thing you do -- an
15  opinion you give regarding the API is that when
16  creating a pharmaceutically acceptive active
17  appropriate particle size and type, pressure,
18  column length, and flow rate must all be taken
19  into account.
20     Right?  You say that at paragraph 71?
21     MS. PIPER:  Objection to form.
22     A.  Right.  I think that you substantially
23  read what I say at the bottom of page 22 in the
24  middle of paragraph 71, and it has to be
25  understood in the context of the paragraph in

Trout - Confidential

1  the section, too, but that's I think
2  substantially what's written there.
3       Q.  So is it your opinion a
4  pharmaceutically acceptable active is one
5  wherein the particle size of the active is
6  known?
7       A.  I don't have an opinion about that.  I
8  wanted to emphasize this appropriate -- I
9  think -- this appropriate particle size we're
10  talking about within the context of column
11  chromatography, I'm talking about the particles
12  in the chromatographic equipment.
13       Q.  Okay.  What, if anything, do you know
14  about the particle size and type in the column
15  chromatography apparatus used in Boschelli?
16       A.  Well, Boschelli, for example, on
17  page 3974, on the right column, the last full
18  example, which references 31a, and I think I
19  quote it in my report, too, but it says, "The
20  residue is purified by column chromatography,"
21  and the sentence continues.
22       And so Boschelli doesn't disclose
23  that, and these are the kind of things that one
24  would expect to be disclosed if one were to make

Trout - Confidential

1  a pharmaceutically acceptable composition.
2       Q.  But what they say is that the residue
3  is purified by column chromatography, right?
4       MS. PIPER:  Objection to form.
5       Q.  I mean, isn't that what they say,
6  purified?
7       MS. PIPER:  Objection to form.
8       A.  I mean, that's what's written there,
9  and I discuss this in my report.
10       Q.  You don't believe them?
11       MS. PIPER:  Object to form.  And
12  outside the scope of Dr. Trout's opinion.
13       A.  I'm -- I don't -- I -- I see what's
14  written there, and I -- I certainly believe
15  them.  I think the important thing is to
16  understand the context of this purification.
17  And I -- you know, I discuss this in multiple
18  paragraphs, and I -- around paragraph 71 that we
19  discussed, and before that in paragraph 70,
20  and -- and beyond.
21       But I think it's important, in
22  answering your question, in paragraph 70, I
23  start out, "A POSA reading Boschelli 2001 would
24  conclude that Compound 31a was synthesized

Trout - Confidential

1  without much attention paid to purification or
2  to any of the specifications required for active
3  compounds that are to be included in a
4  pharmaceutical composition," and I go on.
5       So they purified it for a certain
6  purpose, but not for the purpose of creating a
7  pharmaceutical composition based on their
8  disclosure.
9       Q.  Okay.  They don't say that, right?
10  They don't say, we purified it -- strike that.
11       Boschelli doesn't say they made a
12  crude purification of bosutinib, right?
13       A.  Correct.  So I mean, citing that,
14  those are not the words that they use.
15       Q.  Okay.  Now, let me ask you a different
16  question.  Let's say for the sake of argument
17  that it wasn't purified to the standards that
18  would be required for a pharmaceutically
19  acceptable active.  At the time of the invention
20  here, would a person of ordinary skill in the
21  art have been able to synthesize bosutinib and
22  purify it to a standard that would be -- would
23  render it acceptable for use in a
24  pharmaceutically acceptable composition?

Trout - Confidential

1       MS. PIPER:  Objection.  Outside the
2  scope of Dr. Trout's opinion and report.
3       A.  I haven't done that analysis, and I
4  don't have an opinion on that.
5       Q.  Okay.  Let's say for the sake of
6  argument the TWEEN 80 used in the composition of
7  Boschelli was not pharmaceutical grade TWEEN 80,
8  at the time of the invention would a person of
9  ordinary skill in the art have been able to
10  formulate a composition that included
11  pharmaceutical grade TWEEN 80?
12       MS. PIPER:  Objection.  Outside of the
13  scope of Dr. Trout's opinion and report.
14       A.  I didn't express an opinion on that
15  issue.
16       Q.  Okay.  Then let me ask you this
17  question.  At the time of the invention, could a
18  person of ordinary skill in the art have
19  reproduced the composition of Boschelli in such
20  a way that it would meet the standard of a
21  pharmaceutically acceptable compound or
22  composition as you understand that claim to
23  require?
24       MS. PIPER:  Objection.  Outside the

Trout - Confidential

1
2  scope of Dr. Trout's opinion and report.
3      A.  I don't have an opinion on that.
4      Q.  Okay.  What are the pH requirements
5  for a suspension being administered ip?
6          MS. PIPER:  Objection.  Outside the
7  scope of Dr. Trout's opinion and report.
8      A.  I didn't express a -- such opinions.
9  I don't have an opinion on that.
10     Q.  Are you aware of any pharmaceutically
11 acceptable compositions with a pH of
12 approximately 5.9 that have been administered to
13 animals ip?
14         MS. PIPER:  Objection.  Outside the
15 scope of Dr. Trout's opinion and report.
16     A.  To the extent that you're not talking
17 about my paragraph 77, I don't have an opinion
18 on it.  I mean, the pH 5.9 is in my paragraph
19 77.
20     Q.  So this is something -- again, in --
21 sticking to paragraph 77, you say, "Were the
22 Boschelli composition intended to be a
23 pharmaceutical composition, potential issues
24 such as choosing a desired pH and maintaining it
25 would have likely been addressed."

Trout - Confidential

1
2          MS. PIPER:  Objection to form.
3      Q.  And my question to you is, it likely
4  would have been addressed but is it your opinion
5  that it's not necessary in all circumstances for
6  such things to be addressed?
7      A.  Right.  That's why I say "likely."
8  I'm not saying it's absolutely necessary.  I say
9  that it's likely.  And, again, this is one part
10 of the totality of the evidence which led me to
11 my conclusion.
12     Q.  Okay.  So is it possible that it
13 wasn't necessary for pH adjustment to be
14 addressed in the composition of Boschelli?
15         MS. PIPER:  Objection.  Outside the
16 scope of Dr. Trout's opinion.
17     A.  Frankly, I don't understand the
18 question.  But to the extent that I do, I think
19 it's outside of my scope of my opinions.
20     Q.  To make sure that I understand, let me
21 rephrase the question.  Can you envision a
22 scenario wherein it would not have been
23 necessary for the investigators in Boschelli to
24 adjust the pH of the composition they use to
25 administer to the mice?

Trout - Confidential

1
2      A.  I don't think I talk about adjustment
3  of pH.  But I'm -- maybe if you could -- we're
4  still talking about paragraph 77?
5      Q.  Uh-huh.
6      A.  Again, my opinion is, potential issues
7  such as choosing a desired pH and maintaining it
8  would have likely been addressed, even reporting
9  it potentially.  So that's what my opinion is
10 about.
11     Q.  Okay.  At the time of the invention
12 would persons of ordinary skill in the art know
13 how to choose and maintain the pH level for a
14 pharmaceutical composition?
15     A.  I mean, I -- I think it depends on the
16 details.  My point here -- in general, it might
17 or might not.  My point here is that it -- it
18 doesn't even seem to be in the minds of the
19 authors of the paper, and it's something that
20 would have been -- would have come to mind
21 potentially or likely have been addressed.
22     Q.  What is tonicity?
23     A.  And I think you're referring, just to
24 clarify, to my paragraph 79?
25     Q.  Just generally.  But, yes, you do use

Trout - Confidential

1
2  that term in paragraph 79.
3      A.  Okay.  So just -- not -- I'm sorry.
4  I'm confused.
5      Q.  I'm just asking, what is your
6  understanding of the term "tonicity"?  What does
7  that mean?
8      A.  Outside of the scope of my report but
9  just generally?
10     Q.  I mean, specifically as you use it in
11 your report.  You use the term, so I just want
12 to understand what it means to you.
13     A.  Okay.  What it means is a -- a
14 particular, let's say, concentration of -- of,
15 let's say, a -- an aqueous solution, the
16 different concentration of the solutes in that
17 solution leading to a value tonicity usually
18 measured in particular units like milliosmoles,
19 which is a measure of how -- how much solutes,
20 I'll say it that way, are in the solution,
21 concentration of such.
22         MR. BENSON:  Okay.  Why don't we
23 take -- I think I'm almost finished.  Why
24 don't we take a short break, and I'll just
25 confer with my colleagues here.  And we'll

1    Trout - Confidential
2    come back and finish up.  Okay?
3        THE WITNESS:  Okay.
4        THE VIDEOGRAPHER:  The time is
5    1:58 p.m., and we are going off the record.
6        (Recess from 1:58 to 2:14.)
7        THE VIDEOGRAPHER:  The time is
8    2:14 p.m., and we are back on the record.
9    Q.  Okay.  Just a few more questions.
10        The patent in -- at issue here, the
11    '625 patent, also describes xenograft studies
12    using bosutinib with mice, correct?
13        I'll direct you to, for example,
14    Column 13.
15    A.  Yes.  I see that, Column 13 and 14,
16    yes.
17    Q.  Okay.  So it says that the -- "The
18    compounds of formula 1 ('the compounds'),
19    originally identified as a Src inhibitor, are
20    shown here to be a potent anti-proliferative and
21    proapoptotic agent against CML cells in
22    culture."
23        Right?  Did I read that correctly?
24    A.  Yes, that's what's written there.
25    Yes.

1    Trout - Confidential
2    Q.  And then next it says, "The apoptotic
3    activity of the compounds against CML cells in
4    culture is mirrored by its activity in vivo
5    against CML xenografts."
6    Right?
7    A.  Yes, that's what's written.
8    Q.  And it says, "The K562 tumors regress
9    in nude mice when the compounds are administered
10    p.o. once a day."
11    Right?
12    A.  Yeah, I mean, just -- since you're
13    quoting didn't say "the" but, yeah,
14    substantially that's right.
15    Q.  What does p.o. stand for?  Do you
16    know?
17        MS. PIPER:  Objection.  Outside the
18    scope of Dr. Trout's opinion.
19    A.  I -- I guess it's outside of my
20    opinion.
21    Q.  Okay.  I didn't really ask your
22    opinion.  I just asked if you knew.  You can
23    answer.
24    A.  Yes, I know.
25    Q.  Okay.  What does it mean?

1    Trout - Confidential
2    A.  I think it means oral administration.
3    Q.  Thank you.
4        Now, let's go over to Column 14.  It
5    says here -- now, this is describing the nude
6    mice data with the CML cell xenografts, correct?
7    Beginning at about, looks like line 3?
8        MS. PIPER:  Objection.  Outside of the
9    scope of Dr. Trout's opinion and report.
10    A.  Yeah, I don't have an opinion on what
11    kind of cells those were.
12    Q.  Okay.  All right.  Well, that's fine.
13        It says here that -- the very last
14    sentence says, "The compound of Example 1 was
15    administered p.o. in 0.4 percent
16    methocel/0.5 percent TWEEN at 75 mg/kilogram
17    once a day for 5 days (8 mice/group)."
18        Did I read that correctly?
19    A.  Yes.
20    Q.  Do you know what methocel is?
21    A.  Yes.
22    Q.  What is it?
23    A.  It's a -- an abbreviation for
24    methylcellulose.
25    Q.  Okay.

1    Trout - Confidential
2    A.  Or maybe not an abbrev -- a shortened
3    version of methylcellulose.
4    Q.  And would this -- the .4 percent
5    methocel/.5 percent TWEEN, is this a -- is there
6    also water in this composition, as far as you
7    can understand?
8        MS. PIPER:  Objection.  Outside the
9    scope of Dr. Trout's opinion and report.
10    A.  I didn't analyze it as such.
11    Q.  Would you expect, based on the
12    description here, that there's also water in
13    this composition?
14        MS. PIPER:  Objection.  Outside the
15    scope of Dr. Trout's opinion and report.
16    A.  I didn't offer an opinion about what
17    else is in the -- in this compound of Example 1,
18    and -- and the other things.
19    Q.  Well, let me ask you this.  This
20    composition that's described here in Column 14,
21    is that a pharmaceutically acceptable
22    composition?
23        MS. PIPER:  Objection.  Outside the
24    scope of Dr. Trout's opinion.
25    A.  I don't have an opinion about whether

Page 166

Trout - Confidential

1
2  that's pharmaceutically acceptable or not.
3      Q.  What would you need to know to make
4  that determination?
5      A.  Well, I would need to do a similar
6  kind of analysis as to what's in my report, the
7  analysis that I did for the Boschelli 2001.
8          MR. BENSON:  Okay.  I don't think I
9  have any further questions for you,
10 Dr. Trout.  Thank you very much for your
11 time.
12         THE WITNESS:  You're welcome.
13         THE VIDEOGRAPHER:  Is that it?
14         MR. BENSON:  Before we go off the
15 record, do we -- let's designate -- we'll
16 designate this as confidential.  I don't
17 think there's anything but we'll just go
18 through it and double-check, but for the
19 time being we'll just designate it as
20 confidential.
21         (Continued on following page to
22 include jurat.)
23
24
25

Page 167

Trout - Confidential

1
2          THE VIDEOGRAPHER:  The time is
3  2:20 p.m., and this ends the deposition of
4  Bernhardt Trout.
5          (Time noted: 2:20 p.m.)
6
7
8
9
10
11          ------------------------
12          BERNHARDT TROUT, Ph.D.
13 Subscribed and sworn to before me
14 this   day of      2019.
15
16
17
18
19
20
21
22
23
24
25

Page 168

1
2      C E R T I F I C A T E
3
4  STATE OF NEW YORK   )
        ) Ss.:
5  COUNTY OF NEW YORK  )
6      I JEFFREY BENZ, a Certified Realtime
7  Reporter, Registered Merit Reporter and
8  Notary Public within and for the State of
9  New York, do hereby certify:
10     That BERNHARDT TROUT, Ph.D., the
11 witness whose examination is hereinbefore
12 set forth, was duly sworn by me and that
13 this transcript of such examination is a
14 true record of the testimony given by such
15 witness.
16     I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage; and that I am
19 in no way interested in the outcome of this
20 matter.
21     IN WITNESS WHEREOF, I have hereunto
22 set my hand this 14th of August, 2019.
23     ------------------------
24     JEFFREY BENZ, CRR, RMR
25

Page 169

1
2  --------------------INDEX--------------------
3  WITNESS           EXAMINATION BY    PAGE
4  BERNHARDT TROUT, Ph.D.   MR. BENSON      5
5  --------------------EXHIBITS--------------------
6  NUMBER     DESCRIPTION        PG   LN
7  Exhibit 1   Dr. Trout's expert report,   9   23
         including exhibits
8
   Exhibit 2   Opening expert report of    57   14
9      Craig W. Lindsley, Ph.D.
      and reply expert report of
10     Craig W. Lindsley, Ph.D.
11 Exhibit 3   Guide for the Care and Use  93   24
      of Laboratory Animals
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 170

1

2          ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:   Wyeth LLC v. Alembic Pharmaceuticals

4   Dep. Date:   August 7, 2019

5   Deponent:   Bernhardt Trout, Ph.D.

6

7   Pg. Ln.   Now Reads     Should Read     Reason

8   __ ___   _____   _____   _____

9   __ ___   _____   _____   _____

10  __ ___   _____   _____   _____

11  __ ___   _____   _____   _____

12  __ ___   _____   _____   _____

13  __ ___   _____   _____   _____

14  __ ___   _____   _____   _____

15  __ ___   _____   _____   _____

16  __ ___   _____   _____   _____

17  __ ___   _____   _____   _____

18  __ ___   _____   _____   _____

19

                _____
20                 Signature of Deponent

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS ____ DAY OF _____, 2019.

23

     _____
24
     (Notary Public)  MY COMMISSION EXPIRES: _____
25

**A**

**a m (5)**
2:6 4:12 54:14,18
120:20
**abbrev (1)**
165:2
**abbreviated (2)**
34:23,25
**abbreviation (3)**
12:14 32:6 164:23
**able (6)**
6:8 9:4 42:10 70:9
156:22 157:10
**absent (1)**
77:18
**absolute (2)**
88:14,17
**absolutely (4)**
88:18 138:19 152:9
159:8
**abstract (2)**
113:15 114:21
**abstracted (2)**
125:11 127:22
**abstraction (3)**
114:17 115:2 116:20
**abstractly (2)**
114:2,16
**acceptability (1)**
114:6
**acceptable (70)**
24:15 25:8 39:14,24
47:23,24 48:4 49:4
67:20 69:15 73:16
79:12,18 81:2 85:9
86:11,24 87:2 89:12
91:8,22 113:2
119:19 122:5 127:6
127:20 130:18
131:5,9 132:7,16
134:9 136:25 138:9
138:20 140:2,9,12
140:17,23 141:4,14
142:8,20 143:4
144:13 149:10,18
149:21 150:5,6,8,14
150:25 151:7,17,24
152:2,8,14,23 154:5
155:2 156:20,24,25
157:22 158:11
165:21 166:2
**acceptance (1)**
143:14
**acceptive (1)**
153:16

**accommodate (1)**
6:18
**accomplish (1)**
44:12
**account (9)**
75:13 93:13 97:17
106:13 108:25
137:17 138:6 144:7
153:19
**accurate (1)**
100:11
**accurately (2)**
95:14 97:15
**achieve (1)**
93:15
**achieved (1)**
103:6
**action (2)**
1:3 168:18
**active (21)**
18:3,25 19:2,11 25:22
64:15 65:6,11,17
67:21,24 68:6 69:3
119:8 125:11
132:18 153:16
154:5,6 156:3,20
**activity (7)**
63:9 66:6 69:23 70:4
70:5 163:3,4
**actual (3)**
22:11 67:6 125:12
**additional (2)**
10:24 137:15 138:4
**additive (1)**
27:17
**address (6)**
8:9,16 56:12 80:7
81:17 89:4
**addressed (2)**
44:16 158:25 159:4,6
159:14 160:8,21
**addresses (1)**
49:19
**addressing (2)**
18:24 78:8
**adequate (1)**
75:12
**adjective (5)**
122:9,16 123:9,22
124:10
**adjectives (1)**
122:18
**adjust (1)**
159:24
**adjustment (2)**
159:13 160:2

**administer (6)**
37:23 140:15 144:14
145:16 153:6
159:25
**administered (29)**
35:4,9 39:25 47:18
51:25 66:12,18
71:22 80:13 89:10
108:12 134:13
136:21 137:22
139:13,24 141:3,12
142:10,22,23
144:22,23,24,25
158:5,12 163:9
164:15
**administering (9)**
70:8 82:11 106:17
109:6 134:2 145:10
145:23 146:8,21
**administration (7)**
34:4,12 50:13 134:20
135:23 143:13
164:2
**adopt (1)**
11:25
**adverb (1)**
122:12
**affect (3)**
73:15,17 84:8
**against- (1)**
1:7
**agent (3)**
27:16,17 162:21
**aggregate (1)**
128:11
**agree (28)**
10:6 19:8 21:23 27:22
28:13 29:15,20
30:10 41:15,24
53:25 63:15 64:3,6
72:7 75:25 76:3
89:17,19 95:12 96:6
96:23 101:20 113:8
124:22 128:23
129:8 131:12
**agreed (3)**
115:22 129:3 131:14
**agreement (2)**
112:13 127:2
**Ah (1)**
148:2
**ahead (2)**
9:16 10:4
**aimed (1)**
17:25
**al (6)**

1:5,8 3:19 4:6,7 81:17
**Alembic (7)**
1:8 3:18 4:7 5:2 56:10
56:19 170:3
**allowable (1)**
104:7
**allowed (7)**
43:25 44:15 51:17
52:17 78:16 79:4,11
**allows (1)**
115:13
**alluding (1)**
79:11
**ambiguity (1)**
59:18
**amino (1)**
118:2
**amount (12)**
22:13 23:13,23
110:14 111:2,3,8
112:4 116:13
129:15,16 130:11
**amounts (4)**
61:8,19 63:17 112:7
**analyses (1)**
93:15
**analysis (11)**
7:11 73:17 74:17
84:11,13 93:14
139:18 140:25
157:4 166:6,7
**analyze (7)**
9:12 54:3 70:15 95:18
137:18 141:22
165:10
**analyzed (1)**
86:21
**analyzing (1)**
150:23
**and/or (1)**
16:22
**animal (34)**
36:24 38:3 43:18 44:6
44:10,12,15,18 46:7
49:24 50:9 77:5
81:19 82:6 93:4
98:22 100:22
101:24 105:2 106:8
106:10,17,22 110:4
134:3,13 135:2,9,11
136:8 137:11
141:12 142:22
145:17
**animal-related (1)**
97:4
**animals (58)**

36:19,20 37:3,5,7,19
38:13 39:25 40:22
41:12,16,17,25 42:9
42:11,13,17,25 43:3
43:6,9 46:11,24
47:7,19 78:19 80:9
80:13,15 82:12 83:7
83:9,16 84:7 92:6
93:22 94:4 95:11
106:20 107:4,5,10
107:23 108:10,13
108:20 109:14
134:20 135:23
136:14,22 137:22
142:3,6 144:14
153:6 158:13
169:11
**answer (12)**
6:7 48:16 51:11 65:17
99:3,4 106:14
107:11 109:19
113:25 117:19
163:23
**answering (1)**
155:23
**answers (1)**
79:9
**anti-proliferative (1)**
162:20
**anticipated (3)**
49:14 59:4,25
**anticipation (6)**
7:23 8:3,10 60:8,23
109:24
**apart (1)**
123:10
**APHIS (2)**
99:18,22
**API (27)**
18:25 19:11 20:4
42:10,17 55:14
64:14,15,21 67:18
68:7 69:7 73:22
113:16 114:6
127:18 128:10
143:9 151:5,17,24
152:2,8,14,23 153:7
153:15
**apologize (2)**
100:25 126:7
**apoptotic (1)**
163:2
**app (1)**
26:10
**apparatus (1)**
154:16

**appears (3)**
10:6 21:20 24:7
**application (1)**
42:15
**appreciate (6)**
21:5 32:25 33:11
37:18 89:14 127:25
**appropriate (4)**
108:6 153:17 154:9
154:10
**approvable (6)**
133:5,10 134:15
138:11,22,25
**approval (8)**
79:20 103:5,17
132:21 133:17
134:12 137:5 139:3
**approve (1)**
135:22
**approved (14)**
31:2,9,20 98:23
100:22 133:11
134:25 135:4
136:23 137:4,10,21
140:7,15
**approves (1)**
134:19
**approximately (3)**
4:12 61:25 158:12
**April (2)**
3:22 4:24
**aqueous (3)**
55:24 62:3 161:15
**area (1)**
16:4
**argument (4)**
8:10 109:24 156:17
157:7
**arguments (2)**
60:19,20
**Arnold (2)**
3:4 5:4
**art (40)**
11:15,18 12:3,7 15:5
15:6 17:4 19:9,15
20:2,14 21:8 33:4
44:24 45:2,7 77:5
82:17 84:21 87:23
88:6,24 89:16 90:14
90:23 91:10 92:12
93:4 96:22 101:5,22
102:11 105:17
121:17 132:20
150:22 156:22
157:10,19 160:12
**art's (1)**

91:12
**article (2)**
98:25 102:9
**articulated (2)**
124:25 129:3
**articulation (1)**
54:21
**arts (3)**
20:15 126:11,12
**aside (3)**
55:2,10 64:4
**asked (13)**
6:9 8:4,9 9:9 13:17
14:21 23:25 48:13
49:6 118:15 135:19
135:25 163:22
**asking (14)**
9:2 21:10 26:19 33:3
55:18 92:17 116:18
117:7 122:24
123:15 139:2
140:10 146:16
161:5
**aspect (3)**
60:15 71:8 151:14
**aspects (8)**
97:18 113:18 114:7,7
125:14 131:21,24
133:2
**assays (2)**
65:4 83:19
**assess (1)**
53:16
**assessed (1)**
50:12
**assessing (2)**
146:9,22
**association (1)**
4:16
**assume (3)**
29:24 118:14 140:14
**Assuming (1)**
85:25
**assumptions (3)**
62:20,23 63:8
**atoms (2)**
115:17 126:16
**attempt (2)**
41:10 63:7
**attempting (1)**
142:3
**attention (6)**
76:17,19,22,24,25
156:2
**Attorneys (3)**
3:5,11,18

**AUCUC (1)**
100:23
**August (5)**
1:16 2:5 4:12 168:22
170:4
**author (1)**
77:13
**authorities (1)**
42:22
**authors (2)**
81:16 160:19
**available (7)**
85:12,14 97:3,12
100:6 101:25 105:9
**Avenue (3)**
2:11 3:20 4:11
**avoidance (1)**
59:17
**aware (7)**
10:12 31:18 36:7,9
38:17,18 158:10

———————
**B**
**B-O-S-C-H-E-L-L-...**
49:17
**back (13)**
28:25 54:18 62:14
98:7 103:4,19 110:8
116:11 120:7
121:10,12 162:2,8
**background (9)**
14:9 15:16,20 16:18
23:5 53:13 54:3,23
70:14
**based (33)**
7:19 9:4 10:24 11:2
11:16 16:17 21:9
25:10 32:14,20
35:22 39:11 40:16
41:13 44:23 48:19
74:19 79:17 81:8
82:22 84:10 90:16
90:22 92:3 93:5
96:23 99:25 101:21
111:9 124:6 139:22
156:8 165:11
**bases (2)**
8:5 152:24
**basically (2)**
11:23 142:3
**basing (1)**
62:19
**basis (4)**
20:22 40:10,12 82:15
**began (1)**
17:19

**beginning (2)**
27:10 164:7
**begins (2)**
27:13 28:2
**behalf (5)**
4:19,22 5:2,4 56:19
**Beis (5)**
3:15 4:21,21 56:18,23
**believe (15)**
12:7 23:8 67:3 78:7
79:24 84:2,22 91:13
92:13 94:15 109:16
110:8 142:8 155:11
155:15
**benefit (1)**
47:19
**Benson (30)**
3:14 4:18,18 5:14,18
9:15 52:10 54:5,11
56:5,9,16,21,25 57:5
57:15 58:19,21
93:18 103:12
112:17,19,21,24
120:17 121:11
161:22 166:8,14
169:4
**Benz (6)**
1:24 2:12 4:15 5:10
168:6,24
**Bernhardt (10)**
1:13 2:9 4:4 5:8 121:4
167:4,12 168:10
169:4 170:5
**better (3)**
62:8 71:3 111:16
**beyond (3)**
30:20 143:9 155:21
**big (2)**
36:10 37:16
**binder (6)**
9:17 27:16 56:17
57:22 58:17 147:23
**binders (1)**
112:22
**biochemistry (2)**
15:22,24
**biology (1)**
15:24
**biomedical (1)**
79:13
**bit (11)**
9:2 11:21 20:7 28:25
34:3 41:5 47:8
90:13 113:21
138:18 140:13
**blood (2)**

34:21 168:18
**body (2)**
34:20 52:18
**bonds (1)**
126:17
**Boschelli (139)**
45:5,21 48:3 49:14,16
49:22 50:7,10 53:4
53:7,13,14,22 54:3
54:22,24 55:18 59:4
60:8,24 61:6,17,17
61:24 62:17 63:18
63:24 64:5,7,9,13,17
64:22 65:11,23
66:21 67:8 68:16,23
69:14 70:7,14,17
71:6,14 72:9,13,16
72:25 73:8,12 74:5
74:8 75:5,21,25
76:4,18 77:12 79:24
80:5 82:17 83:13
84:9,14 87:24 88:6
88:16,25 89:7,19,22
90:5,7,15 91:14
92:12 93:9 96:12,21
101:14 102:8
105:23,23 106:8
109:2,6 110:20
111:13,18 112:3
113:9,17,22 114:4
114:12 116:24
117:9,25 118:9,10
118:23 119:3,9,15
131:10,13 135:3
137:10,16,23,24
138:4 139:19
140:24 141:18
142:18 144:10,12
144:20 145:21,23
146:20 150:24
151:15 152:3,20
153:5 154:16,17,23
155:24 156:12
157:8,20 158:22
159:14,23 166:7
**Bosulif (4)**
67:3,4,9 69:25
**bosutinib (93)**
21:25 22:12,14 23:13
23:23 24:22 25:12
26:14 28:15 47:18
50:4,7 51:23,24
55:22 61:7,25 63:15
64:8,14,16,23 65:5
65:11 66:2,22 67:2
67:24 68:2,14,22

69:14,22 70:9,17,23
72:14 73:8,21 74:3
74:24 110:14 111:3
112:2,4 113:4,9,22
114:13,15,18,21
115:23,24 116:7,15
116:18,25 117:9,13
117:15 118:11,13
118:15,17,23 125:2
125:11,21,25 126:5
126:6,19,22 127:8
127:11 128:9,17,18
129:4,7,9,18,24
130:6,13,20,22
131:18 145:24
156:13,22 162:12
**bottom (4)**
22:18 78:9 104:24
153:23
**bought (1)**
85:21
**brackets (1)**
118:6
**break (7)**
6:17 54:7,10,12
120:16,18 161:24
**briefly (2)**
15:3 58:2
**bringing (1)**
76:25
**broad (8)**
15:16 16:17 18:4
35:19 36:10 75:22
81:16 140:10
**broader (5)**
8:12 61:21 81:15
102:20 103:24
**broadest (1)**
59:24
**broadly (18)**
7:25 13:4 16:5,24
17:21 19:21 20:6
44:11,19 51:20 64:4
64:11 75:18 123:4
123:18 124:4
139:11 140:21
**bulk (2)**
47:22 141:16
**bunch (1)**
128:11
**buy (3)**
86:25 87:4,6

———————
C
———————
**C (3)**
3:2 168:2,2

**calculation (1)**
63:16
**calculations (5)**
62:20,22 63:7,23 64:2
**call (9)**
45:5 52:6 64:10 66:2
72:11 76:19 119:13
129:8 131:15
**called (2)**
5:9 32:2
**Cambridge (2)**
87:16,20
**cancer (6)**
13:11 37:14 43:14
80:16,18 83:8
**cancerous (1)**
51:7
**candidates (1)**
43:14
**capable (1)**
147:10
**carbons (1)**
115:10
**care (17)**
26:21 38:13 93:21
94:3 99:19 107:4,9
107:23 108:11,13
108:21 135:9,11
136:8,14 137:11
169:11
**career (3)**
36:25 37:9,20
**carrier (2)**
27:17 33:20
**carriers (4)**
29:9,10 33:14,16
**case (25)**
4:9 10:2,7 12:24 13:2
14:5 16:21 19:20
21:4 44:24 48:8
58:6 60:6 63:9
74:22,23 82:2,6
91:21 111:20 113:4
113:19 132:16
148:18 170:3
**cases (1)**
48:11
**catalysis (1)**
17:17
**categories (2)**
36:10 152:24
**causes (1)**
106:21
**cavity (1)**
34:21
**cell (2)**

71:23 164:6
**cells (16)**
43:18,20,24 50:11,24
51:3,13,16,21,22
52:2,15 65:4 162:21
163:3 164:11
**cellular (1)**
15:24
**central (1)**
113:18
**certain (14)**
28:7 33:23 62:20
66:18 69:7 79:3
86:10 87:17,17
88:11,12,18 105:14
156:6
**certainly (16)**
15:25 21:3 36:21 42:4
48:23 59:14 73:14
73:17 82:5 119:19
133:9,12 137:17
152:9 153:4 155:15
**certainty (5)**
88:15,17,19 91:18,24
**Certified (2)**
2:12 168:6
**certify (2)**
168:9,16
**chain (1)**
85:19
**chance (4)**
102:3,16 103:10
107:8
**change (12)**
11:25 72:14 73:11
74:7 75:3,9,17 91:2
108:3,19 109:3
137:12
**changed (1)**
10:21
**chapter (4)**
95:21 99:6,16 102:23
**characterization (1)**
100:11
**characterize (3)**
64:21,23 120:8
**characterized (9)**
51:2,6 69:18 74:13,14
74:15 75:11 113:18
114:4
**check (3)**
32:17,23 98:16
**checked (2)**
31:3,6
**chemical (44)**
17:17 18:2 22:11

64:25 67:7,14,25
68:8,14 78:17 80:17
81:4 113:14 114:3
114:16,17,21,25
115:5,7,15,19,22
116:14,16,17
117:15 118:13,16
118:18,25 125:7
126:6,11,12,16
127:11 128:18
129:2,6,9 130:22
143:22 151:15
**chemically (1)**
66:25
**chemicals (12)**
65:25 80:18 94:24
95:8 96:7 97:20
98:21 100:5,20
101:6 102:12 142:5
**chemist (4)**
114:25 115:7,16
117:4
**chemistry (4)**
17:5 126:14,23
148:10
**Chicago (1)**
3:13
**choose (1)**
160:13
**choosing (3)**
66:20 158:24 160:7
**chromatographic (1)**
154:13
**chromatography (4)**
116:22 154:12,16,21
155:4
**chronic (1)**
12:14
**circulatory (1)**
34:22
**circumstances (11)**
77:19 79:3 80:20
105:15,19,23,25
106:6,7,13 159:5
**citation (2)**
97:22 98:24
**cite (1)**
100:15
**cited (1)**
10:3
**citing (1)**
156:14
**City (1)**
87:20
**Civil (1)**
1:3

**claim (64)**
19:23 21:17,24,24
22:10,12 24:7 25:3
25:10,13 38:23 39:3
39:4,11,16,17,19
40:12,17 48:14,15
48:17,19,20,24 49:2
49:13 59:3,16,24
108:8 109:24 110:5
110:8,12 111:7
115:23 116:2,6,11
116:12,19 121:14
121:20,22 122:5
122:23,25 123:5,6
124:3 127:4 128:15
129:3,7,25 130:7,11
130:14,16,25 131:3
134:7 157:23
**claims (5)**
40:18 133:15 136:25
139:6 140:3
**clarification (2)**
52:8 58:16
**clarifications (1)**
32:25
**clarify (7)**
21:10 99:3,4 104:4
106:3 114:14
160:24
**clarity (7)**
12:13 18:10 23:18
39:10 111:25 127:7
149:9
**cleaner (1)**
113:21
**clear (15)**
21:4,6 26:15 33:12
46:8 55:17 61:2
62:6 73:5 81:25
92:16 118:17 126:2
126:5 138:19
**clinical (5)**
139:25 140:16,21
148:23 149:7
**clip (1)**
94:14
**Closed (1)**
27:3
**CML (45)**
12:10,13,22 13:2,6,9
13:15,23 14:6 16:10
16:14,23 22:13,20
22:24,25 23:13,22
47:17 49:3 50:10,17
50:20,22,23,24 51:2
51:3,6,12,16 52:2

110:13 111:3,8
112:3,6 116:13
129:15,15 146:10
162:21 163:3,5
164:6
**colleagues (3)**
81:18 82:5 161:25
**colon (1)**
143:22
**color (1)**
27:17
**column (18)**
27:9 28:2,11 33:15
34:8 78:14 103:21
116:21 153:18
154:11,15,18,21
155:4 162:14,15
164:4 165:20
**come (5)**
63:22 93:16 96:2
160:20 162:2
**comes (2)**
37:15 56:24
**commercialized (1)**
66:9
**COMMISSION (1)**
170:24
**Committee (3)**
135:10,12 137:11
**Committees (4)**
135:9,13,14 136:8
**common (1)**
33:20 37:22,25
**companies (3)**
136:4,7,13
**company (1)**
144:5
**completely (1)**
6:7
**complicated (1)**
74:12
**complications (1)**
105:3
**component (3)**
69:4 79:13 84:4
**components (4)**
63:13 89:8 91:5
124:25
**composition (198)**
19:11,16 20:4,13,25
20:25 22:13 24:6,15
24:16 25:9 26:5
33:25 35:9 39:7
41:9 46:18 47:25
48:3,4 49:4 61:24
62:11,17 63:13

64:24 67:20 69:5
70:8,21,22,25 71:11
71:14,15,19,21,25
72:8,9,11,12,15,16
73:13 74:5,8,9 75:4
75:5,20 81:4 83:14
83:15 84:9 86:11
87:23 88:9,16 89:22
93:9 109:6 110:13
110:18,20,21
111:11,18,19 112:3
112:10,13 113:3,8
113:22 114:8,12,19
116:12,24 117:5,8
117:25 118:10,22
119:2,7,15 120:2,6
120:11,13 121:23
122:3,5,10,22 123:7
123:11 124:11,11
124:16,17,18,23,24
125:18,20 126:19
126:20 127:3,4,7,7
128:6,16 130:7,15
130:19 131:2,13,15
132:8,12 133:4,6,14
133:16,25 134:2,9
134:11,12,19
136:20,20,24,25
137:9,13,13,22,25
138:8,21,21 139:5,6
139:7,16,24 140:7
140:14 141:3,12
142:9,21,21 143:4
143:11,18 144:4,6
144:12,13,15
145:23 146:9,21
147:9 149:10,11,17
149:19,21 150:9,13
151:6 152:3 153:4,6
155:2 156:5,8,25
157:7,11,20,23
158:22,23 159:14
159:24 160:14
165:6,13,20,22
**composition's (2)**
146:10,23
**compositions (39)**
26:14 28:15,21 29:19
30:13 31:2 33:21
34:6 35:4 36:7
37:23 39:13,24
40:19 41:6 42:3
47:24 63:23 64:7,9
64:10,11,12,13
76:13 82:11 86:14
90:7 108:5,5 119:11

131:16,17 132:4,5
135:23 144:19
151:2 158:11
**compound (56)**
21:23 22:14 24:16,21
25:9,11 47:17 49:23
50:3,5,6,13 53:4,16
64:17 66:21,22 68:2
68:4,14 70:5 74:11
79:19 113:3,11
116:4,7,14 118:8
122:6 125:5,7 126:6
126:10,11,15,22,22
127:21 128:7,9,9,10
128:13,17,18,23,24
129:2,16 130:13,19
155:25 157:22
164:14 165:17
**compounds (15)**
18:2 27:14 29:8 34:10
51:22 78:17 80:6
83:18 104:8 124:13
128:11 156:4
162:18 163:3,9
**compounds' (1)**
162:18
**comprised (1)**
87:24
**comprising (4)**
22:13 61:25 110:13
116:13
**computer (1)**
26:19
**concentrate (1)**
63:17
**concentration (3)**
161:14,16,21
**concept (2)**
94:5,8
**conclude (1)**
155:25
**concluded (2)**
53:4 70:8
**concludes (2)**
61:23 102:7
**conclusion (7)**
48:7 53:9 84:19 85:7
96:2 123:15 159:11
**conclusions (3)**
53:22 63:12 84:10
**condition (1)**
41:25
**conducted (1)**
95:10
**conducting (2)**
15:8,13

**confer (1)**
161:25
**confidence (1)**
150:13
**confident (1)**
36:12
**confidential (167)**
1:11 4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1,16,20 167:1
**confirm (3)**
32:17 33:2 58:3

**confused (2)**
130:4 161:4
**confuses (1)**
114:24
**connected (2)**
115:17 126:16
**connection (1)**
58:5
**consequences (1)**
105:3
**consider (6)**
9:10 21:7 129:6,23,24
130:14
**considered (12)**
75:15,16,18,19,22
97:7 98:3,13 102:4
102:17 138:6
141:14
**constructed (2)**
115:15 138:8
**construction (27)**
24:10,14,20 25:7,16
25:19 39:4,7 48:24
112:11,15,18 113:2
113:10 121:24
122:13 124:23,25
125:20 126:21
128:6,14,15,22
134:7 136:6 142:7
**construed (4)**
24:7 111:19 122:2,4
**construes (1)**
124:12
**contain (11)**
29:11 114:13 116:24
117:9 118:2,23
119:3,9,10 131:17
131:20
**contained (2)**
70:9 113:22
**containing (10)**
24:16 25:9 64:7,13
113:3 122:6 125:21
128:16 130:19
145:24
**contains (7)**
57:22 113:9 117:10
124:24 126:21
127:8 128:6
**contemplate (2)**
39:23 40:19
**context (50)**
18:13 19:22 20:8,9,10
20:17 21:3 25:11,13
25:18 28:18 35:18
36:4,5 41:16 42:24

48:24 55:14 61:21
66:18,20 73:18 85:3
92:4,9 102:8,20,25
106:11 121:16,19
122:14 123:4,23
124:2,4,9 125:19
126:2 134:21,24
135:16 140:16
141:21 148:16,19
150:3 153:25
154:11 155:17
**contexts (4)**
20:20 41:24 44:4 68:5
**continue (3)**
16:4 46:3,5
**continued (5)**
15:23 16:3 17:22
121:11 166:21
**continues (2)**
143:21 154:22
**control (1)**
71:6
**Controls (1)**
148:10
**conventional (1)**
27:15
**convince (1)**
10:3
**copy (3)**
9:25 56:5 57:16
**corner (2)**
78:9 94:16
**correct (132)**
5:22,23 6:23 7:8,24
10:4,14 11:20 12:3
12:10,15 15:9 16:11
17:7,8 19:17 21:12
21:18,25 22:8,15
24:8,11,18,22 25:4
25:12,14 26:14 28:9
28:12,16 29:13,16
30:2,7,13 33:17
34:13 38:18 40:2,23
41:18 42:11,18
43:10,21,22 44:2,3,6
44:18 45:8 48:5,11
49:17,25 50:4,14
51:14,15,18 52:2,19
52:25 53:6,9,17,20
54:22 58:23 59:9,21
60:2,3,6,7,9,10,15
60:16,21 63:2,24,25
64:8,14 66:22 67:4
68:2 69:16 72:10
73:2,3 79:21 81:10
84:2 85:13 86:4,5,7

89:24 90:2,8,9
97:20 99:2,14
100:17 105:22
110:23 111:11,20
111:21 112:4,5
117:13 123:11,19
125:23 129:12
130:10 131:5 133:6
133:20 137:25
147:3 148:24 152:3
156:14 162:12
164:6
**correctly (6)**
12:20 45:11 67:16
150:11 162:23
164:18
**Counsel (6)**
4:17 57:16 60:22
74:10 95:13 120:15
**Counselor (3)**
116:8 117:19 121:23
**count (1)**
115:13
**COUNTY (1)**
168:5
**couple (1)**
83:2
**court (21)**
1:2 4:8,15 5:6 6:5
9:19 12:17 24:8
25:7 39:5,7 40:14
40:17 57:19 111:20
120:15 122:2,3
123:17 124:12
138:8
**Court's (15)**
24:14 25:7 112:11,15
112:18,25 113:10
122:13 124:22
125:19 126:21
128:5,14,15 142:7
**coworkers (1)**
45:21
**Craig (6)**
6:23 57:9,11,24 169:9
169:10
**create (2)**
86:17 87:7
**creating (2)**
153:16 156:7
**creation (1)**
43:7
**creatures (1)**
80:10
**criteria (10)**
86:10 87:17 94:11

141:16,17,19
142:17,19 143:5,15
**criterion (2)**
134:17 149:18
**cross (1)**
68:5
**CRR (2)**
1:24 168:24
**crude (1)**
156:13
**crystalized (1)**
133:2
**culture (2)**
162:22 163:4
**cure (3)**
46:11 83:17 109:20
**currently (1)**
67:2
**cursorily (1)**
151:11
**CV (1)**
5:21

___

**D**

**D (1)**
147:23
**D.C (1)**
3:21
**daily (3)**
20:22,22,23
**data (1)**
164:6
**database (1)**
31:18
**date (9)**
9:22 31:11 32:23,24
33:5 57:13 93:23
100:2 170:4
**day (4)**
163:10 164:17 167:14
170:22
**days (1)**
164:17
**DD (1)**
147:25
**dealing (1)**
86:13
**death (2)**
44:6,17
**decide (1)**
123:16
**decided (1)**
144:11
**default (1)**
77:17
**Defendant (2)**

3:11,18
**defendants (5)**
1:9 4:20,23 5:19 11:9
**define (4)**
18:10 68:10 125:9
144:12
**defined (7)**
19:10 26:6 48:15 69:3
90:24 126:15 144:5
**defining (5)**
118:12 119:24 127:10
130:22 131:19
**definitely (1)**
91:9
**definition (13)**
11:14,17 12:2 15:4,11
18:21 21:9,11,14
38:15 66:10 115:4
118:24
**definitions (1)**
90:25
**degree (3)**
73:22 87:17 91:18
**Delaware (2)**
1:2 4:9
**delays (1)**
85:19
**deliver (1)**
29:9
**delivered (1)**
36:8
**delivery (2)**
29:9 34:20
**deny (1)**
144:19
**Dep (1)**
170:4
**depend (1)**
141:21
**depending (3)**
36:4 46:23 47:6
**depends (10)**
41:20 44:20 66:17
72:17 85:14 125:9
135:3 137:4 139:10
160:15
**Deponent (2)**
170:5,20
**deposed (1)**
5:22
**deposition (11)**
1:13 2:9 4:4,10 5:25
6:4 7:13 57:8,21
93:20 167:3
**describe (3)**
15:19 17:11 55:3

**described (11)**
16:18 26:12 27:21
39:13,15 55:15
66:21 98:21 100:21
146:21 165:20
**describes (3)**
55:12 62:12 162:11
**describing (1)**
164:5
**description (4)**
13:23 60:13 165:12
169:6
**design (1)**
37:6
**designate (3)**
166:15,16,19
**designated (1)**
64:17
**designed (5)**
151:16 152:7,11,13
152:21
**desired (2)**
158:24 160:7
**destruction (1)**
142:6
**detail (3)**
17:23 101:19 151:13
**detailed (1)**
13:4
**details (10)**
5:25 8:23 72:17 137:4
137:6,8 139:20
141:23 145:7
160:16
**detectable (1)**
74:16
**Detergents (1)**
28:6
**determination (1)**
166:4
**determine (7)**
9:4 45:23 62:22 65:3
81:20 132:15
137:18
**develop (1)**
18:5
**development (8)**
16:5 17:7,12,21,24
18:6 20:15 42:24
**deviate (1)**
33:8
**device (3)**
86:20 87:12,14
**devices (2)**
86:15 87:8
**dextrose (12)**

29:15,18,22 31:8
32:9 70:23 80:2
86:3 90:6,11 119:19
145:24
**dextrose/water (5)**
55:7,23 61:11 62:3
71:7
**die (2)**
46:14,16
**differ (1)**
36:4
**difference (2)**
11:22 104:8
**different (35)**
11:19 23:20 29:9
35:17 36:13 43:6
46:23 47:6 51:19
52:6 55:19 65:25
67:7 68:4,15 89:15
90:13,25 98:8 99:7
104:13 105:24
106:5,18 109:21
110:6 117:18,22
124:13 134:25
136:5 138:18 145:7
156:16 161:16
**differentiates (1)**
79:8
**differently (1)**
126:13
**direct (11)**
11:12 21:15 26:17
34:7 47:11 49:9
52:3,4 58:12 94:13
162:13
**directing (2)**
57:2 110:7
**directly (1)**
34:22
**disagree (18)**
22:4 26:3 51:12 53:8
53:21 54:2 55:12
61:14,16 62:16
63:11,14 65:5,9,10
70:7 85:10 109:5
**disagreed (2)**
13:23 62:25
**disclose (4)**
76:2,22 77:16 154:23
**disclosed (16)**
62:17 63:24 64:12
71:6 73:8,12,16
76:13 88:12 96:21
101:7 102:14
111:12 151:15
152:20 154:25

**discloses (6)**
49:23 61:24 64:7
71:18 72:9 150:25
**disclosing (3)**
61:7 77:2 101:14
**disclosure (14)**
72:19 75:21 77:11
83:3 84:14,16,25
90:3,10 92:5 96:12
101:16 108:25
156:9
**disclosures (1)**
85:6
**discovery (3)**
83:7 92:10 106:10
**discuss (12)**
11:22 26:9 47:3 48:7
62:24 69:9 120:3
124:18 131:8
150:20 155:10,18
**discussed (11)**
7:9 52:14 70:13
103:13,22 119:22
142:17 143:4,6,10
155:20
**discussing (3)**
71:10 125:8,25
**discussion (2)**
40:13,17
**discussions (2)**
82:8,14
**disease (7)**
41:10,25 43:10 46:12
46:12 83:17 109:20
**diseases (2)**
13:12 41:17
**disintegrating (1)**
27:16
**dispute (1)**
33:19
**District (4)**
1:2,2 4:8,9
**doctors (1)**
51:10
**document (39)**
38:20 58:7 60:8 71:2
92:5 93:25 94:4,6
94:15,19 95:4,6,15
95:19,22 96:24 97:7
97:25 98:3,5 99:8
99:10,24 100:12,14
101:12,19,21 102:3
102:7,16,22 103:11
107:14 148:5,7,20
149:2,5
**documents (5)**

12:24 14:11 16:19
57:22 58:3
**doing (9)**
15:15,18 18:7 37:13
61:18 80:9 93:4
106:21 142:4
**dosed (1)**
61:8
**dosing (1)**
63:18
**dot (3)**
89:9,9,9
**double-check (1)**
166:18
**Dr (103)**
5:15 6:23 7:3,17,22
8:6,14,17,20 9:7,9
9:20 10:13,25 11:19
11:25 13:14,17,22
13:25 14:10,14,16
14:21 16:16 22:5
23:3,16,25 49:6
51:9 53:11,19,24
55:20 57:24,25 58:4
58:13 59:2,19,19
60:3 61:5,14,23
62:16,19 63:11
67:12 68:19 70:3,12
72:3 97:7 98:3
102:2,15 103:10
106:24 107:8,18,25
108:16 109:11
111:5,22,22 121:12
127:25 129:21
130:3 135:19,25
136:11,17 140:19
141:6 143:2 145:12
145:19 146:2,13
147:2,13 148:14
149:14,25 153:11
155:13 157:3,14
158:2,7,15 159:16
163:18 164:9 165:9
165:15,24 166:10
169:7
**Drive (1)**
3:12
**drug (29)**
16:5 17:7,12,21,24
18:6 19:4 20:15,24
20:24 31:20 42:6,15
42:24 43:7 67:3,8
70:5 73:23 92:10
132:21 133:17
143:13,15,15,19
145:10,15,16

**drugs (1)**
31:9
**Ds (1)**
148:3
**due (3)**
60:8,23 126:4
**duly (3)**
5:10 121:5 168:12
**duty (2)**
106:20,25

---

### E

**E (6)**
3:2,2 121:2,2 168:2,2
**earlier (5)**
66:9 94:10 108:4
119:23 121:15
**early (3)**
83:6 100:7 106:9
**easily (1)**
86:6
**education (1)**
37:2
**effect (6)**
65:19,23,24 66:4,13
80:17
**effectively (1)**
53:5
**effects (5)**
51:21 65:3 83:18 95:9
97:18
**efficacy (1)**
144:7
**either (6)**
45:25 46:14,16 64:22
90:25 100:12
**elaborate (3)**
47:8 64:18 121:25
**element (3)**
25:3 85:5,6
**elements (2)**
116:10 126:20
**emphasize (3)**
28:17 90:21 154:9
**employ (1)**
136:13
**enabled (1)**
62:14
**enablement (1)**
60:17
**enables (1)**
62:8
**ended (1)**
52:22
**ends (1)**
167:3

**engage (1)**
150:23
**engaged (1)**
48:10
**engagement (3)**
6:22 13:2 16:20
**enjoying (2)**
26:20,22
**ensure (1)**
106:20
**ensures (1)**
95:8
**entire (5)**
13:19 21:11 58:17
107:9 111:9
**entirety (2)**
7:16 84:12
**entity (4)**
67:7,14 115:5 128:18
**entries (1)**
30:15
**environment (1)**
129:11
**envision (1)**
159:21
**enzymatic (1)**
17:16
**equal (1)**
105:8
**equipment (1)**
154:13
**equivalent (1)**
6:4
**ERRATA (1)**
170:2
**ESQ (4)**
3:8,14,15,22
**essentially (3)**
47:21 86:16 150:12
**establish (1)**
150:12
**established (1)**
66:23
**et (6)**
1:5,8 3:19 4:6,7 81:16
**eventually (1)**
145:14
**evidence (2)**
137:21 159:10
**evident (2)**
98:9 105:4
**exactly (7)**
80:14 96:8 101:17
115:8 126:18
129:22 150:17
**examination (5)**

5:14 121:11 168:11
168:13 169:3
**examined (2)**
5:12 121:7
**example (48)**
18:2,3 19:4 25:20
28:25 29:23 30:4
31:14,17 33:16
34:22 35:7 40:2
41:3 43:20,22 44:3
45:7 46:25 47:13
60:14 68:25 69:23
70:14 71:4 74:2
87:2 89:4 93:9
119:5 133:13,13,22
134:3,5 138:15
141:2 142:4,14
144:2 149:16 150:3
151:12 154:17,19
162:13 164:14
165:17
**examples (2)**
138:16 140:22
**exceptions (1)**
140:9
**excipient (11)**
25:18 26:4,8,13 28:14
29:18 30:3,19 32:10
150:5,7
**excipients (93)**
19:16 20:5 24:17
25:15 26:6 27:15,21
28:24 29:11,24 30:5
30:7,10,12,16,23,24
31:3,19 35:24,25
46:17 55:11 64:5,6
72:25 73:9,10,15
74:4,6,25 75:2 76:3
76:6,20 77:6,7,17,18
79:4,16 80:12,22,24
81:2,6,8,10,22 82:11
82:18,19,22 84:22
84:23 85:9 91:14,15
93:6 97:2,12 101:23
101:25 103:7,17
104:6,16,22 105:9
105:16,19,21
106:16 113:5 119:3
119:6,13,16,20,21
120:4,12 122:7
125:3,6,21 126:24
127:8 128:19
130:20 131:18
143:10
**excludes (1)**
132:7

**exercise (1)**
75:23
**exhibit (20)**
9:18,21 14:13 26:18
26:25 34:7 57:8,12
57:21 58:17 77:25
93:20,22 94:2 99:12
147:23,25 169:7,8
169:11
**exhibits (6)**
9:21 10:2 14:11,14
58:22 169:7
**EXHIBITS----------...**
169:5
**exist (2)**
38:6 94:9
**expect (12)**
32:13,19,22 73:22
76:12 77:6,11 101:5
101:23 140:11
154:25 165:11
**expectation (4)**
88:7,25 90:15 93:8
**expected (2)**
87:23 96:2
**experience (18)**
12:9,21 15:8,12,17
17:6,9,12 32:14,20
37:12 41:13 48:19
87:6 90:16 91:12
93:5 152:16
**experienced (1)**
93:4
**experiment (6)**
41:20,21,22 44:11
46:6 52:22
**experimental (1)**
95:11
**experimented (1)**
50:25
**experiments (17)**
37:5 44:8,10 46:13
49:24 51:20 52:6,14
65:3 76:4 79:9 83:6
85:3 104:9 106:8,10
145:7
**expert (19)**
6:22 8:22 9:20,25
10:12 11:13 48:10
57:9,10,23,25 58:4
59:8 99:2 100:17
132:14 169:7,8,9
**EXPIRES (1)**
170:24
**explain (2)**
83:11 87:13

**explained (1)**
151:13
**explicitly (3)**
76:10 103:15 131:25
**express (6)**
112:6 114:9 146:4
147:14 157:15
158:8
**expressed (3)**
10:20 147:3 152:15
**extensive (1)**
43:5
**extent (8)**
6:8 9:11 14:8 67:23
90:20 123:14
158:16 159:18
**extenuating (1)**
77:19

_____
**F**
**F (2)**
121:2 168:2
**fact (19)**
26:12 46:4,15 47:15
65:6 71:21 72:9
77:14 80:10 83:24
84:6,17,21 85:4
91:15 92:6 137:20
147:9 151:25
**factors (1)**
75:16
**faculty (2)**
16:2 17:19
**fair (8)**
11:11 16:7 35:21
49:21 63:21 69:20
75:17 98:14
**fall (2)**
134:8 150:4
**familiar (12)**
6:2 27:7 38:3,5,14,15
43:12 77:5 94:4,5,7
98:4
**far (3)**
22:7 138:9 165:6
**fatal (1)**
45:3
**FDA (14)**
31:2,10,18 132:21
133:5,9,11,17
138:11,22 139:3
143:19 148:8
149:12
**feel (3)**
6:12 8:15 47:9
**field (3)**

17:6 20:16 36:10
**filings (1)**
42:21
**filler (1)**
27:15
**filter (4)**
86:16 87:15,18,25
**filtered (1)**
87:25
**filtration (4)**
86:20 87:8,12 88:8
**find (1)**
99:5
**fine (4)**
56:15,16 130:21
164:12
**finish (3)**
117:19 127:13 162:2
**finished (1)**
161:23
**firm (1)**
4:19
**first (15)**
5:9,21 12:7 27:6
50:18 52:16 57:23
58:12 78:24 79:10
101:22 104:3 110:7
128:25 143:21
**flavoring (1)**
27:17
**flipped (2)**
10:8 58:8
**flow (1)**
153:18
**foc (1)**
97:19
**focus (17)**
7:10 8:3,21 14:12,17
14:24,25 18:4 50:18
62:11 78:24 111:13
111:23 117:16
119:12 130:12
140:23
**focused (7)**
7:21 21:14 48:23 79:2
81:6 111:17 112:9
**focuses (1)**
78:13
**focusing (2)**
17:20 131:22
**folks (1)**
145:23
**following (1)**
166:21
**follows (2)**
5:13 121:8

**Food (1)**
143:13
**Footnote (1)**
22:17
**foreclose (1)**
151:25
**foreign (2)**
43:17,18
**form (80)**
19:5 20:19 22:2,6
26:7 29:21 31:22
33:22 35:3,6,9 40:3
40:24 41:19 42:19
43:4 51:4 55:16
59:10 63:3 65:8
67:10 70:19 75:6
76:7 77:8,20 81:11
89:25 91:16 92:15
93:11 97:5 100:8
101:9 103:9 105:12
108:14 109:10
110:3,16,22 112:16
113:12 114:22,23
116:5 117:2,14
118:19 122:11,20
123:12,13 125:4
128:20 130:9 131:6
132:23 133:7,19
134:4 137:14 138:2
138:13,23 139:9
140:4 142:25
144:17,21 150:16
151:9 152:4 153:9
153:21 155:5,8,12
159:2
**forming (3)**
98:4 102:4,17
**forms (2)**
36:6,13
**formula (17)**
114:3,16,21 115:2,7
115:15,22 116:15
118:13,16,18,25
125:10 127:11,22
130:23 162:18
**formulate (3)**
10:23 24:3 157:11
**formulated (1)**
27:14
**formulating (2)**
22:23 23:21
**formulation (14)**
17:7,12,20,21,25 18:6
19:3,3 20:24 30:17
74:25 89:9 117:23
137:24

**formulations (3)**
28:7 31:9,16
**forth (2)**
143:19 168:12
**forward (1)**
59:18
**frankly (2)**
101:17 159:17
**free (2)**
6:12 47:9
**Freeborn (4)**
2:10 3:10 4:19,22
**front (1)**
147:17
**full (5)**
7:6 55:4 84:13,16
154:18
**further (5)**
29:2 121:7 140:14
166:9 168:16

**G**

**gain (2)**
14:6 16:3
**gained (1)**
14:7
**garbage (1)**
128:12
**gauge (1)**
153:6
**gauging (1)**
136:22
**general (10)**
15:17 16:6 18:12 36:4
45:20 59:12 82:14
92:9 148:15 160:16
**generally (23)**
13:8 17:13 18:14,16
18:20 19:24,25 26:3
28:24 32:7 35:11
36:14 37:9 39:18
59:12 83:12 105:18
121:16 124:23
140:6,11 160:25
161:9
**getting (4)**
106:6 120:18 125:16
129:14
**give (8)**
9:3,13 48:13 111:25
112:19 140:20,21
153:15
**given (10)**
50:24 77:9 102:22,23
102:23 112:8 134:6
139:20 144:20

168:14
**gives (2)**
55:21 115:16
**giving (3)**
6:4,5 22:10
**Gleevec (2)**
13:5,8
**go (37)**
5:24 9:16 10:4 17:23
27:9,25 28:25 46:2
46:22 47:11 50:16
56:2 58:14 67:19
69:10 72:18 75:7
77:21,24 94:22
103:4 110:8 114:18
116:11 120:7
121:23 122:22,25
123:6,17 132:15
139:17 140:7 156:5
164:4 166:14,17
**goes (4)**
29:12 69:5 79:15
114:8
**going (22)**
5:24 26:24 33:8 46:13
46:16 54:9,9,14
56:25 73:23 77:24
83:25 84:7,17,18,21
103:19 120:20
144:5,7 147:19
162:5
**good (4)**
5:15,16 54:6 120:16
**grade (70)**
55:11 64:6 73:2,10
74:5 75:2 76:5,16
77:7,15,18 78:17
79:4,16,19 80:2,5,12
80:21 81:22 82:10
82:10,18,21 83:4
84:23 85:11,22 86:3
87:7 89:2,11,23,24
90:3,8,8,18 91:7,15
91:23,25 92:14 93:6
93:10 94:24 95:7
96:7,14 97:2,12,20
98:20 100:4,20
101:6,23 102:12
103:7,16 104:6,16
104:21 105:9,16,19
105:21 106:16
157:8,12
**grammatically (1)**
123:19
**GRAS (6)**
32:2,5,10,12,19

119:22
**great (3)**
6:20 36:16 77:23
**group (1)**
144:10
**grow (3)**
44:2,16,17
**growth (9)**
53:5,17 70:10 71:23
109:7 146:11,23
147:10 153:8
**guess (12)**
19:2,6 41:2 44:20
48:6 52:20 68:21
122:12 125:5
135:10 153:2
163:19
**Guidance (1)**
148:8
**Guide (3)**
93:21 94:3 169:11
**Guideline (2)**
107:4,9
**guides (1)**
94:9

**H**

**hairs (1)**
74:11
**Hampton (2)**
3:17 4:25
**hand (4)**
9:19 57:15 149:17
168:22
**handbook (9)**
29:23 30:4,6,9,11,14
30:21,24 119:21
**handed (3)**
57:19,20 93:25
**happy (2)**
6:17 129:5
**harm (1)**
106:21
**harvested (1)**
43:21
**head (1)**
135:8
**heading (2)**
59:5 95:22
**heard (1)**
5:17
**hearing (1)**
20:3
**heart (1)**
48:2
**held (2)**

2:10 4:10
**help (1)**
68:24
**helped (1)**
37:6
**helpful (1)**
33:13
**helps (1)**
90:21
**hereinbefore (1)**
168:11
**hereunto (1)**
168:21
**high (1)**
10:10
**human (11)**
39:14,22 43:21 50:10
51:12 79:19 108:6
133:17 138:11,22
140:15
**Humane (1)**
38:12
**humans (9)**
40:6,9,14 41:11
139:14 141:3
148:24 149:2,23
**humor (1)**
50:24
**hundred (3)**
58:9 95:16,17
**hundred-page (1)**
101:12
**hydrogens (1)**
115:11
**hypotheses (3)**
45:23 109:21 142:4
**hypothesis (1)**
44:22
**hypothetical (10)**
42:4 55:18 72:18 73:7
75:3,24 109:3 137:3
139:20 140:10
**hypothetically (1)**
139:2

**I**

**IACUC (12)**
79:20 98:23 100:24
101:2 103:5,18
134:19 135:5,16
136:5,23 137:21
**iAnnotate (1)**
26:20
**idea (3)**
83:9,20,21
**identification (3)**

9:22 57:12 93:23
**identified (13)**
30:23 32:9,14,16,19
33:15,18 34:12,16
76:5,9,10 162:19
**identifies (5)**
28:13 29:12 30:11
31:19 34:5
**identity (1)**
67:6
**II (6)**
148:9,12,21,22
149:12,23
**III (6)**
139:25 140:8 148:9
149:3,4,6
**Illinois (1)**
3:13
**impact (1)**
137:23
**implicated (1)**
16:23
**implications (1)**
19:20
**important (18)**
13:10 30:16 42:6
45:14,17,24 69:6
79:7 83:13 84:4
85:5 97:14,16 114:7
121:22 137:6
155:16,22
**impurities (5)**
74:16 87:18 125:13
132:8,11
**impurity (5)**
67:17 74:13 114:5
127:23 131:23
**inactive (2)**
89:7 91:5
**include (6)**
19:11,16 40:22
109:25 119:15
166:22
**included (8)**
23:4 70:23 72:13
93:14 119:18
152:19 156:4
157:11
**includes (6)**
15:5 17:4 43:9 112:11
113:9 118:11
**including (13)**
9:20 30:16,19 65:25
83:19 84:16 85:3
89:8 91:5 92:6,8
97:17 169:7

**inclusive (1)**
40:5
**incorporated (1)**
73:23
**independent (3)**
15:25 17:19 37:9
**independently (3)**
53:15 63:22 70:15
**INDEX----------------...**
169:2
**indicated (2)**
96:15 99:14
**indicates (1)**
102:7
**indication (18)**
71:5,9,9,18,23 72:24
80:24 82:21 84:25
85:8 88:3 91:21
92:2,23 115:3
119:17 120:9,10
**INDs (1)**
148:9
**induced (2)**
80:16 83:7
**Industry (1)**
148:8
**influence (1)**
93:7
**information (8)**
72:13 74:6 101:21
115:16 137:15,18
138:4 148:11
**infringement (1)**
56:12
**ingredient (14)**
19:2,2,12 25:23 64:16
65:7,12,18 67:22,25
68:6 69:4 119:8
127:19
**ingredients (4)**
18:3 25:22 119:7
120:12
**inhibit (6)**
53:17 70:9 109:7
146:10,23 153:7
**inhibited (1)**
53:5
**inhibiting (16)**
22:13,20,25 23:13,22
69:23 71:23 110:14
111:3,8 112:3,6
116:13 129:15,15
147:10
**inhibition (7)**
15:9,13,21 16:5,8,13
16:22

**inhibitor (1)**
162:19
**injected (2)**
35:12 43:24
**inoculated (1)**
52:16
**inquiry (1)**
27:2
**institution (1)**
78:16
**Institutional (4)**
135:9,11 136:8
137:10
**intend (1)**
66:12
**intended (5)**
46:5 109:20,21
136:21 158:22
**intending (2)**
46:24 47:7
**intent (1)**
109:5
**intention (5)**
80:17,18 86:18
109:13 153:3
**intentional (2)**
66:11,16
**intentionality (2)**
66:16,19
**interchangeable (1)**
22:25
**interchangeably (2)**
22:20 23:7
**interested (3)**
30:18 47:2 168:19
**interesting (1)**
152:25
**interpret (2)**
37:7 102:22
**interpreted (1)**
18:24
**intralesional (1)**
34:11
**intraperitoneal (6)**
34:11,17,19 35:5,10
36:8
**intraperitoneally (2)**
37:24 145:2
**introduce (1)**
4:17
**introduced (6)**
44:14 50:11 51:13,21
52:2 95:10
**introductions (1)**
5:17
**invalid (4)**

59:16,16,25 60:13
**invalidated (1)**
59:3
**invalidity (4)**
7:5 8:5,18 59:20
**invention (10)**
27:14 28:8 33:6 34:6
55:15 85:13 156:20
157:9,18 160:11
**inventors (2)**
68:12,13
**investigators (1)**
159:23
**involve (1)**
42:17
**involves (1)**
43:2
**involving (3)**
42:13 78:18 80:9
**ip (6)**
34:24 35:4 61:8 71:22
158:5,13
**issue (12)**
49:20 74:2 82:9 105:7
110:8,19,23,24
111:2 121:20
157:16 162:10
**issues (8)**
9:6 57:6 73:20 75:8
105:5 150:21
158:23 160:6
**italicized (1)**
94:23
**IX (1)**
59:6

---

**J**

**Jeff (1)**
4:15
**Jeffrey (5)**
1:24 2:12 5:10 168:6
168:24
**JOB (1)**
1:25
**joined (2)**
16:2 17:18
**July (1)**
99:19
**jurat (1)**
166:22
**justifiable (1)**
105:20
**justification (2)**
80:11 106:15
**justified (2)**
98:22 100:21

---

**K**

**K562 (1)**
163:8
**keep (2)**
54:9,9
**key (3)**
91:20 127:17 131:21
**kill (2)**
145:9,21
**killed (1)**
145:14
**killing (1)**
145:16
**kilogram (1)**
61:9
**Kimberly (2)**
3:15 4:21
**kinase (2)**
69:23,24
**kinases (6)**
15:9,14,21 16:9,14,22
**kind (16)**
15:19 16:6 26:9 35:13
37:10 41:10 54:21
132:7 136:6 139:10
139:18 150:21
151:13 154:24
164:11 166:6
**kinds (3)**
98:8 131:23 135:2
**knew (2)**
13:4 163:22
**know (89)**
6:12,17 8:12 10:5
13:6,8,11 15:20
18:2,17,19 19:19
21:2 22:10,10 25:23
26:22 27:10 29:6
30:18 31:23,24 33:9
35:8 37:25 38:6
42:23 46:9 54:21
56:9,23 57:4 63:6
65:13,14 68:10
83:11 86:19 87:19
90:24 91:20 93:14
93:16 95:3,16,21
99:22 100:13 104:2
104:23 107:3,12
110:6 115:6,8
116:22 117:21
118:6 121:15
122:23 123:4
124:11 125:7,8,11
126:9,12 129:7
132:17 134:16

135:5,7 137:7
139:20 140:24
142:13,16 146:6
151:5,10,18 152:5
154:14 155:18
160:12 163:16,24
164:20 166:3
**knowledge (10)**
12:8,11 15:7,17,20
16:3 17:3 32:15,21
90:16
**known (4)**
30:3 33:4,5 154:7
**knows (1)**
115:10

---

**L**

**lab (9)**
36:24 42:2 50:3,23
86:20 87:8,13,16
88:2
**lab-synthesized (1)**
49:23
**labeled (1)**
4:3
**laboratories (6)**
86:12,13,16,25
107:15,20
**laboratory (40)**
36:18,20,21 37:3,5,7
37:19 38:13 39:25
41:16,21,24 42:9,10
42:12,17,25 43:2,6
43:19 45:10,22
50:11 51:13 78:18
80:9 89:10 93:22
94:3 106:19 107:5
107:10,23 108:10
109:7 134:20
135:17 136:21
141:12 169:11
**labs (1)**
87:6
**lacks (1)**
71:9
**language (2)**
121:14 147:20
**large (1)**
114:9
**lastly (2)**
6:16 17:2
**law (1)**
6:5
**lawyers (3)**
48:14,22 123:16
**lead (6)**

79:24 84:20 151:16
152:11,13,21
**leading (2)**
142:5 161:17
**leads (4)**
83:25 84:18 85:6
142:7
**learn (1)**
16:4
**learning (1)**
15:23
**leave (4)**
26:23 48:22 51:10
123:15
**leaves (1)**
87:21
**leaving (1)**
46:5
**led (8)**
72:21 91:13 151:17
151:23 152:7,10,22
159:10
**left (2)**
44:5 45:2
**left-hand (1)**
78:9
**legal (10)**
4:14 20:8,17 21:3
48:21 60:22 92:17
92:20 123:15
126:13
**length (2)**
103:14 153:18
**let's (38)**
7:5 19:22 20:8 27:9
34:3 38:22 43:6
50:18 54:19 61:3
65:15 66:7 71:8
73:7 74:3,23,24
76:25 77:10,24
78:23 86:19 89:17
89:20 94:22 105:24
116:11 120:18
124:12 126:15
133:11 143:7
156:17 157:6
161:14,15 164:4
166:15
**leukemia (2)**
12:14 13:11
**level (4)**
10:10 42:18 132:11
160:13
**levels (2)**
17:23 67:18
**likelihood (1)**

92:23
**limitation (1)**
109:25
**limited (4)**
39:22 40:14 59:14
150:10
**Lindsley (24)**
6:23 7:3,17,22 8:6,17
10:13 11:19 22:5
57:10,11,24,25 58:4
58:13 59:19 61:5,14
61:23 62:16,19
63:11 169:9,10
**Lindsley's (13)**
8:14 9:7 10:25 11:25
13:14,22 14:10,14
14:16 55:20 59:2
60:3 111:22
**line (7)**
27:10 28:2 29:2 33:16
34:8,16 164:7
**lines (1)**
28:11
**liquid (6)**
35:13,15,18,19,22
36:2
**list (12)**
31:23,25 32:2,5,10,12
32:20 75:8 98:16
99:16 103:21
119:22
**literature (1)**
36:22
**litigation (1)**
48:11
**little (15)**
9:2 11:18,21 20:7
28:25 34:3,24,24
41:4 47:8 74:12
90:13 113:21
138:17 140:13
**living (5)**
46:3,8,9 80:10 106:17
**LLC (4)**
1:4 3:5 4:5 170:3
**LLP (1)**
2:11
**Ln (2)**
169:6 170:7
**located (1)**
99:7
**location (1)**
59:13
**look (17)**
8:23 9:11 10:5 32:11
49:10 58:3,9 63:6

68:25 78:9 81:15
85:2 98:6 128:21
129:19 140:5
141:13
**looking (9)**
5:20 7:20 22:17 27:6
40:16 78:11 101:10
112:14 128:5
**looks (9)**
10:9,10 27:7 34:16
94:13 98:7 99:11
123:17 164:7
**lot (6)**
61:18 71:17 93:14,15
132:25,25
**lots (3)**
36:11 101:12,12
**lubricant (1)**
27:16
**Luncheon (1)**
120:22

_____

### M

**M-Y-E-L-O-G-E-N...**
12:18
**main (1)**
14:12
**maintain (1)**
160:13
**maintaining (2)**
158:24 160:7
**maintains (1)**
31:19
**major (4)**
48:6 110:24 131:9,11
**making (1)**
60:19
**manage (1)**
46:12
**manifestation (1)**
129:10
**manufactured (1)**
127:24
**manufacturing (4)**
18:7 148:10 152:17
152:18
**mark (2)**
93:18,19
**marked (7)**
9:17,21 57:7,11,20
93:22 94:2
**marketed (3)**
67:2,8 69:24
**marriage (1)**
168:18
**Massachusetts (1)**

87:16
**material (1)**
35:20
**materials (1)**
98:13
**matrix (1)**
36:2
**matter (11)**
4:5 6:22 80:19,21
86:9 104:19 108:18
109:23 116:23
141:24 168:20
**matters (1)**
142:2
**MD (1)**
12:8
**mean (106)**
10:9 11:3 14:8 15:16
23:14 27:6 33:23
35:6 38:5 39:15
41:6,8 43:7 44:20
47:21 48:22 50:19
50:21 51:5,5 52:20
59:11 61:17 64:11
65:14 66:4,8,17,17
66:23 67:13,14
72:18,19 73:19 75:7
76:24 79:6 80:8
81:12,25 82:22,24
84:3 85:15 88:11,18
91:17,18 94:8 96:4
102:19 103:19
107:3,19,19 108:24
110:5 114:15,18,24
115:6 118:15,17,18
119:11 121:19
122:15,17,18 123:9
123:14,18,22,24
124:2,3,18 125:19
126:3,5,7,8,10,11
127:16 128:21
131:7,13,19 132:24
140:5 143:3 145:6
148:15 151:12
152:25 155:6,9
156:14 158:18
160:15 161:7,10
163:12,25
**meaning (5)**
24:25 48:23 122:19
123:9,10
**means (17)**
34:20 64:15 66:5,6
73:18 76:15 102:24
121:16 124:8,16
125:25 133:10

138:20,24 161:12
161:13 164:2
**meant (7)**
23:23 44:11 45:12,14
83:8,10 145:13
**measure (1)**
161:19
**measured (1)**
161:18
**Media (1)**
4:3
**medical (1)**
51:10
**medicinal (2)**
17:5 19:4
**medicine (2)**
13:9,10
**medicines (1)**
108:12
**meet (25)**
26:2,9 33:24 69:7
86:10 120:9 133:16
133:25 134:11,21
134:22 141:15,18
141:20 142:16,18
143:5,11,18,24
149:17,22 150:13
151:6 157:21
**meeting (1)**
143:9
**meets (1)**
86:22
**memorized (1)**
56:4
**mention (1)**
71:20
**mentioned (1)**
28:24
**Merit (2)**
2:13 168:7
**met (1)**
144:12
**methocel (1)**
164:20
**methocel/.5 (1)**
165:5
**methocel/0.5 (1)**
164:16
**method (3)**
48:15,20 109:25
**methylcellulose (2)**
164:24 165:3
**mg/kilogram (1)**
164:16
**mice (34)**
37:14,23 40:23 41:2

43:13 45:3,10,12,22
46:2 47:16 50:12,17
50:20,21 51:14,17
51:25 70:10 71:22
89:10 106:9 109:8
144:20,22,24 145:9
145:13,21 147:10
159:25 162:12
163:9 164:6
**mice/group (1)**
164:17
**middle (3)**
78:14 103:21 153:24
**milk (1)**
29:11
**milligrams (8)**
55:21,22,23 61:8,25
62:2,2 63:15
**milliliter (3)**
55:24 61:9 62:3
**milliosmoles (1)**
161:18
**mind (4)**
35:16,23 37:16
160:20
**minds (1)**
160:18
**minute (1)**
112:19
**minutes (1)**
96:9
**mirrored (1)**
163:4
**missing (1)**
98:15
**MIT (3)**
16:2 17:14,18
**mixture (2)**
55:23 124:13
**model (4)**
43:13 52:25 53:17
115:3
**models (1)**
43:9
**modes (2)**
34:4,12
**modifies (1)**
124:10
**modifying (2)**
122:9 124:15
**molecular (2)**
125:10 127:21
**molecule (5)**
50:8 114:3 115:24
116:3 117:10
**moment (6)**

38:22,24 50:19 55:2
94:25 120:16
**morning (5)**
5:15,16 94:10 125:25
131:14
**mouse (6)**
41:2 43:19,19,25
52:18 145:5
**moving (1)**
59:18
**Mullin (2)**
3:17 4:25
**multiple (7)**
8:2 48:7 130:5 145:4
152:15,19 155:18
**myelogenous (3)**
12:14,18 51:3

——————————
**N**

**N (4)**
3:2 121:2,2,2
**name (5)**
4:13 5:18 22:11 31:24
170:3
**named (1)**
77:13
**names (1)**
116:14
**necessarily (3)**
77:11 133:8,22
**necessary (9)**
75:19 79:12 81:13,14
124:24 159:5,8,13
159:23
**necessity (6)**
79:17,25 80:4,25 81:9
83:5
**need (9)**
6:16 30:18 36:23
56:14 57:3 73:14
128:21 166:3,5
**needs (1)**
74:14
**never (1)**
30:25
**new (17)**
1:15,15 2:11,11,14
3:7,7 4:11,11 5:11
18:5 143:15,15,19
168:4,5,9
**newly (1)**
49:23
**nitrogens (1)**
115:11
**non-pharmaceutica...**
76:5,10 77:15 78:17

79:4,16 80:2 81:7
81:13,22 82:10
89:23 90:8 94:24
96:7 98:20 100:20
101:6 102:12 103:7
103:16 104:6,15
105:15,21 106:16
132:4,5
**non-survival (4)**
79:8 104:9,20 105:4
**nonavailability (1)**
79:18
**nonhuman (1)**
41:11
**Notary (5)**
2:13 5:10 121:6 168:8
170:24
**noted (2)**
104:4 167:5
**notwithstanding (2)**
96:20 104:15
**noun (1)**
123:11
**nude (2)**
163:9 164:5
**number (17)**
4:3,9 7:6,6,10 9:18
57:8,21 59:19 78:10
80:7 93:20 94:2
99:19 114:9 118:9
169:6
**numbers (2)**
94:13,16
**numeral (1)**
59:6
**NW (1)**
3:20

——————————
**O**

**O (3)**
121:2,2,2
**object (3)**
97:6 123:12 155:12
**objection (136)**
8:19 9:8 13:16,24
14:20 16:15 19:5
20:19 22:2,6 23:2
23:15,24 26:7 29:21
31:22 33:22 40:3,24
41:19 42:8,19 43:4
49:5 51:4,8 53:10
53:18,23 55:16
59:10 63:3 65:8
67:10,11 68:18 70:2
70:11,19 72:2 75:6
76:7 77:8,20 81:11

89:25 91:16 92:15
93:11 97:5 98:2
100:8 101:9 102:2
102:15 103:9
105:12 106:23
107:7,17,24 108:14
108:15 109:9,10
110:3,16,22 111:4
112:16 113:12
114:23 115:9 116:5
117:2,14 118:19
122:11,20 123:12
125:4 128:4,20
129:17,20 130:2,9
131:6 132:23 133:7
133:19 134:4
135:18,24 136:10
136:16 137:14
138:2,13,23 139:9
140:4,18 141:5
142:25 144:17,21
145:11,18,25
146:12,25 147:12
148:13 149:13,24
150:16 151:9 152:4
153:9,10,21 155:5,8
157:2,13,25 158:6
158:14 159:2,15
163:17 164:8 165:8
165:14,23
**objective (8)**
44:9 45:21 46:10,12
65:22 145:20,22
146:4
**observe (1)**
22:18
**observing (2)**
23:8,10
**obtain (2)**
93:17 132:21
**obtainable (1)**
85:20
**obtained (4)**
85:18 86:6 88:4
103:18
**obtaining (1)**
87:10
**obviously (1)**
123:14
**offer (1)**
165:16
**offices (1)**
2:10
**oftentimes (1)**
43:8
**okay (239)**

5:24 6:11,14,15,18
7:2,4,12,14,15,19
8:8,14,25 9:15
10:11,19,23 11:6,11
12:17,25 13:7 14:5
14:5 15:3,3,12 17:9
19:8,24 20:21 21:5
21:7,15 22:4,9,17,23
23:12,18 24:5,5,13
24:20,24 26:12 27:4
27:9,13 28:12,19,22
29:6 30:6,9,22 31:4
32:18 33:6,7,9,10,19
34:15,23 35:2,15,21
36:16 37:12,18 38:2
38:12,22 39:2,5,8,9
39:23 40:8,16,22
41:4 43:8,23 44:23
47:5 48:25 49:9,21
50:6,9,16 51:16
52:13,23 53:3,15
54:5,5,19,25 55:10
55:20 57:15,16 58:8
58:11,24,25 60:11
60:25 61:22 62:12
62:13,25 63:10,19
63:21 64:3 65:5
67:6 69:20 70:22
71:12 72:6,12,23
74:3,18,20 75:14
78:4,7,23 79:14
81:24 82:15 83:9,24
84:5,15 85:10,24
87:12 88:14,20
89:14 90:5,12 92:20
94:12,18,20,22,25
95:5,6 98:11,14,17
99:25 100:14
102:10 106:3
108:19 109:5 111:9
111:15 112:8,15,18
112:23,25 113:8,20
115:21 118:14,18
118:22 119:2,14
120:14 122:14
124:9 126:18,25
127:2 132:10 133:4
133:14,21,24
134:18 136:19
137:20 139:22
140:13 142:12
143:7,25 144:3,10
146:6,17 147:6,16
147:16,19,24 148:4
148:12 149:3,8,20
150:19 151:20

153:14 154:14
156:10,16 157:6,17
158:4 159:12
160:11 161:3,13,22
162:2,3,9,17 163:21
163:25 164:12,25
166:8
**once (2)**
163:10 164:17
**oncologist (1)**
12:10
**ones (2)**
36:14,15
**opening (11)**
7:4,17 8:6,15 9:7
10:21 13:14 57:9,23
58:13 169:8
**opine (17)**
8:5 9:5 13:17,25 14:2
14:21 23:25 49:6
68:20 95:19 111:8
123:3 130:6,10,15
135:19,25
**opined (10)**
46:21 65:14 67:16
70:4 71:4 96:15
109:12 110:25
129:21 130:3
**opines (2)**
59:2,15
**opining (1)**
60:14
**opinion (159)**
7:21 8:2,20 9:3 12:6
15:5 16:16 17:2
20:3 22:19 23:3,16
23:17,19 24:11 46:4
46:15 48:2,14,22
49:8 51:9 53:11,12
53:19,24 55:21
59:18 60:5 67:12
68:19 69:13,13,16
69:17 70:3,12,24
71:13,16 72:3,5,15
72:22,24 73:11 74:7
75:3,17 78:13,25
81:4 82:20 83:13
84:3 85:7 92:21
98:4 102:5,18
106:24 107:2,18,25
108:2,16,17,19
109:11 111:5,9,16
112:2,9 117:3
119:14 127:5
130:17 131:4,7
132:6,9,19 133:15

135:21 136:3,11,12
136:17,18 137:12
137:23 138:19
139:21,23 140:19
140:20 141:6,7,9,11
141:25 143:2
144:16 145:12,19
146:2,5,7,13,19
147:2,4,4,6,8,13,15
148:14 149:9,14,25
150:2,10,11 151:4
152:12,24 153:2,11
153:12,15 154:4,8
155:13 157:3,5,14
157:15 158:2,3,7,9
158:15,17 159:4,16
160:6,9 163:18,20
163:22 164:9,10
165:9,15,16,24,25
**opinions (51)**
7:21 8:2,13,16 9:14
10:20,24 11:3,4,8,24
14:3,19 15:2 22:24
23:21 24:3 49:13
59:7,12,20,23 60:4
60:12,17 64:18
68:24 75:9,10 77:10
82:25 83:2 84:8
90:22,25 93:16,17
109:4 111:14,23
112:6 113:19 114:9
124:20 127:17
128:2,2 137:19
150:20 158:8
159:19
**opportunity (5)**
10:16 36:18 37:2 38:9
38:19
**opposed (1)**
106:10
**oral (1)**
164:2
**orally (4)**
29:3,7 34:10 145:3
**order (2)**
57:6 141:13
**ordinary (35)**
11:14,18 12:2,6 15:4
17:4 19:9,14 20:2
21:8 77:4 82:16
84:20 87:22 88:6,24
89:16 90:14,23
91:10,12 92:12 93:3
96:22 101:4,22
102:11 105:17
121:17 132:20

150:21 156:21
157:10,19 160:12
**organizations (1)**
136:9
**original (1)**
109:19
**originally (1)**
162:19
**outcome (3)**
46:14 83:22 168:19
**outcomes (1)**
45:24
**outlined (2)**
8:21 105:20
**outside (68)**
8:19 9:8 12:23 13:16
13:24 14:20 16:15
19:3,21 23:2,15,24
49:5 51:8 53:10,18
53:23 55:18 56:15
67:11 68:18 70:2,11
72:2 82:6 106:23
107:17,24 108:15
109:9,10 111:4
123:4 129:20 130:2
135:18,24 136:10
136:16 138:4
140:18 141:5 143:2
145:11,18,25
146:12,25 147:12
148:13 149:13,24
153:10 155:13
157:2,13,25 158:6
158:14 159:15,19
161:8 163:17,19
164:8 165:8,14,23
**overall (1)**
92:5
**oversee (1)**
136:14
**overseeing (1)**
108:12
**overseen (1)**
108:22
**oxygens (1)**
115:11

---

**P**

**p (3)**
3:2,2 34:24
**P-O-S-A (1)**
12:12
**p m (4)**
162:5,8 167:3,5
**p.o (3)**
163:10,15 164:15

**page (25)**
22:18 25:21 27:6
47:13 52:4,9 59:6
71:5 78:10,11 94:13
94:13,15,16,18,20
95:2 96:24 103:22
119:5 143:8 153:23
154:18 166:21
169:3
**pages (8)**
48:8 58:9 69:2 94:17
95:16 139:19
151:11 152:16
**paid (2)**
76:17 156:2
**paper (3)**
76:23 77:2 160:19
**papers (1)**
14:13
**paragraph (52)**
11:13,22 21:15 24:11
25:21 27:24,25 29:4
47:12,15 49:10,11
52:8,10,11 54:20
55:3 58:15,24 61:4
61:4,23 62:18 63:13
70:14 71:5 74:2
89:5 95:2,24 96:25
97:10 100:13
101:11 102:23
110:9 112:10
121:25 143:8
151:12 153:20,24
153:25 155:19,20
155:23 158:17,18
158:21 160:4,24
161:2
**paragraphs (7)**
14:25 25:25 47:3 48:8
69:2 152:19 155:19
**Park (2)**
2:11 4:11
**part (34)**
12:11 14:4 21:14 25:2
27:23 42:6,12 48:6
54:23 55:9 58:25
61:20 62:15 69:6,10
78:24,25 81:3 84:13
92:8 98:12 101:15
104:3 111:7 118:8
122:23 130:14,16
130:16 131:9,11
132:25 148:22
159:9
**particle (4)**
153:17 154:6,10,15

**particles (1)**
154:12
**particular (24)**
7:13 18:23 26:10
38:20 51:23 58:14
60:14,20 61:4 94:6
96:24 108:20 118:8
123:23 128:3
129:11 132:16,17
142:18 148:20
150:23 153:13
161:14,18
**particularly (1)**
102:8
**parties (1)**
168:17
**parts (6)**
14:25 15:10 69:9,11
81:5 117:5
**patent (47)**
7:6,13,14,23 8:11,18
14:8 18:15 21:18,20
21:25 22:19 23:9,11
26:13 27:4,7 28:13
28:18 29:25 31:11
32:24 33:15 34:5
39:18 48:10,14,20
49:3,14 59:3,15,16
59:21,25 60:12
68:13 108:5 121:21
123:24 124:5,7,10
137:2 150:15
162:10,11
**patents (1)**
7:10
**patients (4)**
12:10 66:7 73:24
139:24
**pay (3)**
76:18,21,24
**Pennsylvania (1)**
3:20
**people (4)**
36:11,12,21 37:10
**percent (9)**
52:18 55:6,7 61:10,10
164:15,16 165:4,5
**percentage (1)**
92:24
**Perfect (1)**
28:22
**perform (1)**
44:10
**performed (4)**
44:25 45:10,12
148:23

**person (43)**
11:14,17 12:2,6,7
15:4,6,7 17:3,4 19:9
19:14 20:2 21:8
76:11 77:4,10 82:16
84:20 87:22 88:5,24
89:15 90:14,23 91:9
91:11,24 92:11,22
93:3 96:13,21 101:4
101:22 102:10
105:16 121:17
132:20 150:21
156:21 157:9,19
**personally (1)**
37:4
**persons (1)**
160:12
**perspective (1)**
88:23
**pet (1)**
41:2
**Peters (4)**
2:10 3:10 4:19,22
**Pg (2)**
169:6 170:7
**pH (10)**
71:6 158:4,11,18,24
159:13,24 160:3,7
160:13
**Ph.D (15)**
1:13 2:10 5:8 15:7
17:5,17 57:10,11
121:4 167:12
168:10 169:4,9,10
170:5
**pharmaceutical (185)**
18:3,11,22,25 19:10
19:12,15 20:3,13,15
20:25 22:12 24:6,14
26:5 28:14,21 29:19
29:23 30:4,7,10,12
30:13,15,24,25
33:21,25 34:5 39:6
39:13 40:19 41:6,9
42:3,24 46:17 55:11
55:13 64:6,10,16,20
65:6,12,15,18,19,23
66:3,6 67:21,24
68:6,7,16,22,23 69:3
69:4 70:17,21,25
71:10,14,19,24 72:8
72:16 73:2,10,12
74:5,8 75:2,5,12,20
76:12 77:7,18 79:19
80:5,12,21,24 81:9
81:14,21 82:10,18

82:21 83:4,14 84:23
85:11,22 86:3,11,14
87:7 89:2,11,23
90:7,18 91:7,14,15
91:23,25 92:14 93:6
93:10 95:7 96:14
97:2,12,20 100:4
101:23 104:16,21
105:9,18 108:4
110:13,18,20
111:10,18 112:9,13
114:19 116:12
117:5 119:7,10,21
119:25 120:5,11,13
121:19,23 122:3,8
122:15,21 123:5,10
123:21,25 124:8,15
124:17 130:15
132:12 133:4,14,25
136:4,7,13 137:13
137:25 138:7
139:15 143:10,17
144:4,6,13,15 150:4
150:12 152:16,17
156:5,8 157:8,12
158:23 160:14
**pharmaceutically (6)**
24:15 25:8 39:24
47:23,24 48:4 49:4
67:20 69:15 73:16
81:2 85:9 86:23,25
89:12 91:8,22 113:2
119:18 122:5 127:5
127:19 130:18
131:5,9 132:7 134:8
136:24 138:9,20
140:2,8,12,16,22
141:4,14 142:8,20
143:3 149:10,18,21
150:5,6,8,14,25
151:7,17,23 152:2,8
152:13,23 153:16
154:5 155:2 156:19
156:25 157:22
158:10 165:21
166:2
**pharmaceuticals (14)**
1:4,8 3:11,18 4:6,7
13:5 17:16 18:8,9
18:18,19 149:7
170:3
**pharmacology (1)**
17:5
**phase (14)**
83:7 139:25 140:8
148:9,9,12,21,22

149:3,4,6,6,12,23
**phases (1)**
92:10
**Phil (2)**
3:25 4:13
**physiological (1)**
78:18
**Piper (143)**
3:8 5:3,3 8:19 9:8
13:16,24 14:20
16:15 19:5 20:19
22:2,6 23:2,15,24
33:22 40:3,24 41:19
42:8,19 43:4 49:5
51:4,8 52:8 53:10
53:18,23 55:16 56:8
57:18 58:16,20
59:10 63:3 65:8
67:10 68:18 70:2,11
70:19 72:2 75:6
76:7 77:8,20 81:11
89:25 91:16 92:15
93:11 97:5 98:2
100:8 101:9 102:2
102:15 103:9
105:12 106:23
107:7,17,24 108:14
109:9 110:3,16,22
111:4 112:16,20,23
113:12 114:23
115:9 116:5 117:2
117:14 118:19
122:11,20 123:12
125:4 128:4,20
129:17,20 130:2,9
131:6 132:23 133:7
133:19 134:4
135:18,24 136:10
136:16 137:14
138:2,13,23 139:9
140:4,18 141:5
142:25 144:17,21
145:11,18,25
146:12,25 147:12
148:13 149:13,24
150:16 151:9 152:4
153:9,21 155:5,8,12
157:2,13,25 158:6
158:14 159:2,15
163:17 164:8 165:8
165:14,23
**place (3)**
45:19,20 99:7
**placed (1)**
55:24

**places (2)**
46:22 47:14
**Plaintiff (1)**
3:5
**plaintiffs (3)**
1:6 5:5 97:6
**plan (1)**
42:16
**please (11)**
4:17 5:7 6:12 11:13
21:16 57:8 58:2
104:4 117:20
146:18 147:23
**plural (1)**
135:14
**point (8)**
11:10 26:15 80:14
90:22 91:9 127:17
160:16,17
**policy (2)**
38:12,14 99:19 100:6
**Porter (2)**
3:4 5:4
**portion (4)**
13:13,21 14:18 25:16
**portions (4)**
9:6 56:10,11 57:2
**POSA (1)**
155:24
**posed (1)**
82:13
**posing (1)**
139:21
**position (1)**
56:12
**possessed (1)**
12:8
**possibilities (2)**
103:20,23
**possibility (5)**
42:5 85:23 93:13
140:6 151:25
**possible (11)**
26:13 33:25 88:10,21
88:22 106:21
139:12,23 149:20
152:5 159:12
**post-undergraduate...**
15:25
**potent (1)**
162:20
**potential (12)**
43:14 105:2 127:18
136:23 138:16
139:15 142:13
146:10,23 153:7

158:23 160:6
**potentially (5)**
131:20 132:4 134:14
160:9,21
**powders (1)**
35:7
**practice (2)**
81:20 104:7
**precise (1)**
115:4
**preclinical (1)**
106:11
**preparations (1)**
78:18
**prepared (2)**
10:13 61:9
**present (2)**
3:24 128:12
**presented (4)**
8:6,17 9:6 11:19
**pressure (1)**
153:17
**presume (2)**
31:5,12
**pretty (2)**
36:12 48:16
**prevalent (1)**
87:11
**previous (3)**
59:6 89:6 99:4
**previously (4)**
9:17 31:21 48:11
121:5
**principles (1)**
104:20
**prior (5)**
13:2 16:20 44:24 45:2
45:7
**priority (1)**
33:5
**proapoptotic (1)**
162:21
**probably (3)**
62:7 79:7 99:23
**procedure (1)**
132:14
**procedures (3)**
97:4 108:22 143:14
**process (1)**
42:15
**processing (1)**
17:16
**produces (1)**
87:20
**producing (1)**
144:6

**product (3)**
20:24 69:25 143:20
**products (2)**
31:20 143:16
**profile (2)**
74:14 127:23
**profiles (2)**
114:6 131:23
**program (1)**
17:20
**project (1)**
37:16
**proliferate (1)**
51:17
**promulgated (2)**
38:4 100:6
**pronouncing (1)**
12:20
**properly (1)**
116:22
**properties (1)**
30:17
**proposed (1)**
132:17
**protecting (1)**
107:5
**protective (1)**
57:5
**protein (1)**
15:24
**protocol (7)**
98:22 100:22 101:8
101:14,15,16
102:14
**protocols (1)**
135:22
**provide (1)**
47:18
**provided (11)**
7:22 10:2,7 24:10
29:3,7,8 34:10 39:5
39:8 59:19
**providing (3)**
10:11 54:2 107:22
**Public (2)**
2:13 5:11 121:6 168:8
170:24
**purchased (2)**
85:16 86:2
**pure (7)**
73:9 74:4,12,24 86:17
116:21 151:6
**purification (4)**
86:15 155:17 156:2
156:13
**purified (10)**

73:21 86:7,9,10
154:21 155:4,7
156:6,11,18
**purify (1)**
156:23
**purity (4)**
72:13 73:18,25 75:11
**purpose (9)**
41:21 87:14,15
136:22 145:15,16
153:5 156:7,7
**purposes (14)**
7:12 40:7,10,20 41:7
41:12 68:6 71:22
139:8,14 142:10,23
146:9,22
**pursuant (4)**
126:20 133:15 136:25
140:2
**Pushing (1)**
140:13
**put (4)**
20:9 43:17 65:15
93:12

_____

**Q**

**Q6A (3)**
143:13,23,24
**qualification (1)**
25:24
**qualified (5)**
8:15 9:5,12,13 109:17
**qualify (4)**
18:4 19:18 24:25
117:3
**qualitative (1)**
92:24
**query (3)**
79:7 103:21 106:14
**question (61)**
6:8,12,13 8:25 13:20
14:24 18:24 23:6,20
33:3,13 42:21 44:13
44:13 48:21 51:11
55:19 65:17 67:15
68:20 71:12 73:19
78:14,15,20 82:14
88:5 89:9,14 90:13
90:20 91:20 104:3
104:13 106:4,7,18
107:11 112:17
113:21,25 114:11
114:11,15 115:21
116:23 117:22,22
118:14 129:13,13
134:10 138:17

146:16,17 155:23
156:17 157:18
159:3,18,21
**questions (4)**
130:5 147:20 162:9
166:9
**quite (5)**
42:20 43:5 44:7
104:25 112:21
**quote (3)**
55:9 99:19 154:20
**quoted (1)**
70:13
**quotes (1)**
54:2
**quoting (6)**
53:7,13,14 55:5
146:14 163:13

_____

**R**

**R (3)**
3:2 121:2 168:2
**range (2)**
18:8,18
**rate (1)**
153:18
**reach (1)**
52:17
**reactivity (1)**
17:18
**read (22)**
7:16 8:14 10:17 14:10
14:23 62:8 95:2,5
95:14,24 96:25
97:15 101:11
102:19 103:12
107:13 115:7
143:22 153:23
162:23 164:18
170:7
**reader (1)**
77:2
**readily (2)**
85:11 98:9
**reading (16)**
10:19,24 12:23 13:22
15:16 81:12 82:17
88:6,24 89:16 90:14
92:12 105:17 117:4
124:6 155:24
**Reads (1)**
170:7
**ready (1)**
85:15
**real (1)**
127:22

**really (16)**
8:23 21:13 33:19
48:21 49:18 84:11
92:10 101:18 105:2
119:12 124:18,20
131:4 142:14 151:2
163:21
**Realtime (2)**
2:12 168:6
**reanalysis (1)**
75:13
**reason (9)**
31:15 53:21,25 63:10
63:14 72:20 80:11
137:5 170:7
**reasons (7)**
71:11,20 72:21,23
82:23 120:3 132:2
**recall (1)**
55:20
**recapitulate (1)**
112:12
**received (2)**
6:22,24
**recess (3)**
54:16 120:22 162:6
**recognize (2)**
27:5 148:5
**recognized (2)**
32:7 79:2
**recommendation (2)**
96:25 100:3
**record (9)**
7:7 54:15,18 120:21
121:10 162:5,8
166:15 168:14
**redo (1)**
74:17
**refer (2)**
7:13 39:3
**reference (29)**
30:6,19 45:6,9,19
46:25 77:12 78:4,10
80:15 97:24 98:6,9
99:9,12,13,18
100:10,10,15
112:14 118:9
131:10 137:16
138:5 140:25
146:22 150:24
153:5
**referenced (1)**
21:24
**references (11)**
46:25 89:13 93:15
95:17,17 99:5,16

101:13 138:5
152:18 154:19
**referencing (1)**
143:12
**referring (9)**
26:16 28:10 33:5 78:5
79:10 89:6 100:4
104:23 160:23
**refers (2)**
97:19 101:17
**regard (4)**
22:5 61:15 68:24
111:23
**regarding (3)**
17:3 137:16 153:15
**regardless (2)**
46:14 83:22
**Registered (2)**
2:13 168:7
**regress (1)**
163:8
**regulations (2)**
38:3,10
**regulatory (1)**
42:22
**rehash (1)**
19:25
**relate (2)**
124:20 128:2
**related (7)**
7:5 15:2 17:6,15 18:6
125:10 168:17
**relates (7)**
8:10,17 16:9 130:17
131:4,7 132:19
**relating (1)**
7:22
**relevance (1)**
84:6
**relevant (2)**
46:6,16
**relied (1)**
100:16
**rely (1)**
98:25
**remain (2)**
104:22 105:5
**remaining (1)**
9:6
**remember (3)**
55:25 56:3 63:5
**remind (1)**
6:3
**remove (1)**
87:18
**render (1)**

156:24
**rendered (1)**
68:15
**repeat (1)**
146:17
**rephrase (3)**
6:13 104:17 159:21
**replacing (1)**
22:11
**reply (6)**
10:13,25 14:16 57:10
57:24 169:9
**replying (1)**
14:18
**report (127)**
6:23 7:4,9,17,20 8:6
8:13,15,20,22 9:7,14
9:20,25 10:5,6,8,10
10:12,13,17,19,21
10:21,25 11:3,4,13
11:16,24 13:14,19
14:4,10,14,17,18,23
21:16 25:21 38:23
46:21 47:4,11,14,22
49:11,12,19 52:4
55:21 56:2,4,6,18
57:9,10,23,25 58:13
59:2,8,13 60:15,19
63:2,6,8 64:19 69:2
69:9 71:17 72:4
77:25 82:23,25
84:12 90:22 91:20
93:2 97:8 99:2
100:17 111:24
119:6,12 122:2
124:19 131:8,22
140:24 141:6,18
142:16 143:5,8
146:2,3,13 147:2,13
147:17,21 148:14
148:18 149:14,25
150:20 151:3
152:20 153:11
154:20 155:10
157:3,14 158:2,7,15
161:8,11 164:9
165:9,15 166:6
169:7,8,9
**reported (2)**
1:23 50:10
**reporter (10)**
2:12,13 4:15 5:7 9:19
12:17 57:19 120:15
168:7,7
**reporting (3)**
4:14,16 160:8

**reports (5)**
6:25 14:15 58:4,10,18
**represent (2)**
5:18 9:24
**representation (1)**
115:20
**representations (1)**
12:19
**reproduce (2)**
62:21 63:7
**reproduced (2)**
21:17 157:20
**require (2)**
109:25 157:24
**required (4)**
39:14 107:15 156:3
156:19
**requirement (1)**
6:7
**requirements (7)**
6:6 46:23 47:6 107:22
149:11,22 158:4
**requires (2)**
49:3 129:25
**requiring (1)**
104:21
**research (31)**
15:8,13,15,18 17:15
17:19,22 18:5 36:11
36:17,19,24 37:11
41:16 42:7,12,16,25
44:21 79:13 80:9
81:19 106:20 107:6
107:15,20 135:17
136:15 139:7,11
152:17
**researcher (1)**
16:2
**researchers (3)**
37:13 76:18 106:19
**researches (1)**
17:24
**researching (1)**
139:14
**residue (2)**
154:21 155:3
**respect (10)**
11:7 12:5 14:16 56:13
63:12,23 81:21
126:4 148:25 153:3
**responding (7)**
26:25 59:8,11 60:6,20
60:23 111:22
**response (3)**
10:13,21 139:22
**responsive (1)**

63:2
**result (2)**
44:5,17
**resulted (1)**
45:2
**results (2)**
36:23 37:7
**resumed (1)**
121:5
**return (5)**
38:22,23 54:19 61:3
112:10
**returning (1)**
15:3 121:14
**review (14)**
9:4 13:13,21 36:22
38:10,20 44:23
79:20 102:3,16
103:5,10,17 107:8
**reviewed (7)**
13:19 16:19 58:5,10
100:9,12 103:13
**reviewing (5)**
58:7 71:2 95:4 97:25
99:10
**Richter (2)**
3:17 4:25
**right (172)**
8:4 9:15 11:11,23
17:2 19:12 20:5
21:21 22:5 25:3,15
26:6,20 27:18 33:21
34:3,17 38:2 39:10
39:17,20 40:8,20
42:3 43:3 44:4 48:3
49:9 50:6,7 51:6,24
52:13,23 54:19,25
59:4 60:25 61:3,22
65:7 66:23,25 67:9
69:10,12,25 70:10
70:18,25 73:24 76:6
76:8 78:7,20,23
79:5,23 82:4 85:22
88:16 92:7 94:12
96:10 97:4,13,22
98:19 99:25 100:14
100:23 103:2,2,8
104:10 105:7
107:16 108:7 109:8
109:15 110:15,21
111:6,16 112:8,21
113:6,11,23 115:5,8
115:12,18,23,25
116:4,15,16,17
118:6,11 119:16
122:9,18,19 123:9

124:6 125:3,5,15,22
126:24 127:3,9,10
128:7,17,19 129:4,5
129:12,16,19,22,23
129:25 130:8,20
131:12,13,17,18
132:6,8,22 133:18
134:10 136:19
138:7,12,17,22
139:5,8 142:24
144:8,20,25 145:2,5
146:6,11,24 147:11
147:14 149:8,12,23
151:8 153:8,20,22
154:18 155:4
156:10,13 159:7
162:23 163:6,11,14
164:12
**rise (1)**
138:10
**Rizzuti (2)**
3:25 4:13
**RMR (2)**
1:24 168:24
**rock-solid (1)**
134:17
**role (2)**
16:13 135:16
**Roman (1)**
59:6
**room (1)**
56:15
**routes (1)**
87:10
**rules (1)**
6:9

——————S——————

**S (5)**
3:2 121:2,2,2 135:10
**sacrifice (2)**
45:24 83:21
**sacrificed (14)**
45:13,15 47:20 80:19
83:8,10,25 84:7,18
84:22 85:4 92:7
109:22 145:13
**Safe (1)**
32:7
**safety (1)**
144:7
**sake (2)**
156:17 157:6
**satisfies (1)**
149:11
**saying (12)**

20:12,16 69:21 71:3
74:11 76:21 79:12
84:24 105:11
143:24 144:2 159:8
**says (24)**
25:8 29:6,10 55:5
98:20 100:19 103:2
103:4 104:14 105:2
105:6,13,14 110:17
116:12 128:22
151:12 154:20
162:17 163:2,8
164:5,13,14
**scenario (1)**
159:22
**science (1)**
48:23
**scient (1)**
81:19
**scientific (9)**
79:17,25 80:4,11 81:8
83:5 104:20 105:4,7
**scientist (1)**
30:17
**scientists (3)**
78:16 80:8 146:20
**scope (58)**
8:20 9:9 13:17,25
14:21 16:16 23:3,16
23:25 49:6 51:9
53:11,19,24 67:11
68:19 70:3,12 72:3
106:24 107:18,25
108:15 109:11
111:5 129:21 130:3
135:19,25 136:11
136:17 140:19
141:6 143:2 145:12
145:19 146:2,13
147:2,13 148:14
149:14,25 153:10
155:13 157:3,14
158:2,7,15 159:16
159:19 161:8
163:18 164:9 165:9
165:15,24
**scratch (1)**
109:10
**se (9)**
13:6 45:22 65:23 70:5
83:17 101:14
113:14 129:10
141:8
**second (8)**
55:4 57:24 61:5 79:6
97:10 104:3 111:2

120:14
**section (12)**
14:17 27:20 49:12
  56:22 59:6,15 60:18
  60:18 78:8 94:22
  99:17 154:2
**sections (1)**
98:8
**see (26)**
7:5 22:9,21 28:2 29:4
  34:9 42:9 54:22
  55:3,8 61:12,13
  62:5 79:23 86:22
  94:14,16,17 97:9
  99:8,15,20,21 143:7
  155:14 162:15
**seen (2)**
34:25 95:15
**segue (1)**
106:4
**select (1)**
46:18
**selective (1)**
30:16
**sell (1)**
132:21
**sense (10)**
18:20,23 59:24 75:10
  75:19,22 76:25 90:2
  90:9 129:5
**sentence (21)**
55:5 61:5,20 78:22
  79:6,10 89:6 96:3
  97:10,15,16 98:19
  101:10,17 102:19
  102:23 104:24
  127:13 151:19
  154:22 164:14
**sentences (1)**
104:2
**separate (2)**
123:10,20
**separately (1)**
54:4
**series (1)**
65:2
**set (7)**
30:15 75:9 85:6 86:22
  126:15 168:12,22
**sets (1)**
143:19
**setting (3)**
55:2,10 64:4
**shape (1)**
114:22
**shared (1)**

11:8
**SHEET (1)**
170:2
**Sheppard (2)**
3:17 4:25
**short (2)**
54:7 161:24
**shortened (1)**
165:2
**shown (1)**
162:20
**side (2)**
95:9 97:17
**Sigma (4)**
85:22 86:3 87:2,3
**Signature (1)**
170:20
**significant (1)**
73:25
**silent (3)**
89:19,21 90:6
**similar (1)**
166:5
**similarly (1)**
90:5
**simple (1)**
114:11
**simpler (1)**
9:2
**simplify (1)**
33:2
**simply (3)**
13:20 23:8 76:22
**single (2)**
21:17 145:5
**sit (3)**
63:11 71:13 75:15
**sitting (4)**
31:14 65:16 95:23
  109:2
**situation (3)**
125:12 127:23 132:17
**size (4)**
153:17 154:6,10,15
**skill (37)**
11:15,18 12:2,6 15:4
  15:6 17:4 19:9,14
  20:2 21:8,13 77:5
  82:16 84:21 87:22
  88:6,24 89:16 90:14
  90:23 91:10,12
  92:12 93:3 96:22
  101:4,22 102:11
  105:17 121:17
  132:20 150:22
  156:21 157:10,19

160:12
**skilled (4)**
76:11 91:24 92:21
  96:13
**sole (2)**
60:5 72:20
**solely (5)**
60:23 111:10,17
  112:9 142:23
**solid (1)**
35:20
**solutes (2)**
161:16,19
**solution (6)**
35:24 61:9 71:7
  161:15,17,20
**solutions (1)**
35:8
**somewhat (1)**
113:15
**sorry (12)**
24:25 26:19,24 55:17
  57:5,17 96:4 112:20
  118:16 127:13
  147:25 161:3
**sort (4)**
20:22 41:25 66:8 92:4
**sounds (2)**
60:22 92:16
**source (3)**
76:8 90:3,10
**South (1)**
3:12
**speak (3)**
48:18 146:3 149:15
**speaking (10)**
19:21,24,25 20:6
  35:11 44:11 51:20
  59:23 64:4 139:11
**specialist (1)**
4:14
**specific (42)**
13:3 15:17 16:25
  17:25 18:8,13,18,25
  19:19,22 25:25 36:5
  37:15 41:23 43:10
  45:4,19,20 46:22
  47:12 48:17 59:7
  66:13 75:24 76:16
  76:17,19 78:8 79:20
  82:9 83:3 87:14
  90:3,10 95:19 103:5
  103:17 122:24
  127:21,21 130:11
  146:4
**specifically (27)**

7:21 8:9 16:9 24:4
  32:11,23 35:19
  39:16 50:24 60:7
  63:5 65:13 77:12
  79:11 80:16 82:2,2
  82:13 86:21 89:5
  91:4 111:21 112:14
  126:14 149:15
  150:24 161:10
**specifications (13)**
26:2,9 30:20 33:24
  69:7 143:9,12,14,18
  143:23 144:3,11
  156:3
**specifics (2)**
124:14 131:10
**specified (16)**
24:16,21 25:9,11
  113:3,10 122:6
  125:5,6 126:21
  128:7,16,22,23
  129:2 130:19
**specs (1)**
120:9
**spelled (2)**
12:18 49:16
**split (1)**
74:10
**Src (2)**
69:23 162:19
**Ss (1)**
168:4
**staff (1)**
107:16
**staged (1)**
52:7
**stages (1)**
43:6
**stand (1)**
163:15
**standard (8)**
81:20 134:21,23
  138:10 150:14
  151:7 156:23
  157:21
**standards (5)**
86:23 133:17 134:2
  134:12 156:18
**standpoint (1)**
119:9
**stands (2)**
99:22 135:6
**starch (1)**
29:11
**start (3)**
4:2 89:21 155:24

**started (1)**
37:8
**starting (1)**
47:14
**state (5)**
2:14 5:11 144:4 168:4
  168:8
**stated (4)**
62:18 104:25 115:25
  131:25
**statement (5)**
95:12,19 103:24
  120:3 151:14
**statements (1)**
95:22
**states (12)**
1:2 4:8 22:12 28:6
  29:2 34:9 61:17
  78:15 95:7 103:16
  104:4,18
**stating (2)**
49:13 61:5
**staying (1)**
34:7
**step (2)**
56:14 57:3
**Stephanie (2)**
3:8 5:3
**Stephen (3)**
3:14 4:18 5:18
**sterile (1)**
86:17
**stick (7)**
11:4 19:6 91:3,19
  92:25 109:18
  113:24
**sticking (1)**
158:21
**stock (1)**
85:25
**stop (1)**
83:22
**Street (1)**
3:6
**strike (9)**
17:10 41:14 43:11
  67:22 76:2 117:23
  141:10 147:7
  156:11
**structure (7)**
5:25 113:14 126:6
  129:2,4,6,9
**students (1)**
37:9
**studied (4)**
15:22 70:10 83:18

107:13
**studies (22)**
37:6,14 43:24 44:25
50:10 61:7 77:6
82:7 93:4 95:10
101:24 104:19,20
105:4 135:2 148:9
148:12,23 149:3,7
149:12 162:11
**study (20)**
45:10 65:24 83:20,21
92:4,9 101:7,18
102:14 108:20
141:21,24 142:2,4
145:21 148:21,22
149:4,6,23
**studying (2)**
43:13 80:17
**subject (2)**
29:8 153:13
**submitted (1)**
56:19
**Subscribed (2)**
167:13 170:21
**subsequent (3)**
25:24 27:23 47:14
**substance (2)**
47:22 84:12
**substances (10)**
94:25 95:8 96:8 97:21
98:21 100:5,21
102:13 143:15,22
**substantially (3)**
153:22 154:3 163:14
**substitute (1)**
39:6
**sufficiently (1)**
151:6
**sugar (2)**
29:11,16
**suggesting (2)**
66:14,15
**suggests (3)**
89:7 91:5,6
**summarize (3)**
82:24 151:10,18
**summary (4)**
49:18 69:6 120:2
151:14
**Sun (6)**
3:11 4:20,22 5:19
56:13,19
**supplement (1)**
11:7
**supplier (1)**
87:3

**suppliers (1)**
87:4
**supply (1)**
85:19
**sure (32)**
7:25 35:7 42:20 48:16
48:18 54:8 60:11
67:13 73:18 85:18
87:3,9,10 88:3
92:23 95:25 100:11
101:17 102:6,20
106:25 107:12,19
109:2 118:5 129:8
133:10 134:22
138:18,24 148:19
159:20
**survival (2)**
79:8 104:8
**survive (1)**
84:17
**suspended (1)**
36:2
**suspension (5)**
35:14,16,19,25 158:5
**suspensions (1)**
35:8
**swear (1)**
5:7
**sworn (5)**
5:10 121:6 167:13
168:12 170:21
**synthesis (1)**
151:15
**synthesize (1)**
156:22
**synthesized (5)**
50:3 65:2,25 67:17
155:25
**system (2)**
34:21,22

_____
**T**

**T (5)**
77:25 99:12 121:2
168:2,2
**tab (2)**
10:9 58:12
**tabbed (1)**
57:22
**tablets (1)**
35:8
**take (21)**
6:16 26:21 49:10 54:6
54:10 58:2 62:23
63:16 75:13 82:25
94:25 97:16 106:12

108:25 120:18
137:17 138:6 144:7
147:22 161:23,24
**taken (2)**
50:23 153:18
**talk (18)**
20:23 25:20 34:3
45:19 47:2,15,21
68:10 71:8 81:18
96:4 117:16 119:6
131:22,23 132:2,25
160:2
**talked (9)**
13:14 82:5 83:12 86:8
94:10 121:15
128:25 135:2
141:19
**talking (28)**
18:12,15 28:20 29:24
31:12 32:3 42:21
44:9,19 45:5 67:23
67:25 68:3,5 96:9
96:11,17 106:5
113:13 114:2,5
126:8 127:18
128:13 154:11,12
158:16 160:4
**talks (1)**
77:13
**target (1)**
42:10
**task (1)**
8:21
**taught (1)**
48:15
**technical (3)**
20:9,10 132:13
**technicians (1)**
37:10
**technologies (1)**
18:5
**tell (2)**
41:4 123:3
**telling (1)**
74:15
**tends (1)**
21:2
**term (25)**
18:11 19:19,22 20:3,7
20:13 24:6 60:23
66:5 69:16 92:17,20
111:19 121:16,18
123:24 124:3,19,21
125:7 149:5 150:15
161:2,6,11
**terminology (1)**

19:7
**terms (7)**
22:25 23:7 25:25
45:20 59:12 68:11
92:25
**test (3)**
45:22 109:21 143:14
**tested (5)**
44:22 49:24 51:22
65:2 86:22
**testified (5)**
5:12 108:3 117:12
121:7 130:17
**testifying (1)**
70:16
**testimony (9)**
6:4,5 35:22 55:25
80:22,23 138:12,14
168:14
**testing (1)**
47:20
**text (1)**
91:4
**Thank (20)**
6:19 9:23 21:5 39:2
56:8 57:14,16,18
58:11,20 61:2 69:20
93:24 110:11
117:11 121:13
127:14 150:9 164:3
166:10
**Thanks (1)**
112:23
**therapeutic (3)**
47:19 136:23 139:15
**therapy (1)**
16:23
**thing (4)**
89:18 139:3 153:14
155:16
**things (12)**
33:3 35:17 80:12
105:8 128:25
131:20 132:3,19
151:21 154:24
159:6 165:18
**think (114)**
6:24 7:9 8:25 9:13
13:20 14:12,24
18:17 20:4 21:6,13
23:10 28:10 31:14
31:15,16 32:3,16
35:12 36:14 40:5
46:9 52:5 55:4
56:22 59:11 60:25
62:7 63:4 64:22

65:21,21 66:15,17
67:15 68:3 69:6
70:13 71:3 72:4
74:11 76:11 77:9
78:25 80:6,14 81:15
84:4 85:23 86:5,18
88:10,11 89:4 91:17
91:18,23 92:21
93:12 95:14 96:11
96:16 97:14,16
98:12 99:6 101:13
102:21 104:23
105:13 106:12
109:12,17 110:17
113:13,20,25 114:7
114:20,20 121:22
122:21,25 123:6
124:10 133:8,9
134:5 137:3 138:14
138:25 140:6 141:2
141:15,19 142:15
145:20 149:15
150:2,22 153:22
154:2,10,19 155:16
155:22 159:18
160:2,15,23 161:23
164:2 166:8,17
**thinking (4)**
32:4 36:3 39:4 48:17
**third (3)**
21:14 55:4 78:15
**thought (2)**
118:16 128:24
**three (1)**
103:20
**threshold (3)**
134:16 142:14,15
**till (1)**
17:22
**time (21)**
5:21 6:21 11:10 54:6
54:13,17 65:10
85:12 86:4 120:19
121:9 156:20 157:9
157:18 160:11
162:4,7 166:11,19
167:2,5
**timeframe (2)**
29:25 30:5
**times (1)**
145:4
**tissue (2)**
43:18 44:14
**titled (1)**
94:23
**today (11)**

5:2 11:7 17:22
63:11 65:9 70:16
71:13 75:15,23
108:4 128:25
**Tom (1)**
77:25
**tonicity (3)**
160:22 161:6,17
**top (2)**
52:15 135:7
**topic (1)**
128:3
**topically (2)**
29:3,7
**totality (2)**
85:2 159:10
**toxic (1)**
95:9
**transcript (2)**
168:13 170:2
**treat (12)**
40:25 41:9,10 42:10
44:9,12 45:22 46:11
66:7 83:20 87:15
142:3
**treated (7)**
41:17 42:2 50:22
83:17 84:2 109:15
109:20
**treating (12)**
12:10 13:9,11 22:20
22:24 42:17 43:14
49:3 73:24 110:2
142:10,24
**treatment (4)**
12:22 16:10,14 46:7
**trial (1)**
139:25
**trials (1)**
140:8
**tried (1)**
36:13
**Trout (203)**
1:13 2:9 4:1,5 5:1,8
5:15 6:1 7:1 8:1 9:1
9:9,18,21 10:1 11:1
12:1 13:1,17,25
14:1,21 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1,25
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1

48:1 49:1,6 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1,7,11
57:20 58:1,17 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1,19,22
94:1,2 95:1 96:1
97:1,7 98:1,3 99:1
100:1 101:1 102:1,2
102:15 103:1,10
104:1 105:1 106:1
107:1,8 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1,4
121:12 122:1 123:1
124:1 125:1 126:1
127:1,25 128:1
129:1,21 130:1,3
131:1 132:1 133:1
134:1 135:1,19,25
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1,10 167:1,4,12
168:10 169:4 170:5
**Trout's (48)**
8:20 9:20 16:16 23:3
23:16 51:9 53:11,19
53:24 67:12 68:19
70:3,12 72:3 106:24
107:18,25 108:16
109:11 111:5
136:11,17 140:19
141:6 143:2 145:12
145:19 146:2,13
147:2,13 148:14
149:14,25 153:11
155:13 157:3,14
158:2,7,15 159:16
163:18 164:9 165:9

165:15,24 169:7
**true (6)**
44:24 103:15 104:14
104:18 105:16
168:14
**truthfulness (1)**
6:6
**try (2)**
62:21 87:18
**trying (10)**
20:18 40:25 65:16
68:21 74:10 81:17
96:19 98:6 118:7
140:21
**TSG (2)**
4:14,16
**tumor (25)**
43:20,24,25 44:5,15
44:16,17,20 50:11
50:24 51:2,3,13,16
52:2,15 53:5,17
70:10 71:23 109:7
146:10,23 147:10
153:7
**tumors (5)**
45:2,25 50:12 51:6
163:8
**TWEEN (34)**
26:4,10 28:6,7,14
32:18,19 55:6,22
61:10 62:2 70:23
71:7 80:2 85:11,22
89:2,3,8,20,21,22
90:4,17 91:6 92:14
93:8 119:19 145:24
157:7,8,12 164:16
165:5
**two (10)**
6:24 52:5 57:22 58:3
58:10 68:4 75:10
90:24 123:19 148:3
**two-dimensional (1)**
115:19
**type (10)**
44:8,20,21 76:19 88:7
88:8 90:11 92:4
153:17 154:15
**types (6)**
25:25 27:21 36:13
46:17 51:19 52:6
**typical (1)**
86:19
**typically (8)**
20:14,23 29:10 35:4,9
35:12 86:12,15
**typos (1)**

21:22
**tyrosine (7)**
15:9,14,21 16:8,14,22
69:24

———————
                U
———————
**U.S (2)**
7:6 143:13
**Uh-huh (1)**
160:5
**uncertain (2)**
96:16,18
**undergraduate (2)**
15:23 17:14
**understand (42)**
5:20 6:9,11 16:4
19:10,15,20 20:12
20:18 22:7 23:5
24:5 40:13,15 42:20
48:9 67:15 68:21,24
69:12,13 82:17
90:19,20 92:22
96:14,19 100:2
102:21 114:10
118:20 125:18
127:5 134:24 139:4
150:11 155:17
157:23 159:17,20
161:12 165:7
**understanding (59)**
6:2 7:19 8:8,12 11:17
11:24 12:16,25 13:4
14:6,7,9 16:6,8,12
16:17,21 18:21 22:3
23:12,22 24:13,21
25:6,10,17 30:22
31:7 32:8 35:3
37:21 39:12,21 40:9
40:11,18 41:5 49:2
61:6 67:5 82:16
90:12 97:24 106:13
107:21 108:9
122:16,22 123:16
123:23 124:7
125:17,17 132:13
134:7 135:15
148:20 149:4 161:6
**understands (1)**
61:20
**understood (3)**
93:5 102:11 153:25
**unheard (1)**
42:14
**United (2)**
1:2 4:8
**units (1)**

161:18
**unstaged (2)**
52:7,25
**untreated (2)**
44:5 45:2
**unusual (1)**
74:21
**unwanted (2)**
95:9 97:17
**unwieldy (1)**
112:22
**USDA (4)**
38:4 97:23 99:13
100:10
**use (71)**
18:22 23:7 29:19
30:19 36:18,20,22
38:13 39:14,22 43:2
43:5,8,12 54:11
64:20 66:5 69:15
73:24 78:16 79:3,15
79:25 80:5 81:7,9
81:13,14,21 82:7,9
93:21 94:3,23 95:7
96:6 97:6 98:20,22
100:20,22 103:6
104:5,15,21 105:15
105:18,20 107:4,9
108:7 120:16
121:24 122:14,25
135:9,12,13 136:8
137:11 138:12,22
149:12,22 156:15
156:24 159:24
160:25 161:10,11
169:11
**uses (2)**
22:19 68:7
**usually (1)**
161:17

———————
                V
———————
**v (1)**
170:3
**valid (1)**
62:23
**validate (1)**
63:8
**value (1)**
161:17
**variety (12)**
45:23 65:24 71:11,19
72:21 73:6 75:8
77:9 82:23 106:5
131:16 143:11
**various (14)**

27:20 30:11,20 34:4
34:12 35:24 51:22
65:3 71:8 83:18,19
87:10 94:11 115:17
**vehicle (5)**
55:2,6,13,24 62:4
**version (2)**
26:10 165:3
**versions (1)**
76:11
**versus (6)**
4:6 35:24 79:8 81:21
90:8 104:9
**veterinarian (3)**
107:16 108:21,23
**veterinarians (2)**
108:11 136:14
**veterinary (10)**
40:6,10,20 41:7,12
79:18 99:19 107:23
108:6,13
**video (1)**
4:14
**video-recorded (1)**
4:4
**Videographer (11)**
3:25 4:2 5:6 54:13,17
120:19 121:9 162:4
162:7 166:13 167:2
**Videotaped (2)**
1:13 2:9
**view (4)**
22:24 90:23 91:9
114:25
**vivo (1)**
163:4

**W**

**W (4)**
57:9,11 169:9,10
**Wacker (1)**
3:12
**want (22)**
6:13 11:7 19:18 38:23
54:5,8,9 56:13
62:10 68:10 69:11
77:3 82:24 87:19
112:10,12 117:8
125:9 130:12 131:3
138:18 161:11
**wanted (6)**
21:4 60:11 62:11 91:3
151:21 154:9
**Washington (1)**
3:21
**wasn't (10)**

9:2 31:15 37:16,16
44:13 46:11 48:3
112:17 156:18
159:13
**water (24)**
33:16,18,20,23 70:24
86:7,8,15,16,17,19
87:2,7,16,18,19,21
87:24,25 88:7,8
119:20 165:6,12
**way (38)**
40:4 44:8 45:25 46:14
46:16 62:7 65:16
66:19 71:3 75:12
77:3 79:9 80:3,6
81:16 82:3 87:25
91:19 92:25 104:25
106:2 110:7 111:16
113:17,17 114:22
115:14,14 117:18
123:17 126:18
127:23 136:5 142:6
150:18 157:21
161:20 168:19
**we'll (6)**
62:14 127:6 161:25
166:15,17,19
**we're (12)**
19:21 28:20 67:23,25
68:3,5 81:5 118:12
119:24 127:2
154:10 160:3
**we've (6)**
57:20 66:23 96:8,11
115:21 125:8
**Wednesday (1)**
1:16
**weight (1)**
52:18
**weird (1)**
136:6
**Weisbruch (5)**
3:22 4:24,24 56:14
57:3
**welcome (4)**
58:21 112:24 121:12
166:12
**welfare (2)**
38:3 105:3
**well-known (1)**
29:18
**went (4)**
17:17 45:25 128:8
139:18
**weren't (5)**
46:5 50:23 76:4,9

109:14
**West (1)**
3:6
**whatnot (3)**
67:18 70:6 127:24
**WHEREOF (1)**
168:21
**withdraw (1)**
117:21
**witness (18)**
5:7,9 9:23 48:10 54:8
57:14 58:7 71:2
93:24 95:4 97:25
99:10 162:3 166:12
168:11,15,21 169:3
**Wolff (33)**
46:25 77:13,16,21
78:4,10,14,25 79:2,9
79:14 80:15 81:16
98:24 99:8 100:15
100:19 102:25
103:2,4,12,15,19,24
104:2,12,14,18
105:11,13 106:4,14
135:8
**word (2)**
123:8 124:3
**words (6)**
39:6 66:11 91:19
123:20 152:9
156:15
**work (7)**
18:7,18 20:23 36:21
37:2 58:5 142:5
**worked (1)**
17:15
**working (3)**
37:17,18 106:19
**wouldn't (15)**
11:25 26:22 29:19
40:4 44:7 59:13
64:20,21 77:4 93:7
96:23 101:4,20
102:10 150:17
**write (1)**
53:3
**written (18)**
52:21 60:13 61:13
62:24 95:13 97:9,11
99:23 101:2 104:11
118:6 122:4 144:9
154:3 155:9,15
162:24 163:7
**wrong (3)**
61:19 129:13 150:19
**wrote (3)**

50:15 91:4 152:6
**Wyeth (6)**
1:4,4 3:5 4:5,5 170:3

**X**

**X (2)**
1:3,9
**xenograft (8)**
43:16,17,24 44:14,25
47:16 61:7 83:19
**xenograftic (1)**
162:11
**xenografts (4)**
43:13 45:11 163:5
164:6

**Y**

**yeah (21)**
45:9 47:9 54:11,25
56:21 60:25 62:10
62:10 67:4 73:7
83:22 85:21 97:11
115:14 120:17
135:7 140:20
152:25 163:12,13
164:10
**years (3)**
12:9 15:8 17:6
**yes-or-no (1)**
114:15
**York (13)**
1:15,15 2:11,11,14
3:7,7 4:11,11 5:12
168:4,5,9

**Z**

**0**

**0.4 (1)**
164:15
**0.5 (1)**
61:9

**1**

**1 (24)**
4:3 9:18,21 10:9
21:24 22:17 24:7
25:13 49:2,13 57:22
59:3,16,24 79:17
80:7 108:8 115:23
121:20 129:7
162:18 164:14
167:15 169:7
**1:00 (2)**
121:3,9
**1:58 (2)**

162:5,6
**10 (2)**
55:22 62:2
**10:14 (2)**
54:14,16
**10:28 (2)**
54:16,18
**100 (1)**
61:8
**10019 (1)**
3:7
**11:59 (2)**
120:20,22
**112 (1)**
60:18
**13 (2)**
162:14,15
**14 (6)**
33:16 69:2 162:15
164:4 165:20 169:8
**14th (1)**
168:22
**15 (4)**
25:21 52:18 69:2
119:5
**16-1305-RGA (2)**
1:3 4:10
**161 (3)**
58:15,24 61:4
**162 (5)**
58:15,24 61:23 62:18
63:13
**165308 (1)**
1:25
**17 (2)**
29:2 99:20
**1997 (1)**
100:7
**1997b (3)**
97:23 99:13 100:10
**1998 (2)**
16:3 17:19

**2**

**2 (9)**
55:6 57:8,12,21,23
58:17 61:10 79:17
169:8
**2,4-dichloro-5-meth...**
118:2
**2:14 (2)**
162:6,8
**2:20 (2)**
167:3,5
**20 (1)**
28:6

**20006 (1)**
3:21
**2001 (30)**
45:6 49:15,23 50:7,10
53:4 59:4 60:8,24
61:6,24 63:18 71:6
75:21 89:7 96:13
102:9 105:24
111:13 113:17
114:4 135:3 137:16
140:24 142:18
150:24 151:15
152:21 155:24
166:7
**2019 (7)**
1:16 2:5 4:12 167:14
168:22 170:4,22
**2099 (1)**
3:20
**21 (1)**
47:13
**22 (1)**
153:23
**23 (1)**
169:7
**230 (2)**
2:11 4:11
**24 (1)**
169:11
**25 (5)**
11:13 55:22 62:2 71:5
139:19
**250 (1)**
3:6
**27 (2)**
11:22 28:2
**29 (3)**
24:11 112:11 121:25

---
**3**
---
**3 (13)**
34:8 55:21 61:25
63:15 79:19 93:20
93:23 94:2 99:19
103:21 106:14
164:7 169:11
**3-quinolinecarbonit...**
118:4
**31 (5)**
53:16 94:18,20 95:2
96:24
**311 (1)**
3:12
**31a (15)**
47:17 50:5,6,13 53:4
64:17 65:25 66:22

67:17 114:4 117:12
117:12 118:9
154:19 155:25
**32 (1)**
94:15
**34 (3)**
28:11 78:11 103:22
**35 (2)**
28:11 96:9
**3974 (1)**
154:18

---
**4**
---
**4 (5)**
27:9 28:2,11 33:15
165:4
**4- (1)**
118:2
**40 (2)**
96:9 110:9
**42 (4)**
21:16 38:24 110:10
110:11
**46 (9)**
52:4,9,9,10,11,15
54:20 55:3 70:15

---
**5**
---
**5 (7)**
27:10 55:7,24 61:10
62:3 164:17 169:4
**5.9 (2)**
158:12,18
**51 (1)**
69:2
**52 (2)**
34:8 69:2
**53 (3)**
25:21 34:16 119:6
**55th (1)**
3:6
**57 (2)**
59:6 169:8

---
**6**
---
**6-methoxy-7-[-3-(4-...**
118:3
**60606 (1)**
3:13
**625 (37)**
7:14,23 8:3,11,13,18
8:22 14:8,12 21:17
21:25 22:19 23:9,10
25:14 26:13 27:4,7
28:18 29:25 31:11
32:24 33:15 34:4

48:20 49:3,14 59:3
59:20,24 60:12
68:13 108:5,8
121:21 137:2
162:11
**63 (1)**
143:8
**67 (4)**
47:15 49:10,11,22
**69 (1)**
151:12

---
**7**
---
**7 (4)**
1:16 2:5 4:12 170:4
**7,919,625 (1)**
7:8
**70 (3)**
74:2 155:20,23
**71 (3)**
153:20,24 155:19
**74 (1)**
89:5
**75 (1)**
164:16
**77 (5)**
71:5 158:17,19,21
160:4
**79 (2)**
160:24 161:2

---
**8**
---
**8 (1)**
164:17
**80 (30)**
26:4,10 28:7,14 32:18
32:19 55:6,22 61:10
62:2 70:23 71:7
80:2 85:11,22 89:2
89:3,8,20,21,22 90:4
90:17 91:6 92:14
93:8 145:24 157:7,8
157:12
**80s (1)**
17:15

---
**9**
---
**9 (2)**
22:18 169:7
**9:04 (2)**
2:6 4:12
**93 (1)**
169:11
**98 (1)**
37:8

# Exhibit C

Case 1:16-cv-01305-RGA  Document 234  Filed 09/13/19  Page 112 of 115 PageID #: 5161

# Frequently Asked Questions About the Public Health Service *Policy on Humane Care and Use of Laboratory Animals*

Axel Wolff, MS, DVM, Nelson Garnett, DVM, Stephen Potkay, VMD, Carol Wigglesworth, Denis Doyle, MA, and Venita Thornton, DVM, MPH

**The authors answer eight questions commonly asked of the Office of Laboratory Animal Welfare concerning the Public Health Service *Policy on Humane Care and Use of Laboratory Animals.***

The Office of Laboratory Animal Welfare (OLAW) of the National Institutes of Health (NIH) develops, implements, and oversees compliance with the US Public Health Service (PHS) *Policy on Humane Care and Use of Laboratory Animals*[1] (*Policy*). The PHS *Policy* and the US Department of Agriculture's (USDA's) Animal Welfare Regulations[2] are the two principal federal documents that set forth requirements for animal care and use by institutions using animals in research, testing, and education. One of OLAW's primary functions is to assist institutions in implementing PHS *Policy* by responding to policy-related questions. This is accomplished by collaborating with organizations and individuals in preparing guidance for Institutional Animal Care and Use Committees (IACUCs)[3-5], supporting the publication of monographs on various aspects of animal care and use programs[6,7], and publishing *Policy* interpretations in articles[8-18] and other formats[19-30]. OLAW also sponsors seminars and training that specifically address current topics covering animal care and use, and issues guidance notices in the NIH Guide for Grants and Contracts (formerly as "Dear Colleague" letters), all of which are found on the OLAW website (http://grants.nih.gov/grants/olaw/olaw.htm). The following represent several additional questions frequently asked by institutions and the OLAW responses.

**1. Does the IACUC need to require that the investigator submit the grant application, or portions thereof, along with the IACUC animal use protocol form for review by the IACUC? Is the IACUC required to compare the two for consistency?**

PHS *Policy* (IV.D.) requires the institution to verify, before award, that the IACUC has reviewed and approved those components of grant applications and contract proposals related to the care and use of animals. This position is reiterated in NIH Grants Policy Statement under Part II, Terms and Conditions. Most institutions have developed an IACUC protocol form and require investigators to provide detailed information about the proposed use of the animals on this form. The signature of the authorized institutional official on any PHS application or proposal indicates the organization's commitment to comply with the laws, regulations, and policies to which an activity is subject. Institutional submission of IACUC approval, subsequent to submission of the application/proposal, must represent approval of the information originally submitted in the application/proposal, or include notification of any significant changes required by the IACUC.

Although there is no explicit requirement for the IACUC to do a side-by-side comparison of the application/proposal and the IACUC protocol review form, it is an institutional responsibility to ensure that the information the IACUC reviews and approves is consistent with that contained in the application/proposal to be funded. Institutions are free to devise a workable mechanism to accomplish this end. One excellent way to prevent problems of inconsistencies between the information submitted to the PHS and that on the IACUC protocol review form is to implement a procedure for direct compar-

The authors are affiliated with the Office of Laboratory Animal Welfare, National Institutes of Health. Please send reprint requests to Wolff at OLAW, NIH, RKL1, Suite 360, MSC 7982 6705 Rockledge Dr., Bethesda, MD 20892.

ison[23]. If a procedure of direct comparison is adopted, the individual(s) charged with conducting the comparison should be appropriately qualified to identify inconsistencies. Some institutions have delegated this responsibility to a particular office or position (*e.g.*, sponsored programs office, compliance office); others have asked Departmental Chairs to verify consistency[31].

**2. Our IACUC has several categories for the approval of animal study protocols. Which one to use depends on the kinds of issues it identifies during review. We are sometimes unsure how best to characterize the approval status of these projects. Can OLAW provide any advice as to what constitutes appropriate terminology for approval of a protocol?**

The PHS *Policy* recognizes only three outcomes of IACUC reviews of proposed activities (protocols) related to animal care and use, as well as, proposals for significant changes in previously approved ongoing activities. They are 'approve', 'withhold approval', and 'require modifications to secure approval'. OLAW is aware that some institutions have chosen to use different words and phrases to characterize the latter of these outcomes, such as 'conditionally approved', 'approval pending', 'provisionally approved', 'approved with stipulations', 'administrative approval', and 'limited approval'. We should note that several incidents of suspensions and noncompliance are reported by institutions to OLAW each year that are related to the conduct of unauthorized animal studies by investigators who have misinterpreted IACUC responses or the approval categorization of their proposals. To avoid such misunderstandings and the subsequent necessities to take corrective actions and report to OLAW, this Office recommends that IACUCs use language that is as unambiguous as possible in communicating the results of their reviews of animal study protocols. We suggest that institutions can do this by adhering to the language of the *Policy* and avoiding use of the words 'approved' and 'approval' to describe the

outcome of any review that is not an unequivocal approval and making it known that no animal work may commence without an unequivocal approval. In addition, the IACUC approval date submitted to PHS agencies as part of a grant application or contract proposal must reflect the date of final approval.

**3. Are the scientists at our institution allowed to use non-pharmaceutical-grade chemical compounds in physiological preparations involving laboratory animals? Please clarify whether this is an allowable practice and whether it makes a difference if the compounds are used in survival versus nonsurvival experiments.**

The use of non-pharmaceutical-grade chemical compounds in experimental animals under certain circumstances has been, and will continue to be, a necessary and acceptable component of biomedical research. OLAW and the USDA have determined that their use should be based on (1) scientific necessity, (2) nonavailability of an acceptable veterinary or human pharmaceutical-grade compound, and (3) specific review and approval by the IACUC[32]. In preparing and reviewing proposals to use non-pharmaceutical-grade products, investigators and IACUCs should consider a number of related animal welfare and scientific issues including safety, efficacy, and the inadvertent introduction of research-complicating variables. Although one can assume that issues such as sterility, pyrogenicity, stability, pharmacokinetics, and quality control have been addressed during the course of producing pharmaceutical-grade drugs, one cannot say the same for substances produced in the research laboratory using non-pharmaceutical-grade chemical compounds. Cost savings alone do not adequately justify the use of non-pharmaceutical-grade compounds in animals. Although the potential animal welfare consequences of complications are less evident in nonsurvival studies, the scientific issues remain the same. The principles and need for professional judgment just outlined still apply.

**4. Because of time constraints and the needs of our investigators, our IACUC reviews some protocols by sending each member a copy and then polling them to determine whether they approve. Is this procedure in compliance with the PHS *Policy* if the IACUC members, at a subsequent full-Committee meeting, are asked to reaffirm their votes? Is this procedure appropriate, and if not, what must we do to correct the situation?**

No. The initial polling of members is not sufficient for approval and initiation of work on animals. Only full Committees or designated members can approve animal study protocols, in accordance with the PHS *Policy* (IV.C.2). IACUC members may use electronic or other forms of polling to call for a full-Committee review, but not to vote[12,17]. Any animal studies undertaken on the basis of approvals resulting from such polling would not be compliant with the PHS *Policy*. Recognizing that urgency may sometimes be an issue in considering animal study protocols, the PHS *Policy* allows for designated review by at least one qualified member, appointed by the IACUC Chair, provided that all other voting members have had an opportunity to request full review and that no member requests a full-Committee review.

**5. Several investigators at our institution wish to use surgically modified anmals in their research but do not want to perform the surgery in-house. We are considering the purchase of such animals and would like to know whether the PHS *Policy* applies to customized surgery peformed at vendor facilities.**

The PHS *Policy* is applicable to all PHS-supported activities involving animals, whether the activities are performed at a PHS agency, an awardee institution, or other institution (PHS *Policy* at I., II., III., and V.B.). OLAW has provided guidance regarding animal use (antibody production) that takes place outside the applicant/assured institution through subgranting or subcontracting[33]. That guidance may also serve as a template for determining whether other activities such as

customized surgery are covered by the PHS *Policy*. In this regard, and with respect to applicability of the PHS *Policy*, a determining issue is whether the surgery is conducted in response to a specific custom request or whether the animals were previously modified and available before the request was made. If an investigator requests that a specific custom surgical procedure or procedures be performed on an animal for use in activities funded by the PHS, then the organization that conducts the procedure(s) is considered a performance site and must either have on file with OLAW an approved Animal Welfare Assurance or be included as a component of the applicant organization's Assurance.

**6. We are a small antibody producer using rabbits, mice, and goats, and our work supports numerous clients, including some funded by the PHS. When we applied for an Assurance, OLAW informed us that we could not approve one 'blanket protocol' to cover all of our antibody production procedures, even though the work is essentially always the same. Please clarify.**

Provisions of the PHS *Policy* apply to all Assured institutions regardless of their size or mission. They include the requirement for the IACUC to "review and approve, require modifications in (to secure approval) or withhold approval of those components of PHS-conducted or supported activities related to the care and use of animals," (PHS *Policy* at IV.B.6.) on a project-specific basis. Consequently, each proposed protocol involving antibody production as well as significant changes (e.g., amendments) to previously approved protocols must be submitted for IACUC review and approval, taking into account the aims of the study and the methods proposed to avoid or minimize pain or distress to the animals (PHS *Policy* at IV.C.1.). For example, reviews of proposed ascites monoclonal antibody production in mice must also critically address alternative (*in vitro*) methods as well as pain and distress issues[6,33]. Another example would be a request for a custom antibody against a

specific protein for the purpose of vaccine development, followed by a request for an antibody against a different protein to be used for the same purpose. In both instances, *Policy* would require either an amendment or a new protocol. As is the case with any new protocol or proposed significant change to a previously approved protocol, the PHS *Policy* allows for either full-Committee or designated-member review. OLAW recognizes that many aspects of antibody production are routine and recommends that institutional Standard Operating Procedures (SOPs) be developed that describe species-specific techniques for immunization, titer determinations, volume blood collection, and associated procedures. One may cite IACUC-approved SOPs in proposed project-specific protocols or proposed amendments to avoid needless repetition. Under these circumstances, it is possible to combine multiple projects, or even multiple investigators, under a single protocol. However, for PHS *Policy* purposes, IACUC approval of each project-specific protocol submission or amendment must be readily identifiable and amenable to tracking.

**7. May a former employee or former student of our institution be considered for appointment to our IACUC as a nonaffiliated member?**

PHS *Policy* (IV.A.3.b.4.) defines the nonaffiliated member as an "individual who is not affiliated with the institution in any way other than as a member of the IACUC, and is not a member of the immediate family of a person who is affiliated with the institution," and the USDA's Animal Welfare Regulations expect the individual to "provide representation for the general community interest[34]." The *Guide*[3], which calls this person the "public member," requires additionally that the individual not be a current laboratory animal user. Regarding the service of a former employee in the capacity of a nonaffiliated member, the appointing official would have to receive assurance that the person is not in any way conflicted or beholden to the institution[35]. If there are no discernable

ties or ongoing affiliation with the institution, then it would be permissible to consider appointment of the former employee or former student to the IACUC. It is important for officials who appoint IACUC members to determine whether real or perceived conflicts of interest exist and make the appropriate choices to avoid criticism about the institution's or the Committee's integrity. Choosing an individual who is unambiguously 'nonaffiliated' is the best way to fulfill the letter and the spirit of this provision.

**8. Our IACUC has encountered a problem with investigators who do not submit their protocols for review in time to gain approval before the three-year expiration date. Is it permissible to grant an administrative extension of IACUC approval so as to avoid expiration?**

No. For PHS purposes, IACUC review following the provisions at IV.C.2. of the PHS *Policy* must be accomplished at least once every three years[1]. The IACUC may not extend the three-year approval by any means other than IACUC review and approval using the procedures of IV.C.2. When IACUC approval expires, it is no longer valid. Continuation of animal activities beyond the expiration is a serious and reportable violation of PHS *Policy*.

**References**

1. Public Health Service. *Policy on Humane Care and Use of Laboratory Animals* (US Department of Health and Human Services, Washington, DC, revised August, 2002).
2. 9 CFR Chapter 1, Subchapter A—Animal Welfare, Parts 1–3.
3. Institute of Laboratory Animal Resources, National Research Council. *Guide for the Care and Use of Laboratory Animals* 8 (National Academy Press, Washington, DC, 1996).
4. ARENA/OLAW. *Institutional Animal Care and Use Committee Guidebook*, 2nd edn (2002). http://grants.nih.gov/grants/olaw/GuideBook.pdf.
5. Silverman, J., Suckow, M.A. & Murthy, S. (eds.) *The IACUC Handbook* (CRC Press, Washington, DC, 2000).
6. Institute for Laboratory Animal Research. *Monoclonal Antibody Production* (National Academy Press, Washington, DC, 1999).

## DON'T MISS A SINGLE ISSUE

**Lab Animal has a new and faster way to renew your free subscription.**

Staying on top of the latest developments in laboratory animal management and care is your top priority, so don't risk missing an issue of Lab Animal! For an easier way to continue enjoying your free subscription, visit us online.

www.labanimal.com

## Back issues of **Lab Animal** contain a wealth of information.



## Fill in the gaps in your reference library.

To order missing issues or to add complete volumes, call today.
Back issues are $9.00 each, postage and handling included.

- Visa, Mastercard, and American Express accepted.

- Quantities are limited and subject to availability.

- For current availability of specific issues call 800-524-0328 or fax 615-377-0525.

### **Lab Animal**
Back Issues Dept.
PO Box 5054
Brentwood, TN 37024

7. Institute for Laboratory Animal Research. *Occupational Health and Safety in the Care and Use of Research Animals* (National Academy Press, Washington, DC, 1997).

8. Division of Animal Welfare, Office for Protection from Research Risks. The PHS responds to commonly asked questions. *ILAR News* **33**, 68–70 (1991).

9. Division of Animal Welfare, Office for Protection from Research Risks. Frequently asked questions about the PHS Policy on Humane Care and Use of Laboratory Animals. *ILAR News* **35**, 47–49 (1993).

10. Wolff, A.V. & Smith, P.D. Compliance at the institutional and programmatic level. *Lab Anim. (NY)* **23**, 28–29 (1994).

11. Potkay, S., Garnett, N.L., Miller, J.G., Pond, C.L. & Doyle, D.J. Frequently asked questions about the PHS Policy on Humane Care and Use of Laboratory Animals. *Lab Anim. (NY)* **24**, 24–26 (1995).

12. Garnett, N. & Potkay, S. Use of electronic communications for IACUC functions. *ILAR J.* **37**, 190–192 (1995).

13. Garnett, N.L. & Schwindaman, D. A note from the NIH and USDA. *Lab Anim. (NY)* **25**, 22–26 (1996).

14. Oki, G.S., Prentice, E .D., Garnett, N.L., Schwindaman, D.F., & Wigglesworth, C.Y. Model for performing institutional animal care and use committee; continuing review of research. *Contemp. Top. Lab. Anim. Sci.* **35**, 33–36 (1996).

15. Potkay, S., Garnett, N.L., Miller, J.G, Pond, C.L. & Doyle, D.J. Frequently asked questions about the PHS Policy on Humane Care and Use of Laboratory Animals. *Contemp. Top. Lab. Anim. Sci.* **37**, 47–50 (1997).

16. Potkay, S. OLAW's compliance oversight: noncompliance with PHS Policy. *Lab Anim. (NY)* **29**, 32–35 (2000).

17. Wolff, A.V. Correct conduct of full-committee and designated-member protocol reviews. *Lab Anim. (NY)* **31**, 28–31 (2002).

18. Alderson, C. & Garnett, N.L. Disaster recovery: "Who ya gonna call?" *Lab Anim. (NY)* **31**, 27–30 (2002).

19. Garnett, N.L. & DeHaven, W.R. OPRR and USDA/Animal Care response on applicability of the animal welfare regulations and the PHS Policy to dead animals and shared tissues. *Lab Anim. (NY)* **26**, 21 (1997).

20. Garnett, N.L. & DeHaven, W.R. A word from the government [IACUC authority]. *Lab Anim. (NY)* **27**, 21 (1998)

21. Garnett, N.L. & DeHaven, W.R. OPRR and USDA commentary [protocol review]. *Lab Anim. (NY)* **27**, 18 (1998).

22. Garnett, N.L. & DeHaven, W.R. The view from USDA and OPRR [suspension authority]. *Lab Anim. (NY)* **27**, 17 (1998).

23. Garnett, N.L. & DeHaven, W.R. A word from OPRR and USDA [protocols and grant applications]. *Lab Anim. (NY)* **28**, 21 (1999).

24. Garnett, N.L. A word from OPRR [protocol extensions]. *Lab Anim. (NY)* **29**, 18–19 (2001).

25. Garnett, N.L. Letter to the editor: innovative but not compliant [electronic protocol review]. *Lab Anim. (NY)* **30**, 15 (2001).

26. Taylor, K. & Wolff, A. Pass the baton [research transfers and pilot studies]. *Lab Anim. (NY)* **30**, 21 (2001).

27. Garnett, N.L. & DeHaven, W.R. A word from OLAW and APHIS [protocol approval]. *Lab Anim. (NY)* **30**, 18–20 (2001).

28. Garnett, N.L. & DeHaven, W.R. A word from OLAW and USDA [IACUC minutes]. *Lab Anim. (NY)* **30**, 21–23 (2001).

29. Garnett, N. & Gipson, C. Letter to the editor: Suggestions to bring electronic protocol system into compliance. *Contemp. Top. Lab. Anim. Sci.* **40**, 8 (2001).

30. Garnett, N.L. A word from OLAW [unapproved animal use]. *Lab Anim. (NY)* **31**, 19–21 (2002).

31. Klemfuss, H. Matching protocols to grant proposals. *Lab Anim. (NY)* **31**, 36–39 (2002).

32. U.S. Department of Agriculture, Animal and Plant Health Inspection Service, Animal Care, Policy 3—Veterinary Care, April 14, 1997.

33. Garnett, N.L & Ellis, G.B Sources of custom antibody production. OPRR Reports, Number 95-02 — February 12, 2001.

34. US Department of Agriculture, Animal and Plant Health Inspection Service, Animal Care, Policy 15, IACUC Membership—Veterinary Care, April 14, 1997.

35. Silverman, J., Suckow, M.A. & Murthy, S. (eds.) *The IACUC Handbook* Section 5:25 (CRC Press, Washington, DC, 2000).